CHARLEY vs. THE UNITED STATES OF AMERICA, et al.  Timothy Boyd Charley
No. 1:22-CV-00033-JB/JFR  May 05, 2023

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
                Case No. 1:22-CV-00033 JB/JFR

 THE ESTATE OF NENA CHARLEY,
 By and Through Personal Representative,
 TIMOTHY CHARLEY, TIMOTHY
 CHARLEY, as Parent and Next Friend of
 NILE CHARLEY, and TIMOTHY CHARLEY, Individually,

                 Plaintiffs,

       v.

 THE UNITED STATES OF AMERICA,
 ROBIN RANELL SALES, R.N., JOELLE
 CATHERIN CERO GO, R.N., AB
 STAFFING SOLUTIONS, LLC, a Foreign
 Corporation, NEXT MEDICAL STAFFING,
 a Foreign Corporation, and JOHN or JANE
 DOE Corporation,

                 Defendants.



               VIDEOCONFERENCE DEPOSITION
                OF TIMOTHY BOYD CHARLEY
                     May 5, 2023
                     10:00 a.m.
                Albuquerque, New Mexico



       PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE,

 this Deposition was:

 TAKEN BY:          JOHN J. CHECKETT, ATTORNEY FOR
                    DEFENDANTS ROBIN RANELL SALES, R.N.,
                    AND NEXT MEDICAL STAFFING


 REPORTED BY:       REBECCA FELLA, RPR
                    NEW MEXICO CCR 534
                    WILLIAMS & ASSOCIATES, LLC
                    317 Commercial Street NE, Suite G-101
                    Albuquerque, New Mexico 87102
```

USA EXHIBIT A

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 2 of 9

Page 2 (Pages 2-5)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.   Timothy Boyd Charley
No. 1:22-CV-00033-JB/JFR   May 05, 2023

## Page 2

```
                APPEARANCES
FOR THE PLAINTIFFS:
      MELANIE BEN
      LISA K. CURTIS
      Curtis & Co. Law Firm
      215 Central Avenue NW, Third Floor
      Albuquerque, New Mexico 87102
      (505) 243-2808
      Melanie@curtislawfirm.org
      Lisa@curtislawfirm.org

FOR DEFENDANT THE UNITED STATES OF AMERICA:
      BRETT EATON
      Office of the US Attorney
      Post Office Box 607
      Albuquerque, New Mexico 87103-0607
      (505) 224-1507
      Brett.Eaton@usdoj.gov

FOR DEFENDANTS ROBIN RANELL SALES, R.N., AND NEXT MEDICAL
STAFFING:
      JOHN J. CHECKETT
      The Checkett Law Firm, PLLC
      6829 North 12th Street
      Phoenix, Arizona 85014
      (480) 272-9100
      Jcheckett@checkett-law.com

FOR DEFENDANTS JOELLE CATHERIN CERO GO, R.N., AND AB
STAFFING SOLUTIONS:

      DENISE M. CHANEZ
      Saiz Chanez Sherrell & Kaemper, P.C.
      5600 Wyoming Boulevard NE, Suite 200
      Albuquerque, New Mexico 87109
      (505) 340-3443
      Dchanez@sclawnm.com
```

## Page 3

```
                    INDEX
DEPONENT:  TIMOTHY BOYD CHARLEY          PAGE
EXAMINATION BY:
     Mr. Checkett ......................   5
     Ms. Ben .........................  110
     Mr. Eaton .......................  171

FURTHER EXAMINATION:
     Mr. Checkett ....................  111
ERRATA SHEET ...........................  201
REPORTER'S CERTIFICATE .................  202

                  EXHIBITS

NO.        DESCRIPTION           IDENTIFIED

Exhibit 1    Calendar for May 2019            25

Exhibit 2    Medical record of 5/28/19        44

Exhibit 3    Note from Navajo Fire            88
             Department
Exhibit 4    Med Star Ambulance record        93
Exhibit 5    Record from Gallup Indian        94
             Medical Center dated 5/28/19

Exhibit 6    Record from Gallup Indian        97
             Medical Center dated 5/29/19
Exhibit 7    Report of Elvina Clark-Joe,     102
             R.S., MPH

Exhibit 8    Questionnaire from Elvina       103
             Clark-Joe, R.S., MPH
Exhibit 9    Deposition transcript of        104
             Elvina Clark-Joe

Exhibit 10   Statement of Nyla Gonzalez      105

Exhibit 11   Statement of Neil Pablo         141

Exhibit 12   Statement of Ned Pablo          105
```

## Page 4

```
Exhibit 13   Statement of Nathan Emerson    107
Exhibit 14   Partial statement of Tim       143
             Charley

Exhibit 15   Workers' compensation documents 108
```

## Page 5

            TIMOTHY BOYD CHARLEY,
having been first duly sworn, testified as follows:
                  EXAMINATION
BY MR. CHECKETT:
   Q. All right. Please state your full name for the record.
   **A. My name is Timothy Charley.**
   Q. And Mr. Charley, have you ever given a deposition before?
   **A. No.**
   Q. All right. Let me go over some ground rules that your attorneys may have gone over with you.
       The first ground rule is, if you don't understand a question that I ask, just make sure you say, John, can you rephrase it, or I don't understand it.
       Can you do that?
   **A. Yes.**
   Q. And you're doing a great job already. From time to time you may feel a question calls for a yes-or-no answer. Just make sure that you say okay or yes or no or whatever you feel is appropriate instead of saying uh-huh or huh-uh or just nodding your head.
       And so if you do that, I'll correct you on the record just so Rebecca can take down what you're saying. I'm not intending to be rude or interrupt you that way,

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 3 of 9

Page 21 (Pages 78-81)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.
No. 1:22-CV-00033-JB/JFR

Timothy Boyd Charley
May 05, 2023

Page 78

1   A. It's --
2   Q. So basically, just to -- go ahead.
3   A. It's just -- go ahead. I'm sorry.
4   Q. All right. So as far as you said she went back
5   with this nurse who poked her head out, you know, to the
6   side and went back, and one of the things they did was
7   take her temperature and weight, you're just saying, hey,
8   that's what they normally do, correct?
9   A. Yes -- ask her questions.
10  Q. Yeah. And so as far as you're -- again, whether
11  it was actually done or not is a different story -- you're
12  guessing that that's what they're doing with Nena when
13  she's with this nurse who poked her head out around the
14  corner, correct?
15  A. Correct.
16  Q. And you're -- you're -- you're guessing that
17  they're -- they're taking vital signs and taking her
18  weight and asking her questions, correct?
19  A. Correct.
20  Q. And so as far as what actually occurs that's
21  going on back there with the nurse -- the person you
22  believe to be the nurse, the white lady -- and Nena, you
23  don't have any knowledge of what was going on back there,
24  do you?
25      MS. BEN: Form.

Page 79

1   A. No.
2   Q. And so basically all it is is you're just
3   sitting out there for approximately 15 minutes while the
4   nurse is going -- while the -- while Nena sees the nurse,
5   and you have no information as to what exactly is
6   occurring with the nurse.
7       Am I correct?
8       MS. BEN: Form.
9   A. Correct.
10  Q. So all you know is that whatever happened
11  between the nurse and Nena, you have no knowledge about
12  that, correct?
13  A. Correct.
14  Q. And that all you know, the next thing that
15  happened was Nena comes back out 15 minutes later after
16  seeing this person who you believe to be the nurse, this
17  white lady, correct?
18  A. Correct.
19  Q. And you have no -- again, you said you really
20  had no conversation with Nena after she got back with you
21  and before she went back with the third person who called
22  through the window.
23      Am I correct?
24  A. Correct.
25      MS. BEN: Form.

Page 80

1   BY MR. CHECKETT:
2   Q. So it's fair to say that you didn't hear
3   anything going on with the nurse back in the -- the room
4   with Nena, correct?
5       MS. BEN: Form.
6   A. Correct.
7   Q. And so as far as whatever conversation that this
8   nurse had with Nena back in the room -- this white nurse
9   around the corner -- you don't know what that was?
10      MS. BEN: Form.
11  A. Just a routine checkup.
12  Q. Okay. But you don't know what they talked
13  about?
14      MS. BEN: Form.
15  A. No.
16  Q. And so you couldn't -- just to make sure, you
17  were not able to hear what the nurse was talking about
18  with Nena.
19      Am I correct?
20      MS. BEN: Form.
21  A. I could hear my wife talk.
22  Q. All right. So you just told me that you didn't
23  know what the conversation was between them.
24      Am I right?
25  A. I don't know what the nurse was --

Page 81

1       MS. BEN: Form.
2   A. -- I couldn't hear the nurse, but I could hear
3   my wife talk.
4   Q. So you're at a point in the waiting room faced
5   away from where your wife was -- wherever she was with the
6   nurse -- and you -- could you hear the nurse?
7       MS. BEN: Form.
8   A. No.
9   Q. And so it's your testimony that the only voice
10  you could hear sitting out in the waiting room facing away
11  from where they were was your wife?
12  A. Yes.
13  Q. And what did you -- what did you -- go ahead.
14  A. Can you repeat the question?
15  Q. All right. What -- so basically without being
16  able to hear the nurse, you're able to hear your wife talk
17  to this nurse around the corner?
18      MS. BEN: Form.
19  A. Yes, I could hear my wife talking.
20  Q. And tell me everything you remember your wife
21  saying to this nurse while you're sitting out there for 15
22  minutes waiting for her to come back from this person who
23  you believe to be the nurse.
24  A. I just noticed that she was explaining her
25  symptoms, how she's feeling.

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 4 of 9

Page 22 (Pages 82-85)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.
No. 1:22-CV-00033-JB/JFR

Timothy Boyd Charley
May 05, 2023

Page 82

1  Q. And what else?
2  A. She just told her that -- how she felt,
3  headache, a little feverish, and then it's just like a
4  thing I could hear.
5  Q. All right. So what I want you to do is tell me
6  everything you remember, you know, details of what you
7  heard your wife say while she's with this nurse -- person
8  who you believe to be a nurse during that 15 minutes.
9      What -- what did -- what did your wife say?
10     MS. BEN: Form.
11 A. I could hear her explaining her -- how she felt,
12 headache. And I couldn't hear the nurse because I guess
13 my wife was a little bit louder, but that was about it.
14 It's more that -- how she felt and headache, fever.
15 Q. Okay. And so --
16 A. I guess that's when the nurse was --
17 Q. And so -- go ahead.
18 A. I guess that's when the nurse was asking her on
19 why she was there.
20 Q. And so in response to my question to everything
21 you heard, was that all you heard from your wife while she
22 was back with this person who you believe to be a nurse?
23     MS. BEN: Form.
24 A. Yes.
25 Q. Did you hear anything else?

Page 83

1  A. No.
2     MS. BEN: Form.
3  BY MR. CHECKETT:
4  Q. So basically while your wife is back there 15
5  minutes with the nurse, you -- you heard your wife say
6  that she had a headache and she was feverish, and that's
7  about all you heard?
8     MS. BEN: Form.
9  A. Oh, let's see. Yes.
10 Q. All right. So if -- and again, Mr. Charley, I'm
11 just trying to give you every chance to answer that
12 question as far as what you specifically recall your wife
13 said to the nurse.
14    When she's back there with this person who you
15 believe to be a nurse for 15 minutes, the only thing that
16 you can recall as you sit here today is that you heard
17 your wife say to this person who was a nurse that she had
18 a headache and she was feverish; is that correct?
19    MS. BEN: Form.
20 A. Correct.
21 Q. And so as far as -- you cannot recall -- outside
22 of your wife -- hearing your wife say that she had a
23 headache and was feverish, you cannot recall anything else
24 that you heard your wife say during the entire time that
25 your wife is back with the person who you believe to be

Page 84

1  the nurse, the white lady who poked her head around the
2  corner.
3     Am I correct?
4     MS. BEN: Form.
5  A. Correct.
6  Q. So then after you're sitting out there waiting
7  for 15 minutes, all you hear your wife say in the
8  background is that she has a headache and felt feverish.
9     She then -- your wife then comes back out 15
10 minutes later and sits with you, correct?
11 A. Correct.
12 Q. And then she -- a third person then takes her --
13 calls her name and takes her back.
14    Does she go to the right of the window when the
15 third person calls her from the window?
16 A. The left.
17 Q. The left, okay. And you didn't see or hear
18 anything else about your wife until she came out
19 approximately 30 minutes later, correct?
20 A. Correct.
21 Q. And that's when you left, correct?
22 A. Yes.
23 Q. So -- so really the only -- the only
24 conversation that you heard between your wife and someone
25 from the hospital while you were in the waiting room, the

Page 85

1  only person -- the only conversation you heard was that
2  your wife told the nurse she had a headache and was
3  feverish.
4     Am I right?
5     MS. BEN: Form.
6  A. Correct.
7  Q. I'm sorry?
8  A. Correct.
9  Q. And you don't recall your wife saying anything
10 else; is that right?
11    MS. BEN: Form.
12 A. Correct.
13 Q. And then outside of complaining about a headache
14 and fever, you hear nothing else from your wife to a
15 hospital person while you're in the waiting room before
16 she goes back, correct?
17 A. Correct.
18 Q. Let me see. I'm going to share screen with you
19 here. This is going to be Exhibit 2 -- we kind of started
20 to go down this -- and this is the triage, meaning the --
21 the initial examination with a nurse just outside the
22 waiting room.
23    And the -- the nurse -- this is -- and again,
24 let me preface this. This is a medical record which you
25 did not author. I will ask you questions if you remember

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 5 of 9

Page 23 (Pages 86-89)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.
No. 1:22-CV-00033-JB/JFR

Timothy Boyd Charley
May 05, 2023

Page 86

1  any of, you know, your -- your wife or you heard anything.
2      But essentially here did your wife -- she
3  complained of headaches; is that right?
4      A.  Yes.
5      Q.  And you heard her tell that to the -- the nurse
6  who -- the white lady who poked her head around the
7  corner, correct?
8      A.  Yes.
9      Q.  And then you see temp here.  It says 99.5.
10     You heard your wife say that she felt feverish
11 when she's talking with that nurse around the corner, the
12 white lady --
13     A.  Yes.
14     Q.  -- correct?
15     A.  Correct.
16     Q.  And you didn't hear -- and -- and besides those
17 two things, you didn't hear anything else your wife talked
18 about with that nurse who poked her head out around the
19 corner and she was back with for 15 minutes.
20     Am I correct?
21     MS. BEN:  Objection; form.
22     A.  Correct.
23     Q.  Then I'll show you -- this is still Exhibit 2 --
24 a record from -- so this is the triage record that I'm
25 showing you on pages 3 and 4.

Page 87

1      And then on page 5, your -- your -- your wife
2  goes back -- you know, once she saw the person at the --
3  at the window, she sees the person around the corner for
4  15 minutes, and then goes back into the ER, there was
5  another nurse by the name of Nurse Go -- and I'm pointing
6  to page 6 of 6 -- G-o.
7      You don't know or didn't hear anything that
8  happened back in the room once your wife was taken back
9  after the third person said Nena Charley, correct?
10     A.  Correct.
11     Q.  And then your wife then sees -- this is still
12 Exhibit 2, and I'm just showing the names on things.
13     Your wife ultimately then saw a doctor by the
14 name of Dr. Leach.  As far as -- and he's a male -- as far
15 as -- Robert Leach.
16     As far as what your wife said to Dr. Leach, you
17 couldn't hear what was going on with them in the ER during
18 that first visit.
19     Am I correct?
20     A.  It's not the ER -- it's the walk-in clinic --
21 and no, I can't hear because it's --
22     Q.  Okay.
23     A.  -- it's --
24     MR. CHECKETT:  Then what I'm going to do is show
25 you Exhibit 3.

Page 88

1      (Exhibit No. 3 marked.)
2  BY MR. CHECKETT:
3      Q.  And this is the Navajo Fire Department, and it's
4  on page 3 of that exhibit, which is -- it's got a Bates
5  number 0005.
6      And it's -- it's -- basically what happened was
7  you and your wife leave the ER; after, you know, the 30
8  minutes she comes out, and you guys drive home, correct?
9      A.  Yes.
10     Q.  And then sometime the next morning do you go to
11 work?
12     You know, you leave for work before 9:00 to get
13 to work on -- let me show you Exhibit 1 again.
14     You go to work sometime around 9:00 a.m. on
15 Tuesday, the 28th, correct?
16     A.  Correct.
17     Q.  All right.  And then going back to Exhibit 3,
18 which is the -- the Navajo Fire Department -- well, let me
19 back up.
20     Mr. Charley, do you know what time you got to
21 work on Tuesday, May 28th, 2019?
22     A.  9:00.
23     Q.  Okay.  And do you have any like punch cards that
24 you punch in with or are you just -- again, you just go
25 and you've worked there for 25 years and you go and get

Page 89

1  there at 9:00?
2      A.  It was ID scan.
3      Q.  I see.  Got it.  Before you left for work on the
4  morning -- you know, so you'd been to the ER earlier in
5  the morning on the 28th.
6      Before you left for work later in the morning on
7  the 28th to get to work at 9:00, do you recall any
8  conversations with Nena how she was doing or was she
9  sleeping?
10     A.  She was --
11     COURT REPORTER:  I'm sorry?
12     THE WITNESS:  She was up.
13     COURT REPORTER:  I couldn't hear you.  Could you
14 start over, please?
15     THE WITNESS:  She was up.
16     Q.  And how -- how was she feeling?
17     MS. BEN:  Form.
18     A.  Oh, she was telling me that she -- oh, she -- I
19 remember she was saying -- she was sitting on the edge of
20 the bed telling me she had a cough.
21     Q.  Was she able to -- you know, after getting back
22 from the ER earlier in the morning, you know, around 1:00
23 or 2:00 in the morning, was she able to sleep throughout
24 the night or she was up and down throughout the night?
25     A.  She could sleep.  She was smiling.  She was --

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 6 of 9
Page 26 (Pages 98-101)
CHARLEY vs. THE UNITED STATES OF AMERICA, et al.
No. 1:22-CV-00033-JB/JFR
Timothy Boyd Charley
May 05, 2023

Page 98

1  on May 29th about the circumstances of your wife's
2  passing?
3  **A. Yes, I did, but I don't remember her name.**
4  Q. Okay.
5  **A. I think --**
6  Q. Basically you gave her -- go ahead.
7  **A. Ms. Joe, I think, was her name. That's the one**
8  **I talked to.**
9  Q. And say that name again?
10 **A. Ms. Joe.**
11 Q. Ms. Joe, okay. Oh, yeah, you spoke with Ms. Joe
12 later, okay, and I'll pull that one up, you know, next.
13      Do you recall telling -- do you recall telling
14 the history of what you were aware of to a nurse at GIMC
15 regarding your wife's condition and what you were aware
16 of?
17      MS. BEN: Form.
18 **A. I don't remember.**
19 Q. During this conversation, it says -- and this is
20 the nurse's note. I'll just read it to you.
21      Monday she -- you were talking about Nena --
22 Monday she felt okay. She got a headache and laid down.
23      Tuesday morning she was talking away. She
24 stated she is feeling hungry, and she felt like finally
25 going to the restroom, and he told her maybe because she

Page 99

1  was not eating much before.
2       Tuesday morning she sat on the side of the bed
3  and started coughing and said her throat was itching.
4       My question to you is, on Tuesday morning, when
5  you went to work, that's when Nena was telling you that
6  she had some coughing; is that right?
7  **A. Yeah. When we came back from the hospital that**
8  **morning she -- she had a cough.**
9  Q. All right. And then it says you went to work --
10 you know, this is Tuesday morning -- and got a call around
11 10:00 a.m. from your son and told you that they are taking
12 his mother -- your son -- you know, Nile's mom -- in the
13 ambulance to the hospital.
14      He left work and came right away to meet them by
15 the road.
16      Do you remember -- again, that's what you told
17 us before, Nile had called you, and you went to meet the
18 ambulance, right?
19 **A. Yes.**
20 Q. Okay. In her note the nurse writes, she --
21 patient -- was admitted to ER after being taken there by
22 the ambulance, and he was listening to her telling them
23 that she clean up the mouse dropping at work.
24      She kept telling them that she cannot breathe.
25 They kept getting blood from her, x-ray back and forth,

Page 100

1  and she was still talking.
2       Do you remember telling a nurse at GIMC, you
3  know, on the day your wife passed that once she got -- the
4  ambulance took her to GIMC around 10:00, 10:30 on
5  May 28th, that you heard your wife telling the providers
6  about the mouse droppings?
7       MS. BEN: Objection; form.
8  **A. I don't remember.**
9  Q. Okay. This nurse goes through and kind of takes
10 you through the history of events.
11      She does not write that you -- you heard your
12 wife tell about the mouse droppings anytime before your
13 wife is admitted to the ER after being brought by the
14 ambulance.
15      Do you agree with that?
16      MS. BEN: Form.
17 **A. Can you repeat that question?**
18 Q. Okay. You're -- this nurse writes that you
19 heard -- the first time you heard your wife talk about
20 mouse droppings was at the second ER visit.
21      Did you tell someone during the second -- did
22 you tell this nurse during the second ER visit, that's
23 when you heard your wife talking about mouse droppings?
24      MS. BEN: Form.
25 **A. Yes.**

Page 101

1       THE WITNESS: Can I take a break?
2       MS. BEN: Can we take a break, John?
3       MR. CHECKETT: Just let me finish two more
4  questions, then I'll move off this exhibit. Just two --
5  two minutes?
6       MS. BEN: Are you okay with that, Tim?
7       THE WITNESS: Yeah.
8       MS. BEN: Okay. Go ahead.
9       THE WITNESS: Yes.
10 BY MR. CHECKETT:
11 Q. All right. And then -- then basically what
12 happened is, after you -- after this nurse writes that you
13 heard your wife telling the staff when she's admitted to
14 the ER after being taken by the ambulance at about 10:00,
15 10:30 in the morning, that after you -- you know, they did
16 the -- the blood test and she's talking about mouse
17 droppings, that's when they took her to the Albuquerque
18 hospital; is that right?
19      MS. BEN: Form.
20 **A. Yes.**
21      MR. CHECKETT: Why don't we go ahead and -- and
22 take our break. It's 11:52 here in Arizona and 12:52 your
23 time, so we'll take a ten-minute break.
24      (Recess was held from 12:52 p.m. until
25 1:13 p.m.)

Case 1:22-cv-00033-JB-JFR Document 209-1 Filed 10/12/23 Page 7 of 9

Page 27 (Pages 102-105)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.
No. 1:22-CV-00033-JB/JFR

Timothy Boyd Charley
May 05, 2023

Page 102

1  MR. CHECKETT: It is 12:13 -- 1:13 New Mexico
2  time.
3  BY MR. CHECKETT:
4  Q. Mr. Charley, I just have a number of things I
5  need to finish up with you here.
6  Let me share screen here with you, and --
7  A. Excuse me.
8  Q. -- can you --
9  A. Excuse me. I would like to go back to that
10 first night. I would like to add on some words.
11 Q. And -- and again, let me -- and I know we're on
12 the record and you're saying that -- let me go ahead -- I
13 will ask my questions. If your attorney needs to clarify,
14 then she can.
15 MR. CHECKETT: What I want to do is, at this
16 time, as far as Exhibit Number -- let's see. It's --
17 Exhibit Number 7 is Elvina Clark-Joe -- this is her
18 report.
19 (Exhibit No. 7 marked.)
20 BY MR. CHECKETT:
21 Q. Did you -- did you speak with Elvina Clark-Joe
22 from the Department of Health and Human Services about
23 hantavirus and kind of -- well, do you remember speaking
24 with her?
25 A. Yes.

Page 103

1  Q. And then are you aware that she did a report?
2  A. Yes.
3  Q. And you're aware that Elvina Clark-Joe is an
4  individual who investigated the circumstances of your
5  wife's death from a sanitarian perspective, correct?
6  A. Yes.
7  MR. CHECKETT: And then she also -- Exhibit
8  Number 8 -- she also -- Elvina Clark-Joe, this is an
9  individual questionnaire that she filled out.
10 (Exhibit No. 8 marked.)
11 BY MR. CHECKETT:
12 Q. She interviewed you and filled in some stuff
13 in -- in a questionnaire; is that correct?
14 A. Yes.
15 Q. Did you -- and the questionnaire is 14 pages.
16 Is this something that -- this is -- is this
17 your handwriting on page 1?
18 A. Yes.
19 Q. Again, I just want to make sure.
20 Or is this Ms. Clark-Joe's handwriting as she's
21 taking down your answers?
22 A. Oh, not -- not the questions, no, not that one.
23 Q. Okay. So the checked boxes, that's not your
24 writing on page 2?
25 A. No. That's when she was asking me questions.

Page 104

1  Q. Okay. And then the name of person involved on
2  page 1, where it says Charley, first name Timothy, and the
3  address and everything, is this your writing in Section 2?
4  A. No. My handwriting is different.
5  Q. All right. So this questionnaire, based upon
6  your perspective, most likely Ms. Joe was -- Ms. Clark-Joe
7  was asking you questions and taking down -- writing things
8  down, correct?
9  A. Yes.
10 MR. CHECKETT: So then Exhibit Number 9 --
11 again, I'm not going to -- at least at this point.
12 (Exhibit No. 9 marked.)
13 BY MR. CHECKETT:
14 Q. Were you aware that Ms. Clark-Joe was deposed?
15 A. Can you --
16 MS. BEN: Form.
17 BY MR. CHECKETT:
18 Q. Okay. Let me ask a better question.
19 Do you know if Ms. Clark-Joe had taken down --
20 had given testimony under oath like you're doing today?
21 Did you know that one way or the other?
22 But don't tell me if you've discussed it with
23 your attorneys.
24 A. I don't know.
25 MR. CHECKETT: Okay. Exhibit 10.

Page 105

1  (Exhibit No. 10 marked.)
2  BY MR. CHECKETT:
3  Q. Nyla Gonzalez -- Nyla is your sister-in-law,
4  right?
5  A. Yes.
6  Q. And were you aware she gave a transcribed
7  statement in this case? Were you aware one way or the
8  other?
9  And don't tell me anything you talked about with
10 your attorney.
11 MS. BEN: Form.
12 A. I don't know.
13 Q. And then were you aware -- and again, I don't
14 want to know anything you talked about with your
15 attorney -- that Neil -- Neil Pablo -- I believe your
16 brother-in-law -- had given a transcribed statement in
17 this case?
18 MS. BEN: Form.
19 A. I don't know.
20 MR. CHECKETT: Exhibit 12.
21 (Exhibit No. 12 marked.)
22 BY MR. CHECKETT:
23 Q. Were you aware -- Exhibit 12 is a statement by
24 Ned Pablo.
25 Were you aware -- and don't tell me anything you

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 8 of 9

Page 29 (Pages 110-113)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.  
No. 1:22-CV-00033-JB/JFR

Timothy Boyd Charley  
May 05, 2023

Page 110

1  MR. CHECKETT: Again, I don't have any further
2  questions.
3      I guess, Melanie, if you want to do a
4  question-and-answer format, that's -- that's fine.
5              EXAMINATION
6  BY MS. BEN:
7  Q.  Okay. Mr. Charley, did you want to add anything
8  to your statement based on your visit to GIMC during that
9  first visit?
10 A.  Yes.
11     MR. EATON: Objection to form.
12     MR. CHECKETT: And foundation.
13     Go ahead.
14 BY MS. BEN:
15 Q.  Can you please tell me what that is?
16 A.  Yes. I could hear the -- this faded
17 conversation between the nurse and my wife that night,
18 because we were facing away from the room, back this way.
19 She was behind me.
20     There was only two persons -- two -- a couple
21 sitting in front of us, and I could kind of hear what
22 they're saying.
23     I remember her saying that -- she asked her what
24 kind of job she was doing, and she told her that -- she
25 told her she cleaned dirty, dusty shelves and mouse

Page 111

1  droppings that night.
2      The -- the hospital wasn't busy. It was
3  quiet and just the two couples, and just the nurse and the
4  custodians were walking back and forth.
5      And that's what I remember that night.
6      MS. BEN: Okay. Thank you, Mr. Charley. I'll
7  probably have some questions later.
8      John, do you mind stopping the share screen?
9      MR. CHECKETT: Oh, sure. Sorry about that.
10     MS. BEN: I'll have more questions later. If
11 anyone wants to ask Mr. Charley some questions.
12     MR. CHECKETT: You know what? Let me -- let me
13 follow up on that.
14          FURTHER EXAMINATION
15 BY MR. CHECKETT:
16 Q.  Mr. Charley, you know, we've been -- we are
17 almost three and a half hours into this deposition, and
18 your attorney just asked you for -- you to clarify
19 something that happened at the first ER visit just about
20 one minute ago; is that correct?
21 A.  Yes.
22 Q.  Okay. I'd asked -- going back to Exhibit
23 Number 6, now you're telling us -- after Ms. Ben's
24 questions here -- that you heard something from your wife
25 about her telling the nurse -- I assume it's the nurse --

Page 112

1  in the first ER visit -- the one who poked her head around
2  the corner -- about mouse droppings.
3      Is that right? Is that what your testimony is
4  now?
5  A.  Yes.
6  Q.  All right. My question more directly to you is,
7  in your conversation on May 29th, 2019, with Nurse Smith,
8  isn't it true that you never mentioned that you heard any
9  reference to mouse droppings by your wife during the first
10 ER visit? Am I correct?
11     MS. BEN: Objection; form.
12 A.  It was rodent droppings.
13     COURT REPORTER: It was what? I'm sorry. Could
14 you say that again?
15     THE WITNESS: Rodent droppings. Mice droppings,
16 yes.
17 BY MR. CHECKETT:
18 Q.  Wait. So my question to you is, isn't it true
19 that you did not tell Nurse Smith on May 29th, 2019, that
20 you heard your wife talk about mouse droppings in the
21 first ER visit? Isn't that true?
22     MS. BEN: Form.
23 A.  Me talking to the nurse?
24 Q.  Right. You -- in Exhibit -- let me share the
25 screen with you -- let me share the screen with you, and

Page 113

1  I'll -- and I'll -- you'll probably get to understand a
2  little bit better what I'm trying to ask, because maybe
3  I'm doing it unartfully.
4      In Exhibit Number 6 there is a nurse by the name
5  of Corrina Smith who, on May 29th, 2019, had a
6  conversation with you.
7      Do you see that in Exhibit 6?
8  A.  (No response.)
9  Q.  It says, contact with family member: patient
10 spouse/Tim Charley.
11     Do you see what I'm referencing?
12     MS. BEN: John, may -- if I could just throw out
13 a suggestion. If you just reference it to first visit
14 versus second visit, that might help.
15     MR. CHECKETT: First and second, okay. Okay.
16 That's fine.
17 BY MR. CHECKETT:
18 Q.  So Mr. Charley, what we're going to do is
19 reference the first ER visit as the one at, you know, 1:00
20 in the morning at GIMC, and the second ER visit as the
21 one, you know, where she's taken by ambulance at
22 10:00 a.m. to GIMC.
23     Do you -- do you understand that or are you
24 following me there?
25     MS. BEN: John, I'm trying -- I'm just trying to

Case 1:22-cv-00033-JB-JFR   Document 209-1   Filed 10/12/23   Page 9 of 9

Page 52 (Pages 202-203)

CHARLEY vs. THE UNITED STATES OF AMERICA, et al.  Timothy Boyd Charley
No. 1:22-CV-00033-JB/JFR  May 05, 2023

Page 202

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW MEXICO
 2            Case No. 1:22-CV-00033 JB/JFR
 3   THE ESTATE OF NENA CHARLEY,
      By and Through Personal Representative,
 4   TIMOTHY CHARLEY, TIMOTHY
      CHARLEY, as Parent and Next Friend of
 5   NILE CHARLEY, and TIMOTHY CHARLEY, Individually,
 6           Plaintiffs,
 7      v.
 8   THE UNITED STATES OF AMERICA,
      ROBIN RANELL SALES, R.N., JOELLE
 9   CATHERIN CERO GO, R.N., AB
      STAFFING SOLUTIONS, LLC, a Foreign
10   Corporation, NEXT MEDICAL STAFFING,
      a Foreign Corporation, and JOHN or JANE
11   DOE Corporation,
12           Defendants.
13            REPORTER'S CERTIFICATE
14      I, REBECCA FELLA, RPR, NM CCR 534, DO HEREBY CERTIFY
15   that on May 5, 2023, the Deposition of TIMOTHY BOYD
16   CHARLEY was taken before me at the request of, and sealed
17   original thereof retained by:
18      FOR DEFENDANTS ROBIN RANELL SALES, R.N. AND
         NEXT MEDICAL STAFFING
19      JOHN J. CHECKETT
         The Checkett Law Firm, PLLC
20      6829 North 12th Street
         Phoenix, Arizona 85014
21
22      I FURTHER CERTIFY that copies of this Certificate
23   have been mailed or delivered to all Counsel, and parties
24   to the proceedings not represented by counsel, appearing
25   at the taking of the deposition.
```

Page 203

```
 1      I FURTHER CERTIFY that examination of this transcript
 2   and signature of the witness was requested by the witness
 3   and all parties present. On May 8, 2023, a letter was
 4   mailed or delivered to Melanie Ben regarding obtaining
 5   signature of the witness, and corrections, if any, were
 6   appended to the original and each copy of the Deposition.
 7      I FURTHER CERTIFY that the recoverable cost of the
 8   original and one copy of the Deposition, including
 9   exhibits, to JOHN J. CHECKETT is $
10      I FURTHER CERTIFY that I did administer the oath to
11   the witness herein prior to the taking of this Deposition;
12   that I did thereafter report in stenographic shorthand the
13   questions and answers set forth herein, and the foregoing
14   is a true and correct transcript of the proceeding had
15   upon the taking of this Deposition to the best of my
16   ability.
17      I FURTHER CERTIFY that I am neither employed by nor
18   related to nor contracted with (unless excepted by the
19   rules) any of the parties or attorneys in this case, and
20   that I have no interest whatsoever in the final
21   disposition of this case in any court.
22
23             [signature: Rebecca Fella]
                REBECCA FELLA, RPR
24              New Mexico CCR 534
                License expires 12/31/2023
25
```