# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TIMOTHY CHARLEY, individually, as
personal representative of the ESTATE OF
NENA CHARLEY, and as parent and next
friend of NILE CHARLEY,

       Plaintiff,

vs.                                        No. CIV 22-0033 JB/JFR

THE UNITED STATES OF AMERICA;
ROBIN RANELL SALES, R.N.; JOELLE
CATHERIN CERO GO, R.N.; AB STAFFING
SOLUTIONS, LLC, a Foreign Corporation;
NEXT MEDICAL STAFFING, a Foreign
Corporation, and JOHN OR JANE DOE
CORPORATION,

       Defendants.

## MEMORANDUM OPINION[1]

    **THIS MATTER** comes before the Court on: (i) Defendant United States' Motion to

---

[1]On March 31, 2025, the Court entered an Order. See Order at 1 (Doc. 318). In the Order, the Court: (i) grants the Defendant United States' Motion to Exclude the Testimony of Bruce W. Polsky For Failure to Appear at his Court-Ordered Deposition, filed November 7, 2023 (Doc. 221); (ii) denies the Plaintiffs' Motion for Reconsideration of the Court's Order Granting Defendant United States' Motion to Exclude Dr. Polsky as an Expert (Doc. 221), filed November 30, 2023 (Doc. 228); (iii) grants the Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion for Summary Judgment, filed December 8, 2023 (Doc. 233); (iv) grants the Defendants Robin Ranell Sales, R.N. and Next Medical Staffing's Motion for Summary Judgment, filed December 8, 2023 (Doc. 234); (v) grants the United States' Motion for Summary Judgment for Lack of Causation on Plaintiffs' Loss of Chance Claim, filed December 8, 2023 (Doc. 235); (vi) denies the Plaintiffs' Amended Motion for Leave to Re-Depose Larry Lybbert Nurse Educator, filed June 24, 2024 (Doc. 267); (vii) denies the Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment [Doc. 233] and [Doc. 234], filed July 18, 2024 (Doc. 272); (viii) denies the Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion to Strike Michelle Harkins, M.D.'s Affidavit, filed August 12, 2024 (Doc. 282), but holds that the Court will not consider the Harkins Aff. in determining whether there is a genuine issue of material fact; and (ix) denies the Plaintiffs' Amended Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant United States' Motion for

Exclude the Testimony of Bruce W. Polsky For Failure to Appear at his Court-Ordered Deposition, filed November 7, 2023 (Doc. 221)("Exclusion Motion"); (ii) Plaintiffs' Motion for Reconsideration of the Court's Order Granting Defendant United States' Motion to Exclude Dr. Polsky as an Expert (Doc. 221), filed November 30, 2023 (Doc. 228)("Exclusion Reconsideration Motion"); (iii) Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion for Summary Judgment, filed December 8, 2023 (Doc. 233)("Go MSJ"); (iv) Defendants Robin Ranell Sales, R.N. and Next Medical Staffing's Motion for Summary Judgment, filed December 8, 2023 (Doc. 234)("Sales MSJ"); (v) the United States' Motion for Summary Judgment for Lack of Causation on Plaintiffs' Loss of Chance Claim, filed December 8, 2023 (Doc. 235)("USA MSJ"); (vi) Plaintiffs' Amended Motion for Leave to Re-Depose Larry Lybbert Nurse Educator, filed June 24, 2024 (Doc. 267)("Lybbert Motion"); (vii) Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment [Doc. 233] and [Doc. 234], filed July 18, 2024 (Doc. 272)("First Relief Motion"); (viii) Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion to Strike Michelle Harkins, M.D.'s Affidavit, filed August 12, 2024 (Doc. 282)("Harkins Motion"); and (ix) Plaintiffs' Amended Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant United States' Motion for Summary Judgment [Doc. 235], filed October 10, 2024, (Doc. 296)("Second Relief Motion").  The Court held hearings on November 14, 2023, see Clerk's Minutes at 1, filed November 14, 2023

---

Summary Judgment [Doc. 235], filed October 10, 2024, (Doc. 296).  See Order at 25-26.  The Court also states in the Order that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

(Doc. 231)("November Minutes"), on January 5, 2024, <u>see</u> Clerk's Minutes at 1, filed January 5, 2024 (Doc. 259)("January Minutes"), and on August 13, 2024, <u>see</u> Clerk's Minutes at 1, filed August 13, 2024 (Doc. 288)("August Minutes").  The primary issues are: (i) whether the Court should exclude the report and testimony of the Plaintiffs' causation expert witness, Dr. Bruce Polsky, because Dr. Polsky did not appear for a court-ordered deposition and did not comply with the Court's order to provide dates for his in-person deposition in Albuquerque, New Mexico; (ii) whether the Court should grant the Go MSJ, the Sales MSJ, and the USA MSJ, because the Plaintiffs cannot point to evidence to meet their burden of production as to causation, an essential element of a New Mexico State medical malpractice claim; (iii) whether the Court should permit the Plaintiffs to depose the Gallup Indian Medical Center's Chief Nurse Educator, Larry Lybbert, a second time, because he did not bring his computer with him the first time and, thus, did not have access to certain documents about which the Plaintiffs wish to question him; (iv) whether the Court should grant the First Relief Motion, because the Plaintiffs purport to present new evidence that raises a genuine dispute of material fact about the adequacy of hantavirus training at Gallup Indian Medical Center ("Gallup Medical"); (v) whether the Court should strike the Affidavit of Michelle Harkins, M.D. (signed May 15, 2024), filed July 18, 2024 (Doc. 272-1)("Harkins Aff."), which the Plaintiffs attach as an exhibit to the Relief Motion, because the Plaintiffs' disclosure of the Harkins Aff. allegedly violates rule 26(a)(2) of the Federal Rules of Civil Procedure; and (vi) whether the Court should grant the Second Relief Motion, because the Plaintiffs purport to present new evidence that raises a genuine dispute of material fact about causation.  The Court concludes that: (i) the Court will exclude Dr. Polsky's expert report and testimony pursuant to rule 37(b)(2)(A)(ii) of the Federal Rules of Civil Procedure, because the Plaintiffs' expert witness

did not comply with the Court's order setting his deposition, and the Plaintiffs did not comply with the Court's order to provide dates for a deposition in Albuquerque, New Mexico; (ii) no disputes of material fact remain and the United States, Sales, Go, AB Staffing Solutions, LLC, and Next Medical Staffing are entitled to judgment as a matter of law, because the Plaintiffs do not have expert evidence to prove the necessary causation element of their medical malpractice claims; (iii) the Plaintiffs are not entitled to depose Lybbert a second time, because they could have, but did not, serve him a subpoena duces tecum directing him to produce specific training materials; (iv) after considering the Relief Motions, the Court concludes that summary judgment remains warranted, because the Relief Motions do not advance admissible causation testimony; and (v) the Court does not consider the Harkins Aff., because the deadline for expert disclosures has passed. Accordingly, the Court: (i) grants the Exclusion Motion; (ii) denies the Exclusion Reconsideration Motion; (iii) grants the USA MSJ, the Go MSJ, and the Sales MSJ; (iv) denies the Lybbert Motion; (v) denies the First Relief Motion; (vi) denies the Second Relief Motion; and (vii) denies the Harkins Motion but will not consider the Harkins Aff. in determining whether there is a genuine issue of material fact.

## **FACTUAL BACKGROUND**

This opinion focuses on the parties' arguments about procedural matters and, in particular, the Court's decision to exclude the Plaintiffs' causation expert, Dr. Polsky. The Court includes a short Factual Background section that summarizes this case's underlying facts by describing N. Charley's illness, treatment, and eventual death. The Court takes this factual summary from the Plaintiffs' First Amended Complaint to Recover Damages for Wrongful Death and Loss of Consortium Arising From Medical Negligence, filed October 13, 2022 (Doc. 63)("Amended

Complaint").

Around 1:00 a.m. on May 28, 2019, N. Charley checks in to Gallup Medical's emergency room, in Gallup, New Mexico, complaining about fever, elevated blood pressure, elevated heart rate, body aches, a cough, a headache, a loss of appetite, and exposure to mouse droppings. See Amended Complaint ¶ 3, at 2. Nurses Go and Sales interact with N. Charley before Robert Leach, D.O., sees N. Charley. See Amended Complaint ¶¶ 4-6, at 2. Dr. Leach misdiagnoses N. Charley with acute viral syndrome, and she is discharged roughly an hour after her arrival at the emergency room. See Amended Complaint ¶¶ 9-10, at 2.

Several hours later, at 10:27 a.m., N. Charley returns to Gallup Medical in an ambulance "with more severe symptoms." Amended Complaint ¶ 14, at 3. A different doctor, Logan Bradley, evaluates N. Charley, and orders a complete blood count test -- "CBC" -- the results of which lead him to suspect hantavirus. Amended Complaint ¶¶ 17-20. Dr. Bradley calls a doctor at the University of New Mexico Intensive Care Unit, and explains N. Charley's deteriorating respiratory condition and the test results. See Amended Complaint ¶ 21, at 3. The University of New Mexico doctor dispatches a helicopter to Gallup Medical to pick up N. Charley. See Amended Complaint ¶ 22, at 3. N. Charley's condition worsens, and, after the helicopter picks her up and transports her to the University of New Mexico, she passes away in the morning of May 29, 2019. See Amended Complaint ¶¶ 27-29, at 4.

## PROCEDURAL BACKGROUND

The Procedural Background's first section consists of the undisputed material developments corresponding to the three motions for summary judgment. In the Procedural Background's second section, the Court makes findings of fact pertaining to the events that lead

to the Court excluding Dr. Polsky.  Because the undisputed material developments and the events that lead to the Court excluding Dr. Polsky are developments and events that occur after the Plaintiffs file suit and begin this litigation, the Court includes its discussion of these developments and its findings of fact regarding these events in the Procedural Background section.  Finally, the Procedural Background's third section summarizes the briefs and the hearings at issue in this opinion.

In this first section, which pertains to the summary judgment motions, the statements that the Court deems undisputed for this opinion's purposes go above the line, and in the text.  The Court explains its reasoning regarding each disputed action, or purportedly disputed action, below the line, in the footnotes.  The Court takes its statements from the USA MSJ, the GO MSJ, the Sales MSJ, the Plaintiffs' Response in Opposition to Defendant United States' Motion for Summary Judgment for Lack of Causation on Plaintiffs' Loss of Chance Claim, filed January 3, 2024 (Doc. 246)("USA MSJ Response"), Plaintiffs' Response in Opposition to Defendants' Robin Ranell Sales, RN and Next Medical Staffing's Motion for Summary Judgment, filed January 3, 2024 (Doc. 247)("Sales MSJ Response"), Plaintiffs' Response in Opposition to Defendants' Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion for Summary Judgment, filed January 3, 2024 (Doc. 248)("Go MSJ Response"), the Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Reply in Support of Their Motion for Summary Judgment, filed January 4, 2024 (Doc. 251)("Go Reply"), and Defendants Sales and Next Medical Staffing's Joinder in Defendants Joelle Catherine Cero Go, RN and AB Staffing Solutions, LLC's Reply in Support of Their Motion for Summary Judgment, filed January 5, 2024 (Doc. 253)("Sales Joinder").  The motions for summary judgment present largely the same statements.  Accordingly,

the Court indicates with its citations whether a statement appears in one or more motions for summary judgment.

      1.      **Undisputed Material Developments in the Summary Judgment Motions**.

           a.      **The Amended Complaint's Allegations**.

The Amended Complaint brings a medical malpractice claim, "alleging that Gallup Indian Medical Center 'was or should have been aware of . . . the possibility that Nena Charley was suffering from hantavirus when she presented at the GIMC Emergency Room ("ER") in the early morning hours of May 28, 2019.'" Go MSJ at 4 (asserting this fact)(quoting Amended Complaint ¶ 2, at 1); Sales MSJ at 4 (asserting this fact)(quoting Amended Complaint ¶ 2, at 1). See Go Response at 8 (admitting this fact); Sales Response at 8 (admitting this fact); Amended Complaint ¶ 2, at 1. The Complaint alleges that Gallup Indian Medical Center ("Gallup Medical") "and its agents and/or employees failed to properly assess, care for, treat, and transfer Nena Charley to [University of New Mexico Hospital ("UNMH")] for treatment of hantavirus following her presentation at" the Gallup Medical ER "at approximately 1:00am on May 28, 2019." Go MSJ at 4 (asserting this fact)(quoting Amended Complaint ¶ 30, at 4); Sales MSJ at 4 (asserting this fact)(quoting Amended Complaint ¶ 30, at 4). See Go Response at 8 (admitting this fact); Sales Response at 8 (admitting this fact); Amended Complaint ¶ 30, at 4. Additionally, the Complaint alleges that "Nena Charley suffered a loss of chance of survival when" Gallup Medical "and its agents and/or employees failed to properly assess, care for, and transfer Nena Charley to UNMH in the early morning hours of May 28, 2019 for treatment of hantavirus causing it to progress to a terminal state resulting in Ms. Charley's wrongful death." USA MSJ at 2-3 (asserting this fact); USA Response at 4 (admitting this fact); Amended Complaint ¶ 31, at 4.

The Plaintiffs allege that Defendant AB Staffing Solutions ("AB Staffing") employed Go, a nurse who interacted with N. Charley at the Gallup Medical ER, and, accordingly, AB Staffing is "liable for" Go's "alleged acts and omissions that resulted in medical negligence and the alleged wrongful death of Ms. Charley"; similarly, the Plaintiffs allege that Defendant Next Medical Staffing ("Next Medical") employed Sales, another nurse who interacted with N. Charley at the Gallup Medical ER, and, accordingly, Next Medical is liable for Sales' "alleged acts and omissions that resulted in medical negligence and the alleged wrongful death of Ms. Charley." Go MSJ at 4 (asserting this fact); Sales MSJ at 5 (asserting this fact). See Go Response at 8 (admitting this fact); Sales Response at 8 (admitting this fact); Amended Complaint ¶¶ 40, 42, 44, 44, at 6-7. Additionally, the Plaintiffs allege that Next Medical and AB Staffing negligently hired, trained, and supervised Sales and Go, respectively. See Sales MSJ at 5 (asserting this fact); Go MSJ at 4 (asserting this fact); Sales Response at 8 (admitting this fact); Go Response at 8 (admitting this fact); Amended Complaint ¶¶ 42, 44, at 6-7. The Plaintiffs also allege that these "failures contributed to cause Nena Charley's death." Go MSJ at 4 (asserting this fact); Sales MSJ at 5 (asserting this fact). See Go Response at 8 (admitting this fact); Sales Response at 8 (admitting this fact); Amended Complaint ¶ 30, at 4.

### b.    The Parties Disclose Their Expert Witnesses, and the Court Excludes Dr. Polsky.

On February 8, 2023, the Court entered an Amended Scheduling Order (Doc. 95), which requires the Plaintiffs to disclosure their expert witnesses by April 4, 2023. See Go MSJ at 4 (asserting this fact); Sales MSJ at 5 (asserting this fact); Amended Scheduling order at 2.[2] "The

---

[2]The Plaintiffs purport to dispute this fact, stating, in both responses: "Admit in part and deny in part. Based on Defendant USA's delay in providing deposition dates for its infectious

Court granted an extension for Plaintiffs' expert witness disclosure, allowing Plaintiffs to disclosure their expert witnesses on June 23, 2023." Go MSJ at 4 (asserting this fact); Sales MSJ at 5 (asserting this fact). <u>See</u> Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines at 1, filed April 4, 2023 (Doc. 108); Order Granting Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines at 1, filed April 26, 2023 (Doc. 117).[3] Then, the Court "granted another extension, making Plaintiffs' expert disclosure deadline July 21, 2023." Go MSJ at 4 (asserting this fact); Sales MSJ at 5 (asserting this fact). <u>See</u> Unopposed Motion to Amend Scheduling Order Deadlines at 1, filed June 22, 2023 (Doc. 142); Order Granting Opposed Motion to Extend Amended Scheduling Order Deadlines at 1, filed June 26, 2023 (Doc. 143).[4]

The Plaintiffs disclosed four expert witnesses, including a nursing expert, Edward Shradar, and a causation expert, Dr. Bruce Polsky. <u>See</u> Go MSJ at 5 (asserting this fact); Sales MSJ at 5 (asserting this fact); Go Response at 8 (admitting this fact); Sales Response at 8 (admitting this fact); Plaintiffs' Expert Witness Disclosure at 2 (dated July 21, 2023), filed December 8, 2023 (Doc. 233-1). The Plaintiffs disclosed Dr. Polsky to opine that

> [m]ore likely than not Nena Charley would have survived had Defendants' diagnosed Nena Charley with hantavirus on her first visit to GIMC. Although

---

disease doctor, Dr. Iralu, Plaintiffs were forced to request an extension for expert disclosures." Go Response at 8; Sales Response at 8. The Plaintiffs' explanation why they filed an extension for expert disclosures does not change that the Amended Scheduling Order required them to disclose their experts by April 4, 2023. Accordingly, the Court deems this fact undisputed.

[3]In response to this fact, the Plaintiffs state that they "were forced to request an extension to disclosure their experts due to the delay of Defendants to provide deposition dates." Go Response at 8; Sales Response at 8. The Plaintiffs' explanation why they filed an extension for expert disclosures does not contradict the text's fact, which is that the Plaintiffs filed a motion for and received an extension. Accordingly, the Court deems this fact undisputed.

[4]The Plaintiffs' response to this fact is identical to their response to the preceding fact. Accordingly, the Court deems this fact undisputed.

> Ms. Charley had approximately 35% risk of mortality when she first presented at the ER, her condition was sufficiently stable at that point that had she been transferred to UNMH for a higher level of care, she had a significant chance of surviving.

USA MSJ at 3 (asserting this fact)(quoting Supplemental Expert Report of Bruce Warren Polsky, M.D., M.A.C.P., F.I.D.S.A at 2, filed December 8, 2023 (Doc. 235-1)("Dr. Polsky Report"). <u>See</u> USA Response at 4 (admitting this fact); Dr. Polsky Report at 2. The Court "entered an oral order excluding Dr. Polsky as an expert witness and precluding Plaintiffs from offering his opinions into evidence." USA MSJ at 3 (asserting this fact)(citing November 14 Minutes at 1). <u>See</u> USA Response at 4 (admitting this fact); November 14 Minutes at 1. "The deadline for Plaintiffs to disclose expert witnesses has passed." Go MSJ at 5 (asserting this fact); Sales MSJ at 6 (asserting this fact). <u>See</u> Go Response at 11 ("Admit that the scheduled deadline has passed."); Sales response at 11 (same).

### c. Apart From Dr. Polsky, None of the Plaintiffs' Expert Witnesses Provide a Causation Opinion, but Shradar Opines that the Nurses Breach the Standard of Care, and Dr. Glaser Opines that Dr. Leach Breaches the Standard of Care.

Shradar, the Plaintiffs' nursing expert, opines that, if Gallup Medical trained the nurses on hantavirus, the way in which the nurses care for N. Charley breaches the standard of care. <u>See</u> Sales MSJ Response at 5 (asserting this fact); Deposition of Edward Shradar, RN, MSN, CEN at 122:20-124:14 (taken October 16, 2023), filed December 8, 2023 (Doc. 233-2)("Shradar Depo).[5]

---

[5]The Plaintiffs purport to dispute this fact, stating: "Deny." Go Response at 8; Sales Response at 8. In support of their position, the Plaintiffs point to the Affidavit of Edward Shradar, RN, MSN, CEN (dated December 21, 2023), filed January 3, 2024 ("Shradar Aff."). The Shradar Aff. states that Shradar was aware at his deposition that additional discovery in this case would occur, that Shradar will review this discovery when it becomes available, and that he will supplement his expert report. <u>See</u> Shradar Aff. ¶¶ 4-5, at 2. The Plaintiffs also point to, albeit in the "Introduction" portion of their briefs, Shradar's testimony at the Shradar Depo.:

Q:    So if -- and I'm just trying to avoid a different deposition after we get finished with some of this -- if the nurse educator says that the travel nurses like Nurse Sales and Nurse Go are given an education on hantavirus and how to handle screening patients for it, and Nurse Go and Nurse Sales just failed to do it, would that be a breach of the standard of care because they're nurses working in the emergency room at GIMC? . . .

A:    If the information they were provided included hantavirus questions screening and escalation, it would be a breach of the standard of care. . . .

Q:    If Nena Charley told Nurses Sales and Go about her exposure to mouse droppings and dust at work, and the nurses had the appropriate training from GIMC about hantavirus, did they breach the standard of care in the way they took care of Nena Charley? . . .

A:    Yes.

Shradar Depo. at 122:20-124:14.

    Go and AB Staffing, in support of their position, cite to the Shradar Depo., which states:

Q:    So then on page 13, you say it's your opinion there were breaches in nursing care, nursing education, and nursing competency validation at GIMC emergency department that directly affected the care of Nena Charley on May 28th. And you have some opinions about GIMC and its training of Nurse Sales and Nurse Go.

        But I wanted to come back, in terms of the breaches in nursing care, have we already covered your opinions with respect to the breaches in nursing care -- did I understand your testimony correctly in the sense that your opinion was that there should have been screening in place? . . .

A:    Yes.

Q:    And is there anything else about -- any other opinions we haven't covered with respect to breaches in nursing care? And let me be even more specific. With respect to Nurse Go.

A:    No. We've covered it.

Q:    Okay. All right. And then you've got four opinions here. The first has to do with the criticism I think that we just discussed previously regarding the Hantavirus Plague PDF version that was in Nurse Go's education file, that it's used for general public purposes and it does not provide

information on how to screen patients for Hantavirus or report a positive screening. And that seems pretty self-explanatory to me. And as I understand it, that's not a criticism or an opinion related to Nurse Go. Correct?

A:    Correct.

Q:    Okay. And then the second opinion has to do with GIMC failing to validate Hantavirus -- or allegedly failing to validate Hantavirus, screening nurse competency of Nurse Sales and Nurse Go, and you talk about the standard workflow that would include screening questions and how to report positive screenings and how to care for a suspected Hantavirus patient. Did I read that correctly?

A:    Yes.

Q:    And it does not appear to me that there are opinions here related to Nurse Go, but I wanted to confirm that with you.

A:    These are my opinions. There's nothing additional.

Q:    And nothing specific to Nurse Go in terms of -- this criticism appears to be focused on the hospital. That's all I'm trying to confirm.

A:    Correct. . . .

Q:    And again, am I accurate in stating that your opinion there is both Nurse Sales and Nurse Go didn't do Hantavirus screening because they weren't trained on it by the hospital? . . .

A:    Correct.

Shradar Depo. at 60:18-62:12; id. at 74:18-23. Additionally, Go and AB Staffing point to the Glaser Depo., in which Dr. Glaser states that his opinion does not contain any opinions as to the nurses' alleged breach of the standard of care, and that his opinion does not contain any opinions regarding AB Staffing. See Glaser Depo. at 133:3-11.

Shradar states that, if the nurses had been trained on hantavirus screening, the way in which they cared for N. Charley breached the standard of care. There is record evidence to which the Plaintiffs point that supports the Plaintiffs' position that Gallup Medical trained the nurses on hantavirus screening. The Plaintiffs point to the Deposition of Elvina Clark-Joe at 79:8-23 (taken November 16, 2022), filed January 3, 2024 (Doc. 247-10)("Clark-Joe Depo."), which states that, when Clark-Joe was a patient at Gallup Medical's emergency department before N. Charley's death, Gallup Medical employees asked her hantavirus screening questions. A reasonable jury

Shradar does not have any opinions regarding AB Staffing's or Next Medical's alleged breach of the standard of care. See Go MSJ at 5 (asserting this fact); Sales MSJ at 6 (asserting this fact); Shradar Depo. at 64:17-24; id. at 67:10-21.[6]  Dr. Glaser does not offer a causation opinion. See USA MSJ at 3 (asserting this fact)(citing Expert Report of David S. Glaser, M.D. at 3 (dated July 21, 2023), filed January 3, 2024 (Doc. 246-5)("Dr. Glaser Report").[7]  Shradar does not offer a

---

could conclude from Clark-Joe's testimony that Gallup Medical trained its emergency department staff, including the nurses, on hantavirus screening and required them to ask hantavirus-screening questions, at the time that N. Charley died. Viewing Shradar's testimony in tandem with Clark-Joe's testimony, the Court concludes that Shradar opines that the nurses' care for N. Charley breaches the standard of care. Accordingly, because the Plaintiffs successfully dispute Go's and Sales' assertion that Shradar does not offer an opinion about breach of the standard of care, the Court includes the Plaintiffs' version of the Defendants' statement in the text as an undisputed material development. See Bell v. City of Tulsa, No. CIV 21-0061 JB/CDL, 2024 WL 1018528, at *14 n.67 (D.N.M. Mar. 8, 2024)(Browning, J.)(accepting as true the plaintiff's version of the defendant's asserted fact)(citing Hunt v. Cromartie, 526 U.S. 541, 551 (1999)), aff'd 2025 WL 86956 (10th Cir. Jan. 14, 2025).

[6]The Plaintiffs purport to dispute this fact, stating: "Admit in part and deny in part. Nurse Shradar's deposition testimony was based on the information available to him at the time of his deposition. After the completion of additional discovery and his review, Nurse Shradar's opinions will be supplemented." Sales Response at 11 (citing Shradar Aff. ¶¶ 4-5, at 2); Go Response at 11 (citing Shradar Aff. ¶¶ 4-5, at 2). In support of their positions, AB Staffing and Next Medical cite to portions of the Shradar Depo., in which Shradar confirms that there are no opinions in his report concerning AB Staffing, see Shradar Depo. at 64:17-24, or concerning Next Medical, see Shradar Depo. at 67:10-21. The Plaintiffs cite to the Shradar Aff.'s statement that Shradar will review any additional discovery that becomes available does not support their position that Shradar offered a standard-of-care opinion as to Next Medical or AB Staffing. Accordingly, because the Plaintiff's position lacks support in the record evidence, the Court does not include it in the text as an undisputed fact.

[7]The Plaintiffs purport to dispute this fact. The United States' version of this fact states: "None of Plaintiffs' other retained experts offered causation opinions." USA MSJ at 3 (citing Dr. Glaser Report; Expert Report of Edward N. Shradar, R.N., M.S.N., C.E.N. at 1-7 (not dated), filed December 8, 2023 (Doc. 235-3)("Shradar Report"); Glaser Depo. at 8:13-9:20; Shradar Depo. at 19:25-19:3; and id. at 38:11-17). In support of their position, the Plaintiffs cite to the Dr. Glaser Report, which states:

These findings would have prompted immediate consultation with the

> University of New Mexico, early transfer, and the opportunity to stabilize Nena
> with tertiary care management -- including ECMO[, extracorporeal membrane
> oxygenation] -- in keeping with University of New Mexico hantavirus protocols.
> All of these events would have significantly increased Nena's chances of
> survival.

Dr. Glaser Report at 3 (this Court's MOO adds brackets). Furthermore, the Plaintiffs also cite to two portions of the Glaser Depo., in which Dr. Glaser states: "So the notion is that if you can intervene earlier than later, the likelihood of death from hantavirus goes down," Glaser Depo. at 105:2-4, and "I think it's fairly clear that the literature indicates that if you get these patients to a tertiary care center before they've had cardiopulmonary collapse, they have a much higher chance of survival than if you don't," Glaser Depo. at 106:13-17.

In support of the United States' position, the United States cites the entirety of the Dr. Glaser Report and the Shradar Report, as well as portions of the Glaser Depo. and the Shradar Depo. See USA MSJ at 3. The portion of the Glaser Depo. to which the United States cites states that Dr. Glaser is aware that his report's purpose is to provide a complete statement of all of his opinions, and that the only additional statement he would add to the report would be that it "would not be enough to order CBC[, complete blood count,] or inquire about mouse exposure, something to that effect." Glaser Depo. at 8:13-9:20 (this Court's MOO adds brackets). The portions of the Shradar Depo. to which the United States cites states that Shradar intends to offer opinions about "the standard of care for an emergency nurse." Shradar Depo. at 18:25-19:3.

New Mexico State law requires a plaintiff in a wrongful death case to prove proximate cause by showing "by a preponderance of the evidence that the defendant's negligence resulted in the lost chance for a better result." Alberts v. Schultz, 1999-NMSC-015, ¶ 28, 126 N.M. 807, 814, 975 P.2d 1279, 1286 (citing Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991)). "Under the lost-chance theory . . . the claim is that the health care provider's negligence reduced the chance of avoiding the injury actually sustained:" The injury -- "the item of value for which the patient seeks compensation" -- is "that chance in and of itself[,] the lost opportunity of avoiding the presenting problem and achieving a better result." Alberts v. Schultz, 1999-NMSC-015, ¶ 13, 126 N.M. at 814, 975 P.2d 1279 at 1283 (this Court's MOO adds brackets)(citing Delaney v. Cade, 255 Kan. 199, 873 P.2d 175, 177-83 (Kan. 1994); and Bear v. Regents of the Univ. of Cal, 1999-NMCA-005, 126 N.M. 508, 972 P.2d 9). The New Mexico Supreme Court states that "damages should be awarded on a proportional basis as determined by the percentage value of the patient's chance for a better outcome prior to the negligent act." Alberts v. Schultz, 1999-NMSC-015, ¶ 31, 126 N.M. at 815, 975 P.2d at 1287. New Mexico's Uniform Jury Instruction 13-1802, titled "Measure of Damages; general," specifies that "for the loss of a chance . . . while you must (1) first determine total damages for the loss under the elements listed above for each of the two claims, you then must (2) base your award on a percentage representing the lost opportunity to avoid each loss." NMUJI 13-1802. The calculation, accordingly, multiplies the percentage of chance lost by the total value of the decedent's life: "For example, the value of a patient's fifty-percent chance of survival is fifty percent of the value of their total life. If medical malpractice reduced that chance of survival from fifty to twenty percent, that patient's compensation would be equal to thirty percent of the value of their life." Alberts v. Schultz, 1999-NMSC-015, ¶ 32, 126

causation opinion.  See USA MSJ at 3 (asserting this fact)(citing Shradar Report).[8]  Finally, Dr.

Glaser "testified that he did not have any opinions regarding the breach of standard of care

regarding nurses in the case," including Nurse Sales and Nurse Go.  Go MSJ at 5 (asserting this

fact); Sales MSJ at 6 (asserting this fact).  See Glaser Depo. at 133:3-6.[9]

_____

N.M. at 815, 975 P.2d at 1287.  Uniform Jury Instruction 13-1802 goes on to state, moreover, that "the value of the loss may be established by fair approximations, by numbers or verbal descriptions, from which you may arrive at a percentage to apply to the total damages."  NMUJI 13-1802.

   As Alberts v. Schultz and NMUJI 13-1802 demonstrate, determining the percentage of chance lost necessarily entails a starting point and an ending point.  The starting point is the chance of survival before the health care provider's negligence.  See Alberts v. Schultz, 1999-NMSC-015, ¶ 12, 125 N.M. at 810, 975 P.2d at 1282.  The ending point is the diminished chance of survival, after the health care provider's negligence.  See Alberts v. Schultz, 1999-NMSC-015, ¶ 12, 125 N.M. at 810, 975 P.2d at 1282.  As the preceding paragraph notes, the factfinder, if he or she believes the plaintiff, uses the difference between the starting percent chance of survival and the ending percent chance of survival to calculate the plaintiff's damages.

   Dr. Glaser's expert report does not describe N. Charley's starting percent chance of survival, and it does not describe N. Charley's ending percent chance of survival.  As a matter of New Mexico law, therefore, Dr. Glaser's expert report does not state a causation opinion.  Dr. Glaser states that if Dr. Leach had taken certain actions, N. Charley's chance of survival would have "significantly increase[d]."  Dr. Glaser Report at 3 (this Court's MOO adds brackets).  This statement goes to the lost-chance calculation's endpoint -- albeit only in the most general sense -- and does not address the lost-chance calculation's starting point, namely, N. Charley's chance of survival before Dr. Leach's alleged breach of the standard of care.   Consequently, the factfinder relying on Dr. Glaser's opinion would have no way of calculating damages, because Dr. Glaser has not opined what the lost chance is.  He has opined that, had things gone differently, N. Charley's chance of survival would have increased.  This opinion is incomplete, as a matter of law.  Accordingly, the Court concludes that the Plaintiffs' proposed fact lacks support in the record evidence and declines to include their version of the fact in the text as an undisputed fact for this opinion's purposes.

   [8]Plaintiffs purport to dispute this fact.  In support of their position, they cite to the Dr. Glaser Report and the Glaser Depo., as the preceding footnote describes.  In their response brief to the USA MSJ, they contend that Dr. Glaser offers a causation opinion, and they do not contend that Shradar offers a causation opinion.  Accordingly, because the Plaintiffs do not support their position that Shradar offers a causation opinion with record evidence, the Court does not include their version of the fact in the text as an undisputed fact for this opinion's purposes.

   [9]Plaintiffs purport to dispute this fact, stating: "Deny.  Dr. Glaser admitted that nurses are

- 15 -

2.     <u>**Findings of Fact Regarding the Court's Ruling to Exclude Dr. Polsky**</u>.

This portion of the Procedural Background recounts the sequence of events that culminates

in the Court excluding Dr. Polsky.  The Court takes its facts from: (i) the Exclusion Motion; (ii) the

Plaintiffs' Response to Defendant United States of America's Motion to Exclude the Testimony

---

healthcare providers that work in the ER and they should have inquired about recent exposure to mouse droppings."  Sales MSJ at 11; Go MSJ at 11.  In support of their position, they cite to portions of the Glaser Depo., which states:  "Q: Dr. Glaser, are nurses healthcare professionals that work in the emergency room? A: Yes."  Glaser Depo. at 133:16-18.  The Glaser Depo. also states: "A:  And it is also my opinion that he and the nurses, or at least one of the two or one of the three, if we're counting both nurses, should have inquired whether she had had any recent exposure to mouse droppings, so that's an opinion."  Glaser Depo. at 101:19-23.  Nurse Go and Nurse Sales, in support of their position, also cite to the Glaser Depo. which states: "Q: Your opinion doesn't concern any opinion regarding the breach of standard of care regarding the nurses in this case; is that right? A: Yes."  Glaser Depo. at 133:3-6.

    Dr. Glaser agrees in this last excerpt that he does not have any opinions regarding the nurses' alleged breach of the standard of care.  Dr. Glaser, while reviewing his expert report during his deposition, agrees that he opines about the nurses in the report, which states that "the nurses caring for Nena should have inquired of Nena whether she had had [] any recent exposure to mouse droppings."  Dr. Glaser Report at 4.  <u>See</u> Glaser Depo. at 101:19-23.  Later in his deposition, however, Go's counsel gives him the opportunity to double down on his report by asking him whether he has an opinion about the nurses' alleged breach of the standard of care.  <u>See</u> Glaser Depo. at 133:3-5.  Dr. Glaser agrees, unequivocally, that he does not have any opinions about the nurses' alleged breach of the standard of care.  <u>See</u> Glaser Depo. at 133:3-5.  A deposition is when the rubber hits the road: The expert has the opportunity to clarify, explain, and qualify anything in his or her report.  When Dr. Glaser states unconditionally that he does not have opinions about the nurses, that statement governs.  A disputed fact, for summary judgment purposes, does not originate from one expert's broad statement that he later backs away from in the same deposition. Either the expert has an opinion, or he does not.  Dr. Glaser states that he does not have a standard-of-care opinion as to the nurses.  Parsing his earlier testimony for statements that suggest otherwise is futile in light of his conclusive, final denial.  Accordingly, because the Plaintiffs' position lacks support in the record evidence, the Court does not include it in the text as an undisputed fact for this opinion's purposes.

    Separately, the Go and Sales MSJs state that the Plaintiffs "have failed to identify any expert witness who will aver that" Next Medical and AB Staffing "negligently hired, trained, or supervised" Nurse Sales and Nurse Go.  Sales MSJ at 6; Go MSJ at 5.  Neither the Sales MSJ nor the Go MSJ supports this statement with a citation to record evidence.  Accordingly, the Court does not include it in the text as an undisputed fact for this opinion's purposes.

of Bruce W. Polsky For Failure to Appear at His Court-Ordered Deposition (Doc. 221), filed November 14, 2023 (Doc. 227)("Exclusion Response"); (iii) the Reconsideration Motion; (iv) and Defendant United States' Response to Plaintiffs' Motion for Reconsideration of the Court's Order Granting Defendant United States' Motion to Exclude Dr. Polsky as an Expert (Doc. 221), filed December 14, 2023 (Doc. 236)("Reconsideration Response").  Next, the Court summarizes the briefing associated with the motions this Order decides.

> **a.    The Court Issues the Initial Scheduling Order and Grants the Plaintiffs' Four Requests for an Extension of the Expert Disclosure <u>Deadline</u>.**

1.      On May 31, 2022, the Court issues an Initial Scheduling Order (Doc. 23), directing the parties to meet and fill out a Joint Status Report and Provisional Discovery Plan ("JSR"), and schedules an initial scheduling conference on July 7, 2022.  <u>See</u> Initial Scheduling Order at 1-2.

2.      In the JSR, the parties propose that the Plaintiffs identify their experts by November 20, 2022, and that the Defendants identify their experts by January 8, 2023.  <u>See</u> Joint Status Report and Provisional Discovery Plan at 24, filed July 5, 2022 (Doc. 24)("JSR").

3.      On August 26, 2022, the Court enters its Scheduling Order, filed August 26, 2022 (Doc. 49), and orders the Plaintiffs to identify their experts, to disclose their expert reports, and to have their experts ready to be deposed no later than November 20, 2022.  <u>See</u> Scheduling Order at 2.[10]

4.      At the Initial Scheduling Conference, the Court adopts the proposed dates, and tells

---

[10]For clarification and consistency, when citing briefs, exhibits, or other documents filed in the CM/ECF system, excluding deposition transcripts, the Court cites to the page numbers that the CM/ECF system places on the upper, right-hand corner of the documents.

the Plaintiffs that, on their due dates, the Plaintiffs must disclose their experts, produce their expert reports, and have their experts ready to be deposed; the Court tells the Defendants that they are going to have to do the same thing for their experts fifty days later, on January 8, 2023. See Draft Transcript at 9:20-10:3, taken July 7, 2022 (Court)("Initial Conf. Tr.").[11]

5.      The Court states that the experts do not have to be deposed on the day on which the expert reports are due, but they must be ready to be deposed. See Initial Conf. Tr. at 9:25-10:1 (Court).

6.      On November 21, 2022, the Plaintiffs file their Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines (Doc. 72)("First Expert Extension"), asking the Court to extend their expert-disclosure date to February 6, 2023, and to extend the Defendants' expert-disclosure date to March 27, 2023; the First Expert Extension does not offer a justification for the request. See First Expert Extension at 1.

7.      On December 14, 2022, the Court grants the First Expert Extension. See Order at 1 (Doc. 80). The new deadline for the Plaintiffs' expert witness disclosures is February 6, 2023, and the new deadline for the Defendants' expert witness disclosure is March 27, 2023. See Order at 1.

8.      On February 6, 2023, the Plaintiffs file an Unopposed Motion to Extend Expert Disclosure Deadlines (Doc. 90)("Second Expert Extension"), asking the Court to extend their expert-disclosure date to April 4, 2023, and to extend the Defendants' expert-disclosure date to May 23, 2023; the Second Expert Extension does not offer a justification for the request. See

---

[11]The Court's citations to the draft transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

Second Expert Extension at 1.

9.      On February 8, 2023, the Court grants the Second Expert Extension.  See Order Granting Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines at 1, filed February 8, 2023 (Doc. 94)("Second Extension Order").  The new deadline for the Plaintiffs' expert witness disclosures is April 4, 2023, and the new deadline for the Defendants' expert witness disclosures is May 23, 2023.  See Second Extension Order at 1.

10.     On February 8, 2023, the Court enters an Amended Scheduling Order (Doc. 95).

11.     The Amended Scheduling Order requires the Plaintiffs to disclosure their experts by April 4, 2023, requires the Defendants to disclosure their experts by May 23, 2023, and sets the trial for December 11, 2023.  See Amended Scheduling Order at 2; id. at 3.

12.     On April 4, 2023, the Plaintiffs file an Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines (Doc. 108)("Third Expert Extension"), asking the Court to extend their expert-witness disclosure date to June 23, 2023, and to extend the Defendants' expert-witness disclosure date to July 24, 2023; the Third Expert Extension does not offer a justification for the request.  See Third Expert Extension at 1.

13.     On April 26, 2023, the Court grants the Third Expert Extension, setting the deadline for the Plaintiffs to disclose their experts for June 23, 2023, and setting the deadline for the Defendants to disclosure their experts for July 24, 2023.  See Order Granting Unopposed Motion to Extend Expert Disclosure and Discovery Deadlines at 1 (Doc. 117).

14.     On June 22, 2023, the Plaintiffs file an Unopposed Motion to Amend Scheduling Order Deadlines (Doc. 142)("Fourth Expert Extension"), asking the Court to extend their expert-witness disclosure date to July 21, 2023, and to extent the Defendants' expert-disclosure date to

August 21, 2023.  See Fourth Expert Extension at 1.

15.    On June 26, 2023, the Court grants the Fourth Expert Extension, setting the deadline for the Plaintiffs to disclose their experts for July 21, 2023, and the deadline for the Defendants to disclose their experts for August 21, 2023; the Fourth Expert Extension does not offer a justification for the request.  See Order Granting Opposed Motion to Extend Amended Scheduling Order Deadlines at 1 (Doc. 143).

16.    On July 21, 2023, the Plaintiffs disclose their experts, including Dr. Bruce Polsky, M.D.  See Certificate of Service at 1, filed July 21, 2023 (Doc. 152).

**b.    The Parties Attempt to Coordinate Their Experts' Deposition Dates.**

17.    On August 21, 2023, Brett Eaton, Assistant United States Attorney, emails Lisa Curtis and Melanie Ben, Plaintiffs' counsel, and asks for Dr. Polsky's availability for his deposition.  See Email from Brett Eaton to Lisa Curtis at 1 (dated August 21, 2023), filed November 7, 2023 (Doc. 221-1).

18.    On August 23, 2023, the Plaintiffs submit their First Supplemental Expert Disclosure.  See Certificate of Service at 1, filed August 23, 2023 (Doc. 160).

19.    On August 29, 2023, Ms. Ben emails Mr. Eaton, stating: "We reached out to our experts and September does not work for any of them, but they are available in October."  Email from Melanie Ben to Brett Eaton at 2 (dated August 29, 2023), filed November 7, 2023 (Doc. 221-1).

20.    On August 31, 2023, Mr. Eaton emails Ms. Ben, stating: "Please let me know what time in October your experts would be available.  We will need their depositions prior to our experts being deposed."  Email from Brett Eaton to Melanie Ben at 3 (dated August 31, 2023),

filed November 7, 2023 (Doc. 221-1).

21.     On September 7, 2023, Mr. Eaton emails Ashley Lopez, a legal assistant for Curtis & Co., Ms. Curtis' and Ms. Ben's law firm, stating: "[P]lease let us know if you have received dates for Dr. Polsky's deposition."  Email from Brett Eaton to Ashley Lopez at 5 (dated September 7, 2023), filed November 7, 2023 (Doc. 221-1).

22.     On September 22, 2023, Lopez emails Mr. Eaton, stating: "We have contacted Dr. Polsky and are awaiting confirmation of his availability, as he had provided the morning of October 19th."  Email from Ashley Lopez to Brett Eaton at 18 (dated September 22, 2023), filed November 7, 2021 (Doc. 221-1).

23.     On September 26, 2023, Ms. Ben emails Mr. Eaton; she states that Dr. Polsky's availability on October 19th is "very limited in the morning," but adds that she "asked for an alternative date and he is available in the afternoon on October 24th.  Does this work for everyone?"  Email from Melanie Ben to Brett Eaton at 17 (dated September 27, 2023, 10:49 a.m.), filed November 7, 2021 (Doc. 221-1).

24.     Several minutes later, Ms. Ben emails Mr. Eaton, stating: "Dr. Glaser is available on October 24th beginning at 8 am MDT.  And Dr. Polsky's deposition can follow.  Does this work?"  Email from Melanie Ben to Brett Eaton at 17 (dated September 26, 2023, 10:54 a.m.), filed November 7, 2021 (Doc. 221-1).

25.     Around noon on the same day, Lisa King, a paralegal for the Checkett Law Firm, which represents Defendants Sales and Next Medical Staffing, emails Ms. Ben and Mr. Eaton, stating: "To clarify: October 9: can we release this date?  October 19: John [Checkett] nor James [Glen Bennett] are available October 24: John is available and I am holding that date for the depos

of Dr. Polsky and Dr. Glaser." Email from Lisa King to Brett Eaton at 16 (dated September 26, 2023, 12:02 p.m.), filed November 7, 2021 (Doc. 221-1)(Court adds brackets).

26.     Later that day, Denise Chanez, counsel for Defendants Go and AB Staffing Solutions, emails Mr. Eaton and Ms. Curtis, stating: "It looks like we were not included in one of the earlier emails concerning Dr. Glaser's deposition on 10/24 in the morning. Unfortunately, both Shannon [Sherrell] and I have conflicts that morning. Shannon can cover in the afternoon for Dr. Polsky." Email from Denise Chanez to Brett Eaton and Lisa Curtis at 16 (document omits date)[12], filed November 7, 2023 (Doc. 22l-1)(Court adds brackets).

27.     At 2:51 p.m., Mr. Eaton emails Ms. Ben, Ms. Chanez, and Ms. Curtis, stating: "Please let me know if you would be available for Dr. Glaser the afternoon of the 24 and Dr. Polsky on the 19." Email from Brett Eaton to Melanie Ben, Denise Chanez, and Lisa Curtis at 15 (dated September 26, 2023, 2:51 p.m.),  filed November 7, 2021 (Doc. 221-1).

28.     At 2:57 p.m., Ms. Chanez emails Mr. Eaton, Ms. Ben, and Ms. Curtis, stating: "Yes, that works for us." Email from Denise Chanez to Brett Eaton at 15 (dated September 26, 2023, 2:57 p.m.), filed November 7, 2021 (Doc. 221-1).

29.     At 2:59 p.m., Ms. Ben emails Ms. Chanez, Mr. Eaton, and Ms. Curtis, stating: "Two hours is sufficient for Dr. Polsky's deposition? Just making sure. Thanks." Email from Melanie Ben to Brett Eaton at 14 (dated September 26, 2023, 2:59 p.m.), filed November 7, 2021 (Doc. 221-1).

---

[12]Page sixteen of Doc. 221-1, where this email appears, cuts off the portion of the email that shows when the email was sent. The email appears, however, in the middle of an email thread from September 26, 2023, between emails sent at 12:02 p.m. and 2:51 p.m. See Exhibit A to Exclusion Motion at 15-16, filed November 7, 2023 (Doc. 221-1). Accordingly, the Court concludes that Ms. Chanez sent her email between 12:02 p.m. and 2:51 p.m. on September 26.

30.     At 3:06 p.m., Ms. Ben emails Mr. Eaton, Ms. Chanez, and Ms. Curtis, stating: "Brett, Dr. Polsky only had the 24th in the afternoon and the 31.  Which of course the 31st is too late."  Email from Melanie Ben to Brett Eaton at 14 (dated September 26, 2023, 3:06 p.m.), filed November 7, 2021 (Doc. 221-1).

31.     The next day, on September 27, 2023, at 9:17 a.m., Ms. Ben emails Ms. Chanez, Ms. Eaton, and Ms. Curtis, stating:

> I need to confirm a date with our experts for their depositions.  I've provided the dates they are available prior to the October 31 mediation.  I need to know if anyone can change their availability.  Otherwise, I think we need to set another conference with the Judge to get something worked out.

Email from Melanie Ben to Brett Eaton at 13 (dated September 27, 2023 9:17 a.m.), filed November 7, 2021 (Doc. 221-1).

32.     At 10:32 a.m., Ms. Chanez emails Ms. Ben, Mr. Eaton, and Ms. Curtis, stating: "Thanks, Melanie.  As I mentioned yesterday, my firm is not available the morning of 10/24.  I tried to get coverage, but it is not feasible for that morning due to other preexisting conflicts.  We are available on the 19th and the afternoon of the 24th."  Email from Denise Chanez to Melanie Ben at 13 (dated September 27, 2023, 10:32 a.m.), filed November 7, 2021 (Doc. 221-1).

33.     The following day, on September 28, 2023, at 1:50 p.m., Ms. Ben emails Ms. Chanez, Mr. Eaton, and Ms. Curtis, stating:

> Because Ms. Chanez is unavailable in the afternoon of October 24th for Dr. Polsky's deposition, Dr. Polsky can do the deposition the morning of October 19th but has to be done by 12 pm EDT, he is in the Eastern time zone.  Will Dr. Polsky's deposition be over zoom or in person?

Email from Melanie Ben to Brett Eaton at 7 (dated September 28, 2023, 1:50 p.m.), filed November 7, 2023 (Doc. 221-1).

34.    The next day, on September 29, 2023, at 8:52 a.m., Mr. Eaton emails Ms. Ben, Ms.

Chanez, and Ms. Curtis, stating:

> We will need additional dates for both Dr. Glaser and Dr. Polsky.
> Limiting the Defendants until 10:00 a.m. MDT for Dr. Polsky's deposition does
> not provide enough time and places an unreasonable burden on the Defendants.
> Please let us know as soon as possible what additional dates your experts have
> for availability.

Email from Brett Eaton to Melanie Ben at 9-10 (dated September 29, 2023, 8:52 a.m.), filed

November 7, 2023 (Doc. 221-1).

35.    The same day, at 10:19 a.m., Ms. Ben emails Mr. Eaton, Ms. Chanez, and Ms.

Curtis, stating:

> Why do we need to reset Dr. Glaser's deposition?  And for Dr. Polsky,
> Plaintiffs are willing to being his deposition in the early morning of October
> 19th.  Would his deposition be by zoom?  I am trying to get these depositions
> done before the mediation date.  Are you telling me we need to inform the Judge
> we need to push the mediation date back?

Email from Melanie Ben to Brett Eaton at 9 (dated September 29, 2023, 10:19 a.m.), filed

November 7, 2021 (Doc. 221-1).

36.    At 10:21 a.m., Mr. Eaton replies to Ms. Ben's email, stating: "Melanie, When do

you have Dr. Glaser scheduled?"  Email from Brett Eaton to Melanie Ben at 9 (dated September

29, 2023, 10:21), filed November 7, 2023 (Doc. 221-1).

37.    At 11:27 a.m., Ms. Ben replies to Mr. Eaton's email, stating: "Brett, If you recall

from our previous emails, we discussed the 24th.  Can you answer my question about whether Dr.

Polsky's deposition will be via zoom?  I've asked a couple times but haven't received a response

from you."  Email from Melanie Ben to Bret Eaton at 8 (dated September 29, 2023, 11:27 a.m.),

filed November 7, 2023 (Doc. 221-1).

38.    At 11:36 a.m., Mr. Eaton replies to Ms. Ben's email, stating:

As for how the deposition of Dr. Polsky will be taken, my preference is to do it in person. That, however, depends on the date. Is Dr. Polsky's availability different if the matter is in person or via zoom? If so, please let me know his availability for a zoom deposition.

Email from Brett Eaton to Melanie Ben at 8 (dated September 29, 2023, 11:36 a.m.), filed November 7, 2023 (Doc. 221-1).

> c.    **The Court Holds a Status Conference to Address Deposition Scheduling**.

39.    On October 6, 2023, the Court holds a status conference at 9:31 a.m. See Clerk's Minutes at 1, filed October 6, 2023 (Doc. 219).

40.    The Plaintiffs request the status conference to discuss deposition dates with the Court, because the parties are "kind of at a standstill in terms of moving forward between taking depositions." Draft Transcript of Hearing at 4:16-18 (taken October 6, 2023)(Ben)("Oct. 6 Tr."); id. at 4:24-5:1 (Ben).

41.    At the status conference, Mr. Eaton informs the Court that the United States is "still waiting for dates for plaintiffs' expert deposition," and the Court responds by stating: "If you can't get it done in the next week, bring your calendars and the Court will set deposition dates." Draft Oct. 6 Tr. at 10:18-20 (Eaton); id. at 12:7-9 (Court).

42.    The Court sets a motion hearing for October 13, 2023, to address the parties' discovery disputes, including the Defendant United States' Motion for Protective Order Regarding the Deposition of Dr. Eric Ketcham, filed September 27, 2023 (Doc. 184). See Oct. 6 Tr. at 4:18-25 (Ben)("Plaintiff had noticed one of Defendant's experts to be deposed, and the United States objected, because that was going to be a deposition beyond the ten depositions . . . ."); id. at 7:12-

13 (setting a motion hearing for "Friday at 9:30").

43.    On October 6, 2023, shortly after the status conference with the Court, at 11:17 a.m., Ms. Curtis emails Mr. Eaton, Ms. Chanez, and Ms. Ben, stating: "Dr. Polsky freed up his morning so that we can start his deposition at any time in the morning and he is available until 2PM.  Please set his deposition on 10-19-23 first thing in the morning, so that we can get this deposition out of the way."  Email from Lisa Curtis to Brett Eaton at 12 (dated October 6, 2023, 11:17 a.m.), filed November 7, 2021 (Doc. 221-1).

44.    Later that afternoon, at 2:45 p.m., Mr. Eaton responds to Ms. Curtis' email, stating:

> It is my understanding that the 2 pm end time is 2 pm EDT/noon MDT/11 am PDT.  Please confirm if that is correct.
>
> The limitation of Dr. Polsky's proposed availability is prejudicial against Defendants . . . . For example, an 8 am EDT start would result in the deposition beginning at 6 am MDT and 5 am PDT.  Additionally, even at this early start time, there would only be six hours for deposition testimony and all breaks.
>
> As previously stated, while I would prefer to take Dr. Polksy's [sic] deposition in person, I would be amendable [sic] to doing it via zoom if Dr. Polsky has additional availability . . . . Please let me know what availability he would have for a zoom deposition.

Email from Brett Eaton to Lisa Curtis at 11-12 (dated October 6, 2023, 2:45 p.m.), filed November 7, 2021 (Doc. 221-1).

45.    On October 9, 2023, at 10:45 a.m., Ms. Ben emails Mr. Eaton, Ms. Curtis, and Ms. Chanez, stating: "Brett, Dr. Polsky is available for a zoom deposition for the same date and same time."  Email from Melanie Ben to Brett Eaton at 11 (dated October 9, 2023 10:45 a.m.), filed November 7, 2021 (Doc. 221-1).

46.    The same day, at 1:17 p.m., Ms. Ben emails Mr. Eaton, Ms. Curtis, and Ms. Chanez,

stating: "Counsel, Dr. Polsky is no longer available for the early start time on October 19th.  I am

waiting to hear when he is available to start on the 19th."  Email from Melanie Ben to Brett Eaton

at 31 (dated October 9, 2023, 1:17 p.m.), filed November 14, 2023 (Doc. 227-1).

      47.    On October 12, 2023, Dr. Polsky emails Lopez, Ms. Curtis, and Ms. Ben, stating:

> Hello Melanie:
>
> With all of the starts and stops, I am afraid that I could not continue to hold the October 19th date.  Frankly, at this point it is really too close now to get prepared adequately.  Let me know how it goes with the judge on Friday and we will find a new date in November.  I just wanted to let you know that the 19th is now off the table.

Email from Bruce Polsky to Ashley Rose Lopez, Lisa Curtis, & Melanie Ben at 33 (dated October

12, 2023, 12:44 p.m.), filed November 14, 2023 (Doc. 227-1).

### d.    The Court Holds a Motion Hearing and Orders Dr. Polsky's Deposition to Take Place In New York City on October 19, 2023, but Dr. Polsky Does Not Attend His Deposition.

      48.    On October 13, 2023, the Court holds the promised motion hearing.  See Clerk's

Minutes at 1, filed October 13, 2023 (Doc. 220).  During the hearing, Mr. Eaton states that "we've

been asking for the deposition of Dr. Polsky, which is one of plaintiffs' expert witnesses, since

August."  Transcript of Hearing at 109:3-5 (taken October 13, 2023), filed December 28, 2023

(Doc. 242)("October 13 Tr.").

      49.    Mr. Eaton continues:

> Most recently, the only time they kept providing over the last several weeks was a very limited time window that he had, where he was going to have to end by noon Eastern Standard Time originally.  And we said that was going to be unworkable; that we would need more time to depose him . . . And that's what I'm requesting the Court do right now, is that we set a time right now to set Dr. Polsky's deposition.

October 13 Tr. 109:5-25 (Eaton).

50.     In response, Ms. Curtis states:

Dr. Polsky's date was October 19.  That date he will start at any point in time in the morning . . . .  He has to be done by 2:00 p.m. . . . And all I keep getting back from Mr. Eaton is that because other people were going to travel where he is, he doesn't want to start the depo at 5:00 a.m., because that's 7:00 a.m. on the east coast.

October 13 Tr. at 110:3-23 (Curtis).

51.     The Court states: "Okay.  This is October 19, next Thursday?"  October 13 Tr. at 111:1-2 (Court).

52.     Ms. Curtis responds, "Yes."  October 13 Tr. at 111:3 (Curtis).

53.     Then, the Court states: "All right.  So the deposition will begin at 8:00 Mountain Daylight Time, and it will end at 3:30 Mountain Daylight Time.  And Dr. Polsky will need to make himself available till 3:30 Mountain Daylight Time.  But we'll start at 8:00 on October 19, Thursday."  October 13 Tr. at 111:4-9 (Court).

54.     Ms. Curtis does not object or otherwise respond to the Court's order setting Dr. Polsky's deposition date and time.  See October 13 Tr. at 111:12-18 (Eaton).

55.     On October 16, 2023, the United States emailed its Notice to Take Virtual Deposition Duces Tecum, filed November 7, 2023, (Doc. 221-2)("Depo. Notice"), to Ms. Curtis and to Ms. Ben.  Depo. Notice at 4.  The Depo. Notice states:

[T]he deposition of Dr. Bruce Warren Polsky will be taken before a certified court reporter . . . on October 29, 2023, beginning at 10:00 a.m., EDT (8:00 a.m., MDT), at United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, New York, 10007.  Information for virtual appearances, via WebEx video conference call will be made available for counsel who wish to appear remotely.

Depo. Notice at 1-2 (Court adds brackets).

56.     On October 17, 2023, Ms. Curtis emails Mr. Eaton, stating: "Brett, I've got 4 depos

tomorrow, but I need to find a few minutes to talk with you tomorrow.  Do you have a good time

to talk?"  Email from Lisa Curtis to Brett Eaton at 19 (dated October 17, 2023 10:50 p.m.), filed

November 7, 2023 (Doc. 221-1).

      57.     On October 18, 2023, Mr. Eaton flies from Albuquerque, New Mexico, to New

York, New York.   See Draft Transcript of Hearing at 9:9-11 (taken November 14,

2023)(Eaton)("November 14 Tr.").

      58.     Upon arriving in New York on October 18, 2023, Mr. Eaton calls Curtis & Co.'s

office at 2:05 p.m. Mountain Daylight Time and leaves a voicemail asking for a return call.  See

Exclusion Motion at 6.

      59.     An hour later, "Plaintiffs' counsel called back":

> During the call, Plaintiffs' counsel claimed the United States knew Dr. Polsky
> was not available on October 19, 2023, for his deposition.  Counsel for the
> United States denied this and stated that Plaintiffs' counsel had only offered
> limited time on October 19, 2023.  Counsel for the United States reminded
> Plaintiffs' counsel that she identified October 19, 2023, as the date for
> Dr. Polsky's deposition, that the Court ordered Dr. Polsky to be deposed on
> October 19, 2023, and that Plaintiffs' counsel did not object to the date.
> Plaintiffs' counsel stated Dr. Polsky would not be attending the deposition.
>
>      Counsel for the United States informed Plaintiffs' counsel that he was
> already in New York and was prepared to take Dr. Polsky's deposition in the
> morning.  Plaintiffs' counsel said there were two options: 1) that she pays the
> costs for the travel, or 2) that the United States moves to strike Dr. Polsky.
> Counsel for the United States stated he would speak with his supervisor on how
> to proceed.

Exclusion Motion at 6.

      60.     At 3:28 p.m. Mountain Daylight Time, Mr. Eaton calls the "Plaintiffs' counsel,"

and leaves a message stating that he intends to proceed with Dr. Polsky's deposition and "make a

record of Dr. Polsky's nonappearance if he did not appear."  Exclusion Motion at 7.

61.     At 8:26 p.m. Mountain Daylight Time, Ms. Curtis emails Mr. Eaton, Ms. Chanez, and Ms. Ben, stating:

> Brett, I've asked you numerous times where the [sic] you knew my expert couldn't show up on the 19th at all when we were in the hearing on Friday. Obviously I didn't know.  As you know, my expert cannot do his deposition tomorrow.  I understand that you've chosen to go to New York. My expert can do his deposition on November 8.  I have no idea why you feel the need to make a record, when I've been very clear. Cannot control what you do, so let me know whether you're gonna reset the deposition or not.

Email from Lisa Curtis to Brett Eaton at 20 (dated October 18, 8:26 p.m.), filed November 7, 2023 (Doc. 221-1).

62.     On October 19, 2023, the date of the deposition that the Court had scheduled and ordered, the Plaintiffs file Plaintiffs Notice of Non-Appearance Regarding the Deposition of Bruce W. Polsky, M.D. (Doc. 211)("Notice of Non-Appearance"), which states:

> More than reasonable efforts were made by Dr. Polsky and Plaintiffs' counsel to try and change Dr. Polsky's schedule so he could attend the October 19, 2023, deposition, but given his position as Chair of his Department at the School of Medicine he must appear for a Board meeting on October 19, 2023, and cannot attend his deposition as Noticed.

Notice of Non-Appearance at 3.

63.     The Notice of Non-Appearance also states:

> Plaintiffs' counsel was shocked to find out defense counsel was in New York for the deposition of Dr. Polsky and was clear Dr. Polsky could not be present for his deposition, asking for clarification, as it was understood that USA's counsel was aware through Plaintiffs' co-counsel that Dr. Polsky was unable to attend a deposition on October 19, 2023, . . . Defendant has been informed that Dr. Polsky is available on November 8, and the deposition should be noticed as soon as possible.

Notice of Non-Appearance at 3.

64.     On October 19, 2023, the Plaintiffs file Plaintiffs' Motion for Protective Order

Regarding the Deposition of Bruce W. Polsky, M.D. (Doc. 212)("Protective Motion"), which explains that:

> Unbeknownst to Plaintiffs' counsel at the hearing, Dr. Polsky had contacted co-counsel the day before to state that he could not be available on the 19th any longer but would work for find another date close in time. Additional contacts were made with Dr. Polsky to try and free up the 19th , but it is understood that he as the chair of his department is required to attend a Board meeting at his University and is not able to either prepare in time for the deposition, or not attend the meeting.

Protective Motion at 2.

65.    On October 19, 2023, Mr. Eaton flies back to Albuquerque.  See November 14 Tr. at 11:7-20 (Eaton).

### e.    The Court Holds a Hearing on the Exclusion Motion.

66.    On October 26, 2023, the Court schedules a hearing on the Notice of Non-Appearance and the Protective Motion for November 14, 2023.  See Notice of Motion Hearing (Doc. 218)(text-only docket entry).

67.    On November 7, 2023, the United States files the Exclusion Motion.  See Exclusion Motion at 1.

68.    On November 8, 2023, the Court enters a Minute Order adding the Exclusion Motion to the November 14, 2023, Motion Hearing's agenda.  See Minute Order (Doc. 223)(text-only docket entry).

69.    On November 13, 2023, the Court instructs the Court's courtroom deputy ("CRD"), Ms. Lauren Rotonda, to call the Plaintiffs and instruct them to bring dates for Dr. Polsky's deposition in Albuquerque to the hearing the next day.  See November 14 Tr. at 3:5-16 (Court).

70.    That same day, and after the Court's CRD calls the Plaintiffs, the Court enters a

Minute Order "instructing counsel for Plaintiffs to identify dates on which Bruce W. Polsky, M.D. would be available to be deposed in person in Albuquerque, New Mexico, and to bring said dates to the Motion Hearing scheduled for 11/14/2023."  Minute Order (Doc. 225)(text-only docket entry)("November 13 Minute Order").

71.    On November 14, 2023, the Plaintiffs file the Exclusion Response.  See Exclusion Response at 1.

72.    The Exclusion Response asserts that "Dr. Polsky is available to have his deposition taken on December 5, 2023 in New York or by zoom."  Exclusion Response at 10.

73.    The Exclusion Response also asserts that:

> It was unknown to co-counsel that Dr. Polsky's deposition had been ordered and that a Notice of Deposition had been sent on Monday, October 16, 2023, until co-counsel returned to the office on Tuesday, October 17, 2023, after returning from vacation.  Plaintiffs informed Dr. Polsky that the Court ordered his deposition to be taken on October 19, 2023.  Dr. Polsky reminded Plaintiffs' counsel that he had already released that date because he had not received a notice of deposition . . . Having released the October 19, 2023 date, Dr. Polsky set other meetings for that day and Dr. Polsky was unable to change his schedule under such short notice and stated he need more time to prepare for his deposition. Plaintiffs informed counsel for the USA that Dr. Polsky would not be able to attend the October 19, 2023, deposition but offered November 8, 2023, as an alternative.

Exclusion Response at 11.

74.    That same day, the Court holds a hearing on the Exclusion Motion.  See November Minutes at 1.

75.    At the hearing, the Court states:

> If I understand everything, we've whittled down all the issues down to this Dr. Polsky deposition.  I'm very disappointed that this didn't get done, the things that have surrounded it.  But I'm also reluctant to -- I'll do it if necessary -- but I'm reluctant to exclude a witness.  So, as you know I entered an order, and also had

> Ms. Rotonda[, the courtroom deputy,] call you to say to the plaintiffs: Show up today with dates that Dr. Polsky can be here in Albuquerque and be available for a deposition. And then I was going to see if Mr. Eaton could make that work.

November 14 Tr. at 3:5-16 (Court).

76.    The Court then asks: "Ms. Curtis, did you come with those dates?" November 14 Tr. at 3:21-22.

77.    Ms. Curtis responds and has the following exchange with the Court:

Ms. Curtis:     Your Honor, we filed a response to the motion to exclude. And I understand that the Court has made this direction. As you know, Dr. Polsky works at --

The Court:      When did you file your response?

Ms. Curtis:     We just filed -- it's not due for a bit, but we filed it today as soon as we understood that we were going to have this hearing. We wanted you to have a response from us about the process that we'd gone through to get to where we were at. I didn't want the Court to have solely defendant's motion.

The Court:      I don't want to hear argument from you right now. I want to know --

Ms. Curtis:     About the dates, yes, sir. Certainly, Dr. Polsky cannot -- showing up here from New York would cause him three days.

The Court:      Then we'll probably just exclude him then. We've had enough with Dr. Polsky.

November 14 Tr. 3:23-417 (Curtis)(Court).

78.    Later in the hearing, the Court asks Ms. Curtis:

The Court:   Why did Dr. Polsky not make himself available that day[, the day of the scheduled deposition]?

Ms. Curtis:   Because he couldn't by the time we got the notice.

- 33 -

The Court:     And why?

Ms. Curtis:    Because he has obligations in his academic --

The Court:     He chose a faculty meeting rather than coming to the deposition; correct?

Ms. Curtis:    Your Honor, I don't believe it was choice. He has -- this is a --

The Court:     If he's going to sign up to be a federal expert, he has to do what courts say. Once he comes into the field of judicial work, he's got to obey court orders. And he chose to go to a faculty meeting rather than doing what he needed to do as an expert in this case.

Ms. Curtis:    Your Honor, respectfully, I disagree with you . . . And we don't hire guns, Judge . . . This is a hard, hard expert to have. The expert is not trying to treat the Court with disrespect.

The Court:     Then why do I not have a date today for him to be in Albuquerque to be deposed?

Ms. Curtis:    Because his ability to knock out three days from his schedule that he has is impossible for him, where --

The Court:     It just seems with this doctor everything is impossible . . . If he's not willing to help you correct the mess, then I don't think he needs to be in this case.

Ms. Curtis:    Well, Your Honor, I am more than happy to replace Dr. Polsky, if that is possible . . . .

The Court:     Well, he needs to help you with the mess that's been created by getting himself here. I'm willing to give that. But you kind of disobeyed another Court order. I told you to come here with dates, and you're saying you can't come -- I don't know how he's supposed to testify if he's not going to come to Albuquerque. We've got a trial coming up. What's he going to do then?

Ms. Curtis:    He will come for trial, that's already been established.

The Court:     He won't come for a deposition?

Ms. Curtis:    Trial is months away, and we can book it that fast.

November 14 Tr. at 18:19-19:12; id. at 20:12-21:8; id. at 21:10-23.

79.    After additional argument, Ms. Curtis states:

Ms. Curtis:   Your Honor, the one thing that I would add is that if, in fact, we're incapable of having Dr. Polsky appear, we do have a local expert at UNM, that's written extensively on Hantavirus . . . So there is a way to do this with a different expert . . . I'm trying to find a compromise.

The Court:    Well, I offered it to you this week. I was not going to grant the motion entirely if you came in here today with his availability here. And I think you've not taken that offer up, so --

Ms. Curtis:   I just don't have an option . . . Is there a way to do this over the weekend . . . then it wouldn't hurt [Dr. Polsky's] work schedule so much. Is that possible?

The Court:    I think the train has come and gone. I gave you a chance to bring a date today . . . talk to Mr. Eaton and see if we can make them work. But that didn't happen, so I think the motion needs to be granted.

Ms. Curtis:   Your Honor, have you already made a decision about whether you're going to allow us to bring a replacement expert in the case, even if that --

The Court:    I think you probably need to talk to Mr. Eaton about that. But I imagine he's going to oppose that, that deadlines have come and gone.

November 14 Tr. at 28:14-17-29:1; id. at 29:25-31:2.

80.    After hearing argument from the United States, the Court states:

Well, I don't get any pleasure out of doing this, and I do it with great reluctance. But I just don't think I'm being fair to the defendants if I -- particularly the United States -- if I don't grant the motion. I was willing to not go that far. If Dr. Polsky would make a date available today, or dates available today, I thought probably I could live with that compromise.

But I think we're at a point where he's just not making himself available, and helping out the Court and the plaintiffs by trying to correct

a situation about the difficulties of getting his deposition taken.

So I will grant the motion. I'll also order all costs for Mr. Eaton going out there, as well as preparing the motion. So those costs will be assessed as well. And Dr. Polsky will not be allowed to testify in this trial.

November 11 Tr. at 42:12-43:5.

### 3.    The Briefing and the Hearings.

### a.    Go And AB Staffing's MSJ.

The Go MSJ contends that, in a medical negligence case, New Mexico law requires expert testimony to prove breach and causation. See Go MSJ at 7. It argues that the Court should dismiss the Plaintiffs' claim, because the Plaintiffs "have failed to present expert testimony" that Go breached the standard of care. Go MSJ at 8. The Go MSJ also contends that the Plaintiffs do not have an expert who will testify that Nurse Go's alleged breach caused N. Charley's injuries. See Go MSJ at 9. Furthermore, the Go MSJ contends that New Mexico law requires the Plaintiffs to offer expert testimony to prove a negligent-hiring claim "against a medical provider." Go MSJ at 10. According to the Go MSJ, the Plaintiffs "have no expert who will opine" on the standard of care as to a nurse staffing agency. Go MSJ at 11. The Go MSJ, therefore, asks the Court to enter summary judgment against the Plaintiffs on their claims against Go and AB Staffing. See Go MSJ at 11.

### b.    Sales and Next Medical's MSJ.

Sales and Next Medical filed their MSJ on the same day as Go and AB Staffing filed their MSJ. Compare Sales MSJ at 1, with Go MSJ at 1. Like the Go MSJ, the Sales and Next Medical MSJ argues that Sales and Next Medical are entitled to summary judgment for two reasons. See Sales MSJ at 2. First, the Plaintiffs do not have expert testimony to establish a deviation from the

standard of care.  See Sales MSJ at 2.  Second, the Plaintiffs do not have expert testimony to establish that Sales and Next Medical's alleged breach caused the Plaintiffs' injuries.  See Sales MSJ at 2.

### c.      The United States' MSJ.

The United States' MSJ begins by noting that the Plaintiffs' claim against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), are evaluated pursuant to New Mexico State law, as the Plaintiffs allege that the United States' negligence occurs in New Mexico.  See USA MSJ at 5.  The United States argues that the Court should dismiss the Plaintiffs' medical negligence case, "because Plaintiffs lack expert testimony to prove the essential element of causation."  USA MSJ at 7.  According to the United States, summary judgment is proper, because the Court excluded Dr. Polsky, and the Plaintiffs do not have another expert to provide causation testimony.  See USA MSJ at 7.

### d.      The Plaintiffs' Response to the Go MSJ.

In the Plaintiffs' Go Response, they begin by asserting, in the "Introduction" section, that N. Charley's husband, T. Charley, testified that N. Charley told the nurses about her exposure to mouse droppings when she "presented to the ER in the early morning of May 28, 2019."  Go Response at 1.  The Plaintiffs then quote from the Shradar Depo., which states that, if N. Charley told the nurses about her exposure to mouse droppings at work, "and the nurses had the appropriate training" from Gallup Medical about hantavirus, the nurses would have breached the standard of care by not telling the doctor about N. Charley's exposure.  Go Response at 1-2 (citing Shradar Depo. at 123:24-124:14).  The Plaintiffs contend, moreover, that Go's training documents list hantavirus as a topic of training and that the United States has not produced equivalent information

for Sales.  See Go Response at 4.  The Plaintiffs also argue that the Glaser Expert Report "establishes the element of causation."  Go Response at 6.  Furthermore, the Plaintiffs assert that "the district Sanitarian at GIMC, Elvina Clark-Joe," testified that Gallup Medical "is required to ask questions about exposure to mouse droppings which she personally experienced both before and after the date Nena Charley presented to GIMC with hantavirus."  Go Response at 6.  According to Clark-Joe, because hantavirus "is endemic to this region, it's a GPRA measure for Indian Health Service.  A GPRA measure is a performance standard that we ask -- that they ask questions if we have a known disease in this region."  Go Response at 6.  The Plaintiffs note that Clark-Joe testifies that she, as a patient at Gallup Medical, has been asked questions about hantavirus exposure before May of 2019 and after May of 2019.  See Go Response at 7.  The Plaintiffs, thus, contend that, based on Clark-Joe's testimony, "nurses must be trained on screening for hantavirus."  Go Response at 7.

Next, after responding to Go's statement of undisputed material facts, the Plaintiffs turn to their additional-discovery argument: they assert that, pursuant to rule 56(d) of the Federal Rules of Civil Procedure, the Court should defer considering the motions for summary judgment until the Plaintiffs depose Gallup Medical's Nurse Educator, Nurse Executive, and Bruce Tempest, a Gallup Medical immunologist.  See Go Response at 13.  The Plaintiffs maintain that "the Nurse Educator will testify about the training GIMC provides on hantavirus as well as the training traveling nurses received while working at GIMC."  Go Response at 13.  They attach a rule 56(d) affidavit, which states that the depositions of Tempest, Dr. Harkins, and the Nurse Educator "are essential to prove Plaintiffs' claims against the defendants in this case regarding negligence on behalf Defendant Nurses Sales and Go and vicarious liability on behalf of their respective staffing

agencies."  Affidavit of Melanie L. Ben, Esq. ¶ 3, at 1 (dated January 3, 2024), filed January 3, 2024 (Doc. 247-12)("Ben Aff.").  Second, the Plaintiffs argue that New Mexico law does not require expert testimony to "establish negligence against the Defendant nurses and their staffing agencies."  Go Response at 14.  They contend that, pursuant to <u>Richter v. Presbyterian Healthcare Services</u>, 2014-NMCA-056, ¶ 19, 326 P.3d 50 ("<u>Richter</u>"), expert testimony "is required when specialized knowledge or skill was applied at the time of the negligent act."  Go Response at 14. They add that the defendants "improperly placed the initial burden to [sic] Plaintiffs by claiming that Plaintiffs have not provided expert testimony even though discovery has yet to be completed." Go Response at 15.   They state, furthermore, that "Dr. Glaser testified to the fact that Defendant Nurses as healthcare providers caused Nena Charley's wrongful death."  Go Response at 15. According to the Plaintiffs, because they have not been able to depose Gallup Medical's nurse educator, they are "unable to fully address" AB Staffing's "negligent training, hiring and supervision of Nurse Go."  Go Response at 16.

### e.    <u>The Plaintiffs' Response to the USA MSJ.</u>

The Plaintiffs begin their USA Response by arguing that the "Defendants motion for summary judgment is <u>not</u> ripe."  USA Response at 2 (emphasis in original).  They reiterate their arguments from the other responses that there are additional depositions that they need to respond to the summary judgment motions.  <u>See</u> USA Response at 2.  They next argue that the "Plaintiffs can establish a genuine issue of material fact" based on Dr. Glaser's expert report and testimony, which "established a breach in the standard of care of healthcare providers at GIMC including the traveling nurses."  USA Response at 3.  According to the Plaintiffs, Dr. Glaser's report also "raises a genuine issue of material fact on causation."  USA Response at 6.  As discussed in the undisputed

fact section above, they recount his testimony that supports this contention.  See USA Response at 7-8.  Finally, they ask that the Court reconsider its order excluding Dr. Polsky.  See USA Response at 8.

       **f.**       **The Go Reply**.

Go and AB Staffing's reply brief contends that the Plaintiffs "attempt to avoid summary judgment through two methods": (i) the Plaintiffs' rule 56(d) argument that they require additional discovery to respond to the summary judgment motions; and (ii) they contend that a genuine issue of material fact exists.  Go Reply at 2.  As to the first method, Go argues that the Plaintiffs' rule 56(d) affidavit is deficient, because it "does not identify any facts that Plaintiffs' counsel believes the additional discovery will uncover, and does not so much as attempt to show how any such facts, if discovered, would oppose the motion for summary judgment."  Go Reply at 2.  As to the second method, Go argues that the Plaintiffs misrepresent the evidence.  See Go Reply at 2.

Specifically, Go maintains that Shradar, the nursing expert, "testified only that, if the nurses had been educated on hantavirus and had been trained on how to screen patients for it, Nurse Go would have breached the standard of care if she failed to screen patients for hantavirus."  Go Reply at 3.  According to Go, this testimony was about a "hypothetical situation," because Gallup Medical "did not provide Go with any training relating to hantavirus screening."  Go Reply at 3 (citing Shradar Depo. at 62:13-63:8).  Go also argues that Dr. Glaser does not offer a standard-of-care opinion as to the nurses, because he "testified that he did not have any opinion regarding the breach of standard of care regarding nurses."  Go Reply at 3.  Furthermore, Go maintains that Dr. Glaser does not offer a causation opinion, because he "never testified, to a reasonable degree of medical probability, that Ms. Charley would have survived had she been treated earlier.  Nor did

he ever provide any percentages regarding Ms. Charley's chances of survival to a reasonable degree of medical probability." Go Reply at 3-4.

After responding to the Plaintiffs' discussion of the undisputed material facts, the Go Reply adds more detail to its critique of the Plaintiffs' rule 56(d) request. See Go Reply at 6. Go contends that the Nurse Educator's deposition "will not uncover any evidence creating a genuine issue of material fact. All of the evidence in this case demonstrates that GIMC did not provide hantavirus training to the traveling nurses at the time of the alleged events." Go Reply at 6 (citing Shradar Depo. at 72:3-10; Deposition of Joelle Catherine Cero Go, RN at 58:12-15 (taken November 21, 2022)("Go Depo."); id. at 79:1-6). According to Go, the Plaintiffs' "speculative assertions" that the nurse educator's deposition will create a genuine issue of material fact "are insufficient to prevent summary judgment." Go Reply at 7. Go also argues that Tempest's deposition will not lead to any material evidence, as he "retired nearly twenty years ago." Go reply at 7. Finally, they maintain that Shradar's "vague statement that he will review additional discovery is insufficient to prevent the entry of summary judgment." Go Reply at 8.

Next, Go addresses Plaintiffs' expert-testimony argument, and asserts that, contrary to the Plaintiffs' position, "expert testimony is necessary and absolutely required" to "know whether Nurse Go properly assessed and treated Ms. Charley, or whether Ms. Charley would have survived had hantavirus been diagnosed earlier." Go Reply at 8. Subsequently, Go repeats her argument that neither Shradar nor Dr. Glaser offer standard-of-care and causation opinions as to Go, because Shradar's opinion to which the Plaintiffs' point is based on a "hypothetical situation." Go Reply at 9. Finally, Go asserts that the Plaintiffs need expert testimony to establish their negligent training, hiring, and supervision claims against AB Staffing, because jurors "cannot be expected

to know the standards applicable to a staffing agency's hiring, credentialing, placement, training, or supervision of its staff." Go Reply at 10. Moreover, "neither Nurse Shradar nor Dr. Glaser proffered any opinions relating to AB Staffing." Go Reply at 11.

### g.    Sales Reply.[13]

The Sales Reply joins the Go Reply. See Sales Reply at 1. The Sales Reply makes substantially the same arguments as the Go Reply. See Sales Reply at 1-3. The Sales Reply's length is three pages. See Sales Reply at 1-3.

### h.    The Exclusion Motion.

The United States files the Exclusion Motion on November 7, 2023, arguing that Dr. Polsky "should be stricken as an expert for failing to appear at his Court-ordered deposition." Exclusion Motion at 7. According to the United States, rule 37(b)(2)(A)(ii) of the Federal Rules of Civil Procedure "states that if a party fails to comply with an order to permit discovery, the court may issue a just order, including prohibiting the disobedient party 'from introducing designated matters into evidence.'" Exclusion Motion at 7 (no citation for quoted material). The United States asserts that "[a]n order was in effect requiring Plaintiffs' expert witness to attend his deposition on October 19, 2023." Exclusion Motion at 8. The United States notes that "[o]ral proceedings compelling discovery 'that unequivocally give a litigant notice' of the discovery required are a sufficient basis for rule 37(b)(2) sanctions." Exclusion Motion at 8 (quoting Avionic Co. v. Gen. Dynamics Corp., 957 F.2d 555, 558 (8th Cir. 1992)). Thus, the United States contends that "[e]xclusion of Dr. Polsky's report and testimony is a proper sanction because Plaintiffs failed to comply with the Court's order to produce Dr. Polsky at his deposition." Exclusion Motion at 9.

---

[13]The United States does not file a reply in support of its MSJ.

The United States identifies five factors that the Court has used to decide whether to dismiss a case, and notes that it is not asking for dismissal, but rather "the more tailored sanction of exclusion." Severance Motion at 10. The factors that the United States identifies are: (i) prejudice to the moving party; (ii) interference with the judicial process; (iii) the nonmoving party's culpability; (iv) whether the Court warned the party in advance that dismissal is a possible sanction; and (v) the efficacy of less severe sanctions. See Exclusion Motion at 10 (citing Walker v. Spina, 17-CV-991 JB/SCY, 2018 WL 6050630, at 6* (D.N.M. Nov. 19, 2018)(Browning, J.)). As to the first factor, the United States asserts that the Plaintiffs' "failure to produce Dr. Polsky for his deposition prejudiced the United States," because it "impeded the United States [sic] ability to prepare its own experts, to evaluate the potential risk and settlement value, and to prepare dispositive motions." Exclusion Motion at 11. As to the second factor, the United States asserts that the settlement conference in the case has been moved five times and that it would "likely be unproductive because the United States has still been unable to depose Dr. Polsky." Exclusion Motion at 12. As to the third factor and fourth factors, the United States asserts that the Court warned the parties that the Court would pick a date for them for expert depositions unless they agreed on one themselves, and, when the parties eventually agreed on a date, but not a time, the Court ordered Dr. Polsky's deposition to start at 8:00 a.m. MDT and end at 3:30 p.m. MDT. See Exclusion Motion at 13. All in all, the United States concludes that "[t]he factors used by this Court for determining if the ultimate sanction of dismissal is proper have been clearly met and support the United States' request" to exclude Dr. Polsky. Exclusion Motion at 14. The United States concludes by maintaining that rule 37(b)(2)(C) of the Federal Rules of Civil Procedure mandates that the Plaintiffs pay the United States' costs for attending Dr. Polsky's deposition. See

Exclusion Motion at 14-15.

### i.    The Exclusion Response.

In the Exclusion Response, the Plaintiffs state that the Plaintiffs' lead counsel, Ms. Curtis, "was unaware Dr. Polsky sent an email the day before the hearing stating he was no longer available on October 19, 2023 because of Defendant USA's refusal to take the date that Dr. Polsky offered." Exclusion Response at 2. The Plaintiffs also state that excluding Dr. Polsky "is much too harsh of a sanction." Exclusion Response at 3. According to the Plaintiffs, the "necessity of expert testimony in this matter counsels against a prophylactic dispositive sanction based on the conduct at issue here." Exclusion Response at 9 (quoting Summers v. Mo. Pac. R.R. Sys., 132 F.3d 599, 604-05 (10th Cir. 1997)). The Plaintiffs argue that the "Defendants can still take Dr. Polsky's deposition before Plaintiffs take any of their experts' depositions," and they state that Dr. Polsky "is available to have his deposition taken on December 5, 2023 in New York or by zoom." Exclusion Response at 10. The Plaintiffs offer the following explanation why Dr. Polsky does not attend his October 19, 2023, deposition: "Having released" that date, Dr. Polsky "set other meetings for that day and Dr. Polsky was unable to change his schedule under such short notice and stated that he need [sic] more time to prepare for his deposition." Exclusion Response at 11. They note that the "Defendants refused Plaintiffs' offer to pay for attorney time and travel expenses related to" the United States' travel to New York to depose Dr. Polsky, and the Defendants refused the Plaintiffs' offer "to have Dr. Polsky's deposition taken on November 8, 2023." Exclusion Response at 11. The Plaintiffs conclude by stating that the "Defendants are not prejudiced because Plaintiffs are willing to set Dr. Polsky's deposition on December 5, 2023." Exclusion Response at 11.

### j.     The November 14, 2023, Hearing on the Exclusion Motion.

As an initial matter, the United States does not file a reply to the Exclusion Motion. Additionally, the Court recounts the proceedings at the November 14, 2023, hearing earlier in this section. See supra, at 32. Accordingly, the Court does not re-summarize the November 14, 2023, hearing here. The Court excludes Dr. Polsky at the November 14, 2023, hearing. See November 14 Clerk's Minutes at 1.

### k.     The Exclusion Reconsideration Motion.

The Exclusion Reconsideration Motion asks the Court to reconsider its order excluding Dr. Polsky. See Exclusion Reconsideration Motion at 1. The Exclusion Reconsideration Motion states that, after the Court entered its minute order instructing the Plaintiffs to come to the November 14, 2023, hearing with dates for Dr. Polsky to be deposed in Albuquerque, the Plaintiffs "immediately contacted Dr. Polsky." Exclusion Reconsideration Motion at 2. According to the Plaintiffs, however, "[b]y the time the hearing began the next day . . . Plaintiffs' counsel was still coordinating with Dr. Polsky regarding his availability." Exclusion Reconsideration Motion at 2. The Plaintiffs state that, because of "the short notice and Dr. Polsky's demanding schedule, Dr. Polsky was unable to find a date for an in-person deposition until the day after the hearing." Exclusion Reconsideration Motion at 2.

Nonetheless, the Plaintiffs assert that one day after the hearing, Dr. Polsky "informed Plaintiffs' counsel that he could sit for a deposition in Albuquerque on Tuesday, January 23, 2024." Exclusion Reconsideration Motion at 2. The Plaintiffs state that they emailed all of the Defendants informing them of Dr. Polsky's availability in January and that the Defendants did not respond. See Exclusion Reconsideration Motion at 2. In sum, the Plaintiffs contend that they seek

"reconsideration on the grounds that Plaintiffs had limited time to work with their expert to provide dates for an in-person deposition which requires more than a day."  Exclusion Reconsideration Motion at 4.  "Dr. Polsky," assert the Plaintiffs, "requires at least four days out of his week" for a deposition in Albuquerque: one day to prepare, one day to travel, one day to be deposed, and one day to fly back to New York.  Exclusion Reconsideration Motion at 4.

The Plaintiffs make several additional arguments for reconsideration.  First, they argue that, because New Mexico State law requires "a plaintiff to use expert testimony to establish a standard of care, breach, and causation," the Plaintiffs "will be substantially prejudiced without an infectious disease expert."  Exclusion Reconsideration Motion at 6.  Second, they argue that "this case should be decided on the merits" rather than on a "technicality," citing to rule 1 of the Federal Rules of Civil Procedure's direction that the rules should be "construed . . . to secure the just, speedy, and inexpensive determination of every action and proceeding."  Exclusion Reconsideration Motion at 7 (quoting Fed. R. Civ. P. 1).  The Plaintiffs contend: "Requiring Plaintiffs to find a date where a professional doctor can rearrange his schedule to travel to Albuquerque for a deposition within 1 day and then excluding that expert because it took 2 days does not secure a just, speedy, or inexpensive determination of this action."  Exclusion Reconsideration Motion at 8.  According to the Plaintiffs, excluding Dr. Polsky "is essentially equivalent to a motion for summary judgment or motion to dismiss as this is a medical malpractice case and Plaintiffs require an expert to prove each of their claims."  Exclusion Reconsideration Motion at 8.

Finally, the Plaintiffs ask the Court to allow them to retain an alternative causation expert.  See Exclusion Reconsideration Motion at 8.  They argue that the Defendants "are already on notice

of Plaintiffs' position regarding hantavirus and their causation theory as Dr. Polsky provided an expert disclosure." Exclusion Reconsideration Motion at 8. They point out that the "Defendants' experts are yet to be deposed and can be scheduled to be taken after Plaintiffs' infectious disease expert's deposition is taken." Exclusion Reconsideration Motion at 8.

### l.       **The United States' Exclusion Response.**

The United States files the Defendant United States' Response to Plaintiffs' Motion for Reconsideration of the Court's Order Granting Defendant United States' Motion to Exclude Dr. Polsky As An Expert (Doc. 221)(sic)(Doc. 236)("Exclusion Reconsideration Response") on December 14, 2023. Exclusion Reconsideration Response at 1. In the Exclusion Reconsideration Response, the United States contends that the "Plaintiffs incorrectly requested the Court to reconsider its prior order" under rules 59 and 60 of the Federal Rules of Civil Procedure, when the order excluding Dr. Polsky is an interlocutory order. Exclusion Reconsideration Response at 1. The United States argues that the Plaintiffs' assertions in the Exclusion Reconsideration Motion are inconsistent with what they said at the November 14, 2023, hearing. See Exclusion Reconsideration Response at 4. According to the United States, at the hearing, the Plaintiffs state: "Dr. Polsky cannot -- showing up here from New York would cost him three days." Exclusion Reconsideration Response at 4 (quoting November 14 Tr. at 4:13-15). The United States asserts that the Plaintiffs also tell the Court that Dr. Polsky's "ability to knock out three days from his schedule that he has is impossible for him." Exclusion Reconsideration Response at 4 (quoting November 14 Tr. at 20:19-23). These explanations, the United States declares, contrast with the Plaintiffs' assertion in the Exclusion Reconsideration Motion that "their failure to comply with the Court's Order was the inability of Dr. Polsky to find dates for his deposition prior to the hearing."

Exclusion Reconsideration Response at 4.

The United States contends that the Court has identified three factors that guide its review of its interlocutory orders: (i) proportionality -- a more thorough earlier ruling gets a more cursory review on reconsideration; (ii) the case's progress and posture, which goes to the opposing party's reasonable reliance on the earlier ruling; and (iii) the <u>Servants of Paraclete v. Does</u>, 204 F.3d 1005 (10th Cir. 2000), factors. <u>See</u> Exclusion Reconsideration Response at 6. As to the first factor, the United States argues that the Court "thoroughly addressed Plaintiffs' failures to comply with the Court's orders when it excluded Dr. Polsky from testifying." Exclusion Reconsideration Response at 6. The United States maintain that the Plaintiffs' Exclusion Reconsideration Motion "reassert[s] prior arguments and attempt[s] to justify their refusal to comply with one of the Court's orders by claiming they were still in discussions with Dr. Polsky." Exclusion Reconsideration Response at 7. As to the second factor, the United States argues that the Defendants "filed dispositive motions related to Plaintiffs' lack of competent expert testimony," which "weighs in favor of a restricted review and against reconsideration." Exclusion Reconsideration Response at 7. As to the third factor, the United States argues that: (i) the Plaintiffs do not show that there has been a change in controlling law that justifies reconsideration; (ii) the Plaintiffs do not have new evidence justifying their lack of compliance with the Court's order to provide Albuquerque deposition dates; and (iii) the Plaintiffs' latest justification for "ignoring the Court's" order is inconsistent with what the Plaintiffs tell the Court at the hearing when the Court excludes Dr. Polsky. <u>See</u> Exclusion Reconsideration Response at 9.

According to the United States, the "affidavit from Dr. Polsky," which the Plaintiffs attach to their Exclusion Reconsideration Motion, does not contain new evidence, and, instead, adds only

a "date when Dr. Polsky now states he would be available for his deposition." Exclusion Reconsideration Response at 10. Moreover, the United States asserts that rule 37(b) of the Federal Rules of Civil Procedure contemplates excluding Dr. Polsky. See Exclusion Reconsideration Response at 11. The United States concludes by noting that the Plaintiffs already asked the Court to substitute another expert in Dr. Polsky's place. See Exclusion Reconsideration Response at 12.

m.    **The Plaintiffs' Exclusion Reconsideration Reply.**

The Plaintiffs' Reply to Defendant United States' Response to Plaintiffs' Motion for Reconsideration to Exclude Dr. Polsky as an Expert, filed December 28, 2023 (Doc. 243)("Exclusion Reconsideration Reply"), begins by asserting that the "Defendants have taken all the other experts' depositions by" Zoom, "and Plaintiffs' counsel was unable to act within a day to achieve Dr. Polsky's guaranteed presence in New Mexico but has secured it with a few more days['] work." Exclusion Reconsideration Reply. The Exclusion Reconsideration Reply explains that, when the Court's clerk called and left the Plaintiffs a message on November 13, 2023, the day before the hearing at which the Court excludes Dr. Polsky, "the Plaintiffs immediately contacted Dr. Polsky for his availability," but Dr. Polsky "stated he could not" provide the Plaintiffs with "in-person deposition dates" on such short notice. Exclusion Reconsideration Reply at 2-3. According to the Plaintiffs, when they email Dr. Polsky on November 13, 2023, asking for dates, Dr. Polsky responds that same day, stating: "As of now, I cannot commit a full day in December. I will need to reshuffle some things in order to do so." Exclusion Reconsideration Reply at 3. The Plaintiffs recount how they then call Dr. Polsky, that same day, and explain "the need for him to attend an in-person deposition in Albuquerque." Exclusion Reconsideration Reply at 3. Dr. Polsky, assert the Plaintiffs, "informed the Plaintiffs that traveling to Albuquerque

- 49 -

required 3-days [sic] out of his schedule and that it was difficult for him to take that time before the end of the year." Exclusion Reconsideration Reply at 3. The Plaintiffs maintain that they "contacted Dr. Polsky during the hearing to continue to press for dates" and to ask for an affidavit, but Dr. Polsky tells them that he can finalize an affidavit the next day, after the hearing. Exclusion Reconsideration Reply at 3.

Next, the Plaintiffs describe how, on November 14, 2023, Dr. Polsky offers December 6, 2023, for his deposition, but also states that he is "unable to sit for the deposition in Albuquerque" in December. Exclusion Reconsideration Reply at 3. Accordingly, the Plaintiffs contend that the United States' assertion that the "Plaintiffs' counsel did not reach out to their expert to obtain dates for a deposition in Albuquerque until after the Court" excludes Dr. Polsky is "completely false." Exclusion Reconsideration Reply at 3. The Plaintiffs maintain that they conveyed accurately Dr. Polsky's concerns about his schedule to the Court as the Plaintiffs "understood" them at the time. Exclusion Reconsideration Reply at 4.

Turning to the Exclusion Reconsideration Reply's merits, the Plaintiffs state that the "Court's exclusion of Dr. Polsky is disproportionate to the practical challenges presented." Exclusion Reconsideration Reply at 7. The Court, state the Plaintiffs, "ordered Dr. Polsky's availability for an in-person deposition be obtained [sic] in Albuquerque within hours. Plaintiffs were unable to coordinate their expert's attendance at that time but could within the next day." Exclusion Reconsideration Reply at 6-7. The Plaintiffs assert that, because of Dr. Polsky's "complex schedule, it took him until the next day after the hearing to provide a time when he could carve out three full days to travel to Albuquerque for his deposition in January." Exclusion Reconsideration Reply at 8.

n.     **The Plaintiffs' Response to the Sales MSJ.**

On January 3, 2024, the Plaintiffs file the Plaintiffs' Response in Opposition to Defendants'

[sic] Robin Ranell Sales, RN and Next Medical Staffing's Motion for Summary Judgment

(Doc. 247)("Sales MSJ Response").    The Sales MJS Response is identical to the Go MSJ

Response.    The Plaintiffs substitutes Sales and Next Medical's names for Go and AB Staffing's

names, and this difference is the only difference.

o.     **The Lybbert Motion.**

On June 24, 2024, the Plaintiffs file the Lybbert Motion.    See Lybbert Motion at 1.    The

Lybbert Motion requests, pursuant to rule 37(a)(1) of the Federal Rules of Civil Procedure, that

the Court "enter an Order to compel" the United States "to produce . . . Nurse Educator Larry

Lybbert to have his deposition continued."    Lybbert Motion at 1.    The Plaintiffs explain that, at

Lybbert's first deposition, "he failed to fully answer Plaintiffs' questions and testified he had

access to such information but did not have it with him."    Lybbert Motion at 2.    The Plaintiffs

request that the Court permit them "more time to depose Mr. Lybbert and to take his deposition

while he has access to his computer so he can fully answer Plaintiffs questions."    Lybbert Motion

at 2.

The Plaintiffs contend, specifically, that, during Lybbert's deposition, they ask him

"questions about the hantavirus training Defendant nurses received prior to Nena's visit to the ER.

Mr. Lybbert responded that he had access to this information but was unable to access it during

his deposition."    Lybbert Motion at 3.    According to the Plaintiffs, the Plaintiffs asked the United

States to produce the information in question -- "what the required HealthStream modules were

for nurses in 2019" -- pursuant to the Plaintiffs' Request for Production No. 27, but the United

States did not produce this information.  Lybbert Motion at 3.  The Plaintiffs also describe how Lybbert, in his deposition, answers that he has access to the nurses' training files.  See Lybbert Motion at 3-4.  Moreover, the Plaintiffs maintain that the United States has not supplemented Lybbert's resume.  See Lybbert Motion at 4.  In conclusion, the Plaintiffs assert that the United States "prevented Mr. Lybbert from being fully prepared for his deposition, hindering Plaintiffs' ability to have their questions fully answered at deposition," even though "hantavirus training for nurses as part of onboarding was the entire point of" Lybbert's deposition.  Lybbert Motion at 5.

### p.    The United States' Response to the Lybbert Motion.

On July 8, 2024, the United States files Defendant United States' Response to Plaintiffs' Amended Motion for Leave to Re-Depose Larry Lybbert Nurse Educator (Doc. 268)("Lybbert Response").  The United States asserts that, before Lybbert's deposition, the United States "produced copies of GIMC's hantavirus training materials"; moreover, the United States maintains that, during a hearing on October 13, 2023, the Plaintiffs "agreed that the United States had produced hantavirus training materials."  Lybbert Response at 2.  Additionally, the United States maintains that it has produced: (i) "documents showing the standard orientation programs for ER nurses at GIMC"; and (ii) "the HealthStream transcripts" for Sales and Go, which identify the training they receive at Gallup Medical.  Lybbert Response at 2-3.  The United States asserts that, although the Court "granted leave for" the "Plaintiffs to submit a request for training materials," the Plaintiffs "never sent the United States any additional discovery requests."  Lybbert Response at 3.  Moreover, the United States declares that the United States never instructed Lybbert to refrain from answering a question, and that Lybbert never refused to answer a question.  See Lybbert Response at 3.

- 52 -

Next, the United States contends that the Plaintiffs have not complied with rule 37's requirement to include in a motion for an order compelling discovery a certification that the movant conferred in good faith with the party purportedly failing to make a disclosure, and, moreover, that the Plaintiffs have not shown that they are entitled to depose Lybbert again. See Lybbert Response at 3, 5. First, the United States maintains that the Plaintiffs do not identify any questions that Lybbert fails to answer, so rule 37(a)(3)(B)(i) does not apply. See Lybbert Response at 5. Second, the United States declares that, because the Plaintiffs did not notice Lybbert's deposition as a rule 30(b)(6) deposition, and because they did not issue a subpoena duces tecum to Lybbert, the Plaintiffs have not demonstrated that "Lybbert should be required to sit in front of his computer to access documents during his deposition" or to answer questions about specific topics. Lybbert Response at 5. Third, the United States maintains that the Plaintiffs' Request for Production No. 27 actually asks the United States "to produce all HealthStream testing scores" for Go and Sales, and not the HealthStream modules. Lybbert Response at 6. Accordingly, the United States asserts that it produced "HealthStream Transcripts that show the HealthStream testing scores for both" nurses. Lybbert Response at 6. Fourth, the United States contends that the Plaintiffs had these transcripts available during Lybbert's deposition "and could have asked him questions about the trainings identified on the transcripts," but the Plaintiffs did not ask him questions about the trainings. Lybbert Response at 6. Fifth, the United States contends that, contrary to the Plaintiffs' assertion, the United States provided the Plaintiffs with Gallup Medical's nurse training materials before Lybbert's deposition, meaning that the Plaintiffs could have questioned Lybbert about these materials. See Lybbert Response at 7.

With regards to the Plaintiffs' resume-supplementation argument, the United States asserts

that Lybbert originally identifies an error on his resume about a date, but, two questions later, corrects himself and clarifies that the resume's date is correct.  See Lybbert Response at 7. Additionally, the United States maintains that the Plaintiffs do not describe which questions "they were unable to ask during the deposition and why additional time is necessary."  Lybbert Response at 8.  Finally, the United States asserts that the Plaintiffs do not meet the rule 26(b) factors that guide the Court's exercise of discretion in the discovery context.  See Lybbert Response at 9-11.

<strong>q.    The Lybbert Motion Reply.</strong>

The Plaintiffs' Reply to Defendants United States and AB Staffing and Joelle Catherine Cero GO, RN's Response to Plaintiffs' Amended Motion for Leave to Re-Depose Larry Lybbert, Nurse Educator [Doc. 268], filed July 22, 2024 (Doc. 274)("Lybbert Reply"), reiterates that Lybbert "was not adequately prepared for his initial deposition, as he did not have access to pertinent information regarding" nurse hantavirus training.   Lybbert Reply at 2.  The Plaintiffs assert that Lybbert is their "only source of information" regarding the nurses' liability.  Lybbert Reply at 3.  The Plaintiffs then respond to the United States' arguments in the Lybbert Response. The Plaintiffs state that it is "offensive to say that it is unduly burdensome for Defendant to have failed to prepare the witness  . . . as a reason why the deposition should not be reconvened." Lybbert Reply at 4.  The Plaintiffs point out that Lybbert "was previously deposed by zoom and can again be deposed by zoom."  Lybbert Reply at 4.

Next, the Plaintiffs address the rule 26 factors.  See Lybbert Reply at 5.  First, the Plaintiffs assert that, while the "Defendants claim Plaintiffs have all the training material related to this case," this assertion "is questionable considering Defendants made the same claim before until Defendant Nurse Go produced training documents (Exhibit '1') and Defendant USA subsequently

- 54 -

supplemented discovery." Lybbert Reply at 5. Second, and finally, the Plaintiffs reiterate that Lybbert can be deposed over Zoom, with time constrains, which mitigate the burden on the Defendants. See Lybbert Reply at 5.

### r.    The First Relief Motion.

On July 18, 2024, the Plaintiffs file their First Relief Motion. See First Relief Motion at 1. The First Relief Motion asks for relief from the Court's statement on January 5, 2024, describing its inclination to grant Sales' and Go's MSJs. See First Relief Motion at 1. The Plaintiffs make their request pursuant to rule 59 or rule 60(b)(2) of the Federal Rules of Civil Procedure. See First Relief Motion at 2. The Plaintiffs contend that the new evidence which justifies relief from the Court's MSJ rulings stems from: (i) the Lybbert deposition; (ii) the deposition of Dr. Gregory Mertz, the United States' infectious disease expert; (iii) the deposition of Matthew Powers, RN, Go's expert; and (iv) the affidavit of Dr. Michelle Harkins, a pulmonologist specializing in hantavirus. See First Relief Motion at 1. In the First Relief Motion, the Plaintiffs first describe the Harkins Aff., which offers opinions about what actions the Defendants should have taken when treating N. Charley and how those actions might have allowed her to survive her hantavirus infection. See First Relief Motion at 3-4. The Plaintiffs assert that the Harkins Aff. creates a genuine issue of material fact; the Plaintiffs, however, do not explain with which of the Defendants' undisputed facts the Harkins Aff. conflicts. See First Relief Motion at 4.

Next, the Plaintiffs describe the testimony of Go's nursing expert, Powers. See First Relief Motion at 5. The Plaintiffs assert that they "have discovered it was inappropriate to administer" fluid to N. Charley "during her second ER visit," because Powers states that fluid "is not appropriate for patients" having cardiac emergencies. First Relief Motion at 5. After describing

- 55 -

Powers' testimony, the Plaintiffs then contend that the "Defendants' expert nurses are unqualified to assert that the Defendant nurses adhered to the standard of care due to their insufficient knowledge about hantavirus, its prevalence in the area," and travel nurses' responsibilities. First Relief Motion at 7. Subsequently, the Plaintiffs assert that Lybbert testifies that the nurses "were trained on hantavirus," but that he "could not recall" the training's specific timing. See First Relief Motion at 8. The Plaintiffs also describe Powers' testimony that, if N. Charley told the nurses she had been exposed to mouse droppings and if those nurses had been trained on hantavirus, "there could have been a breach in the standard of care." First Relief Motion at 8. The Plaintiffs acknowledge that hantavirus "is not something nurses are inherently aware of simply by being nurses," and point to Powers' testimony that the hospital would have to provide information to the nurses regarding endemic diseases in the area. First Relief Motion at 8. In the First Relief Motion's next section, titled the "Defendants' Nursing Experts Assert that GIMC Had An Obligation to Train Its Nurses on Hantavirus," the Plaintiffs describe testimony from Morikawa and Powers that it is Gallup Medical's responsibility to train nurses on endemic diseases. See First Relief Motion at 9-10. The Plaintiffs also describe Morikawa's testimony that she "could not recall if she had seen the CDC training video on hantavirus"; accordingly, the Plaintiffs argue that this lack of recollection "prevented her from addressing whether there was a breach in the standard of care by the nurses." First Relief Motion at 10.

s.    **The United States' First Relief Motion Response.**

In the Defendant United States' Response to Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment, filed August 12, 2024 (Doc. 279)("USA First Relief Response"),

the United States first contends that the Court should not consider the Harkins Aff. as a basis for reconsideration.  See USA First Relief Response at 2.  The United States maintains that the Harkins Aff. "is an improper attempt to circumvent" both rule 23(a)(2) of the Federal Rules of Civil Procedure and the Court's orders regarding expert disclosures, because the Plaintiffs do not disclose Harkins by the July 21, 2023, expert-disclosure deadline.  USA First Relief Response at 2-3.  According to the United States, the Harkins Aff. includes expert opinions and exceeds the scope of Dr. Harkins' work as N. Charley's treating provider.  See USA First Relief Response at 4.  Moreover, the United States contends that the Plaintiffs do not provide "an expert report for Dr. Harkins including her complete statement of opinions and the bases for those opinions."  USA First Relief Response at 5.  Accordingly, the United States maintains that the Court should exclude the Harkins Aff., because each of the four factors that the United States Court of Appeals for the Tenth Circuit directs district courts to consider when deciding whether to exclude expert evidence favors exclusion.  See USA First Relief Response at 6 (noting that the factors are (i) prejudice to the party arguing for exclusion; (ii) the potential to cure the prejudice; (iii) the possible disruption to the trial; and (iv) the introducing party's bad faith or willfulness).

Turning to the Relief Motion's core issue, the United States asserts that the Plaintiffs have not identified "any competent expert causation testimony that was not previously available."  USA First Relief Response at 12.  The United States maintains that the Plaintiffs "knew about Dr. Harkins well before" the summary judgment motions, "could have deposed" Harkins, but did not depose her, "and could have moved to substitute her as an expert but failed to do so."  USA First Relief Response at 12.  In sum, the United States' asserts that "[a]ny opinions Dr. Harkins could have provided were previously available to" the Plaintiffs.  USA First Relief Response at

12. Finally, the United States maintains that the Plaintiffs' claim that there are "unresolved factual disputes regarding the adequacy of hantavirus training at" Gallup Medical "cannot be the basis for reconsideration," because the Court dismissed the negligent-training claims against Gallup Medical, pursuant to the discretionary function exception in the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  USA First Relief Response at 14.

t.      **The Go Relief Response.**

The Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Response to Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment [Doc. 33] and [Doc. 234], filed August 12, 2024 (Doc. 281)("Go Relief Response"), first contends that the Court should strike the Harkins Aff.  Go Relief Response at 7.  Go's basis for this request is that (i) the Court already ruled that the Plaintiffs may not retain a new causation expert; and (ii) the disclosure is "extremely untimely and highly prejudicial."  Go Relief Response at 7.  Second, Go addresses several of the Plaintiffs' assertions.  See Go Relief Response at 8.  As to Lybbert's testimony, Go maintains that Lybbert "did not know whether" Sales or Go "received any hantavirus training before May of 2019," and, also, that Lybbert testifies that "there were no initials next to the hantavirus module in Nurse Go's training materials."  Go Relief Response at 8.  As to Powers' testimony, Go maintains that Powers states that "he could not answer a hypothetical question as to whether the nurses breached the standard of care, assuming that they were trained on hantavirus before Ms. Charley presented to the emergency room, without knowing the specific training that the nurses received."  Go Relief Response at 9.  As to the "Plaintiffs' arguments regarding the alleged 'deficiencies' in Defendants' experts' training and knowledge of hantavirus," Go contends

that these arguments are "irrelevant," because these "alleged deficiencies would go entirely to the" experts' credibility and not to the Plaintiffs' medical negligence claim.  Go Relief Response at 9 n.2.

    u.    **The Sales Relief Response**.

    The Defendants Robin Ranell Sales, R.N. and Next Medical Staffing's Response to Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Rulings on Defendant Nurse Sales' and Nurse Go's Motion To [sic] Summary Judgment, filed August 12, 2024 (Doc. 283)("Sales Relief Response"), begins by contending that the Harkins Aff. is based upon Gallup Medical records that the Plaintiffs provided to the parties on July 6, 2022; accordingly, Dr. Harkins has not reviewed any "newly discovered" evidence.  Sales Relief Response at 3.  Sales also contends that the Plaintiffs do not explain why they do not retain and identify Dr. Harkins earlier, if they want to retain and identify her: "there was no hurdle to Plaintiffs retaining Dr. Harkins in advance of the July 21, 2023 deadline if they chose to retain Dr. Harkins back then."  Sales Relief Response at 3.

    Second, Sales contends that the Court should "disregard" the Plaintiffs' argument that Dr. Mertz' testimony raises "a genuine issue of material fact regarding causation and the loss of chance of survival," because the Plaintiffs do not support their assertion "outside of that conclusory statement."  Sales Relief Response at 4.  Third, Sales maintains that the Plaintiffs still do not have an expert "opining that Nurse Sales and Next Medical Staffing fell below the standard of care."  Sales Relief Response at 4.  Sales asserts that, contrary to the Plaintiffs' assertions, Morikawa "opined that Nurse Sales and Next Medical Staffing met the standard of care."  Sales Relief Response at 4.

<strong>v.      <u>The Plaintiffs' First Relief Reply</u>.</strong>

The Plaintiffs' Joint Reply to Defendants United States, AB Staffing, Joelle Catherine Cero Go, RN, Next Medical Staffing and Nurse Sales RN's Responses (Docs. 297, 281, and 283) to Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment (Docs. 233 and 234), filed September 3, 2024 (Doc. 290)("First Relief Reply"), makes three arguments.  First, the Plaintiffs assert that expert witness Powers "did not have experience as a travel nurse and lacks understanding of" hantavirus' causes and "the significance of exposure to mouse droppings."  First Relief Reply at 4.  Second, the Plaintiffs maintain that Dr. Mertz states, at his deposition, that, "had Mrs. Charley's hantavirus been discovered during her first visit to the GIMC Emergency Room, she had a 10% to 25% chance of survival."  First Relief Reply at 5.  According to the Plaintiffs, therefore, "Dr. Mertz's testimony supports Plaintiffs' position that timely diagnosis of hantavirus could have afforded Mrs. Charley a chance of survival."  First Relief Reply at 5.  Third, the Plaintiffs contend that there is good cause for the delay in disclosing the Harkins Aff., because "certain depositions of Defendants' experts had not been taken."  First Relief Reply at 6.  The Plaintiffs maintain, moreover, that the Harkins Aff. does not prejudice unfairly the Defendants, because the Harkins Aff. "only strengthens the argument for an already disclosed theory, causation.  Dr. Harkin[s'] affidavit introduces no new line of argument but rather provides necessary and relevant clarity."  First Relief Reply at 6.  Additionally, the Plaintiffs assert that the Defendants may depose Dr. Harkins.  <u>See</u> First Relief Reply at 7.  The Plaintiffs also assert that introducing the Harkins Aff. "will not disrupt the trial," because the trial date has been vacated.  First Relief Reply at 7.  The First Relief Reply concludes by requesting the Court "to allow the

case to proceed with the inclusion of this critical expert testimony." First Relief Reply at 9.

w.    <strong><u>The August 13, 2024, Hearing</u></strong>.

At the August 13, 2024, the United States represents that it has produced all the documents that the Plaintiffs have requested.  See Draft Tr. of August 13, 2024, Hearing at 6:13-17 (taken August 13, 2024)("Aug. 13 Tr.")(Court)(Eaton).[14]  Moreover, the Plaintiffs state that they "can't state specifically any particular document that is being withheld."  Aug. 13 Tr. at 6:23-25 (Ben).  Next, turning to the Lybbert Motion, the Court asks the Plaintiffs whether, if they depose Lybbert again, he will say the same thing as he says in the first deposition.  See Aug. 13 Tr. at 8:20-21 (Court).  The Plaintiffs respond that, at the second deposition, they want Lybbert to get the information that he said previously that he could access, but which he did not currently have access.  See Aug. 13 at 9:11-16 (Ben).  The Court notes that a defendant does not need to prepare a fact witness for her deposition and, here, "[t]his isn't a 30(b)(6).  It's just a fact witness."  Aug. 13 Tr. at 11:1-6 (Court).  The United States reiterates that it responded to the Plaintiffs' discovery requests and produced hantavirus training materials and, moreover, that, when the Court "gave leave for the Plaintiffs to send an additional request for production," the Plaintiffs "never sent that request." Aug. 13 Tr. at 13:3-17 (Eaton).  The United States also states that, with regards to the document to which the Plaintiffs refer, the document "wasn't a training document," but, rather, an "internet site where they could go get additional documents" about hantavirus, which the United States "pulled" from the website "to provide them to the Plaintiffs."  Aug. 13 Tr. at 14:16-25 (Eaton). Furthermore, the United States clarifies that, as to the bucket of documents that Lybbert says would

---

[14]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

take him a long time to get, the United States has produced those documents, which are the HealthStream documents.  See Aug. 13 Tr. at 16:1-5 (Eaton).  Then, as to the bucket of documents that Lybbert says "wouldn't take long" to find, the United States contends that "this is the internet site document," which merely "provides a list of links to documents that somebody who gets on the GIMC internet site can look up."  Aug. 13 Tr. at 18:17-24 (Court)(Eaton).  In sum, the United States asserts that the documents to which Lybbert references were all produced before Lybbert's deposition.  See Aug. 13 Tr. at 20:16-21 (Eaton).

### x.    The Harkins Motion.

On August 12, 2024, Go and AB Staffing file the Harkins Motion, which asks the Court to strike the Harkins Aff.  See Harkins Motion at 1.  The Harkins Motion begins by reviewing the Court's statement at the January 5, 2024, hearing, where the Court states: "I'm not going to grant any request that plaintiffs be allowed to get a new expert."  Harkins Motion at 4.  Next, the Harkins Motion asserts that the Harkins Aff. violates the Court's order setting expert disclosure deadlines. See Harkins Motion at 5.  The Harkins Motion contends, moreover, that, because the Plaintiffs' disclosure of the Harkins Aff. is untimely, the Defendants "cannot designate responsive experts for these new opinions," as the Defendants' "expert disclosure has long since passed."  Harkins Motion at 5.  Finally, the Harkins Motion asserts that allowing the Plaintiffs to "proceed with Dr. Harkins" would allow the Plaintiffs "to disregard the Court's orders and rulings -- the law of the case."  Harkins Motion at 5.

### y.    The Plaintiffs' Second Relief Motion.

The Second Relief Motion asks the Court to grant the Plaintiffs relief from the Court's January 5, 2024, ruling granting the United States MSJ, based on what the Plaintiffs characterize

as new evidence.  See Second Relief Motion at 1.  Similar to the First Relief Motion, the Second

Relief Motion purports to identify the following categories of new evidence: (i) deposition

testimony from Lybbert, the nurse educator; (ii) testimony from Dr. Mertz, the United States'

infectious disease expert; (iii) testimony from Go's nursing expert Powers; and (iv) the Harkins

Aff.  See Second Relief Motion at 1.  First, the Second Relief Motion asserts that Dr. Mertz opines

that, "had Mrs. Charley's hantavirus been discovered during her first" ER visit, "she had a 10% to

25% chance of survival," but this "lost chance of survival was taken from Mrs. Charley and her

family as she was an otherwise healthy 48-year-old woman."  Second Relief Motion at 4.  The

Plaintiffs maintain that Dr. Mertz "provides causation opinions which raise a genuine issue of

material fact" regarding Gallup Medical's employees' "failure to diagnose and treat Mrs. Charley

promptly caused a loss of chance of survival."  Second Relief Motion at 5.

Second, the Plaintiffs describe the Harkins Aff., and contend that it "raises a genuine issue

of material fact regarding the appropriate treatment Mrs. Charley should have received when she

presented to GIMC."  Second Relief Motion at 8.  Third, the Plaintiffs contend that Dr. Mertz

acknowledges that hantavirus "can be detected in peripheral white blood cells during the

incubation period" before the prodromal[15] period.  Second Relief Motion at 8.  According to the

Plaintiffs, Dr. Mertz "confirmed" that "tests that could diagnose hantavirus in the prodromal phase

. . . could have been ordered and conducted at GIMC."  Second Relief Motion at 9.

Fourth, the Plaintiffs contend that, when N. Charley returned to Gallup Medical "at 1:30

---

[15]A "prodrome" is "one or more symptoms that signal the impending onset of disease or illness and that often appear before other closely related or indicative symptoms."  Prodrome, Merriam Webster, available at https://www.merriam-webster.com/dictionary/prodrome (last visited May 16, 2025).

a.m., her ER lab findings yelled [sic] hantavirus." Second Relief Motion at 11. Fifth, the Plaintiffs contend that the "Defendants failed in their duty by not performing a CBC, which could have led to an early hantavirus diagnosis and potentially saved her life." Second Relief Motion at 15. Sixth, the Plaintiffs contend that Lybbert testifies that Gallup Medical doctors and nurses "were trained on hantavirus in 2019." Second Relief Motion at 16.

### z.    The Second Relief Motion Response.

In the Defendant United States' First Amended Response to Plaintiffs' Amended Motion for Relief Based On Newly Discovered Evidence Regarding the Court's Ruling on Defendant United States' Motion for Summary Judgment, filed November 1, 2024 (Doc. 299)("Second Relief Response"), the United States contends that the Plaintiffs misrepresent Dr. Mertz' testimony. See Second Relief Response at 7. According to the United States, the "Plaintiffs' theory of liability and their claim that Mrs. Charley suffered a lost chance of survival is based upon the misrepresentation that her hantavirus could have been diagnosed during her first visit to GIMC when she was in the prodromal phase." Second Relief Response at 8. The United States maintains, however, that "Dr. Mertz testified that it is not feasible to diagnose hantavirus in the prodromal phase." Second Relief Response at 8-9. Moreover, the United States asserts that Dr. Mertz testifies that the tests used to identify hantavirus in the prodromal phase "were largely available in Chile, but that they are" not generally available in the United States, and they were not available "at the time Mrs. Charley went to GIMC." Second Relief Response at 9. The United States contends that the "Plaintiffs excluded this portion of Dr. Mertz's testimony to misrepresent that this testing was available at GIMC." Second Relief Response at 9. Additionally, the United States asserts that, although Gallup Medical "took a sample when Mrs. Charley was in the cardiopulmonary phase

- 64 -

and sent it out for testing, [] the results did not come back until after she died."  Second Relief Response at 9.  Consequently, the United States maintains that the "Plaintiffs have no basis to claim that during the prodromal phase if GIMC would have done the" requisite testing, Gallup Medical would have correctly diagnosed the hantavirus and N. Charley would have survived. Second Relief Response at 9.

Next, the United States addresses the Plaintiffs' assertion that Dr. Mertz offers a causation opinion and contends that the Plaintiffs cherry-pick his testimony and focus on his statements in the context of a hypothetical scenario, in which N. Charley "is in the hospital when she gets to that very beginning res--cardiopulmonary phase of hantavirus."  Second Relief Response at 10. According to the United States, Dr. Mertz asserts, regarding the case's "actual facts," that N. Charley's "likely outcome is fatal," because her disease progressed rapidly in a rural area. Second Relief Response at 10.  In sum, the United States maintains that Dr. Mertz "testified that no action or inaction on the part of anyone at Gallup Indian Medical Center led to a lost chance of survival of Mrs. Charley."  Second Relief Response at 11.  The United States also notes that Dr. Mertz testifies that, in N. Charley's case, Gallup Medical's "healthcare providers could not have made a presumptive diagnosis of hantavirus during her first visit when she was in the prodromal phase."  Second Relief Response at 14.

### aa.   The Second Relief Reply.

In the Plaintiff's Reply to Defendant USA's First Amended Response to Plaintiffs' Amended Motion for Relief Based On Newly Discovered Evidence [Doc. 299], filed November 15, 2024 (Doc. 300)("Second Relief Reply"), the Plaintiffs contend that Dr. Mertz' "failure to be familiar with the training health care providers get at GIMC regarding environmental factors

prevents him from providing adequate expert testimony." Second Relief Reply at 4. The Plaintiffs also assert that the Harkins Aff. "goes beyond Dr. Polsky's testimony by addressing specific issues addressed by Dr. Mertz such as Defendants' negligence in giving" N. Charley fluids. Second Relief Reply at 6. Additionally, the Plaintiffs contend that the Harkins Aff. "will not unfairly prejudice" the Defendants, because it "only strengthens the argument for an already disclosed theory, causation." Second Relief Reply at 7.

### bb.    The March 7, 2025, Hearing.

At the March 7, 2025, hearing, the Plaintiffs explain that they "knew that there was no way that" Dr. Mertz "could testify any other way than the fact that there would be a lost chance of survival for Nena Charley not having been properly treated at two different stages of her visit" to Gallup Medical. Draft Tr. at 5:24-6:4 (taken March 7, 2025)(Curtis)("March 7 Tr."). The Plaintiffs explain that Dr. Mertz "surprised" them, because he did not testify "in line with his own medical literature"; the Plaintiffs state, accordingly, that they "took a very unusual step and we spoke to his colleague at the University of New Mexico." March 7 Tr. at 6:20-23 (Curtis). The Plaintiffs describe how this colleague, Dr. Harkins, "reviewed everything" and then gives "her opinion in an affidavit about what happened and about what the stage was of Nena Charley's actual hantavirus when she came in on the 28th." March 7 Tr. at 7:11-14 (Curtis). The Plaintiffs clarify that "what we've asked is that . . . Dr. Harkins be permitted to come in as a rebuttal expert to Dr. Mertz' testimony but that the Court first recognize Dr. Mertz' testimony that there was a lost chance of survival." March 7 Tr. at 8:8-15 (Curtis). The Plaintiffs also contend that Morikawa testifies that "the way that Ms. Charley was handled by the emergency room nurses was wrong," because "[y]ou can't give fluid to someone like Nena Charley who has hantavirus." March 7 Tr.

at 9:1-9 (Curtis).

Go responds, stating that "the USA produced all training videos, documents, PowerPoint pertaining to hantavirus from 2010 to present." March 7 Tr. at 30:18-21 (Chanez). Go also notes that Lybbert states that he does not have any knowledge of "any specific training required to be done for nurses . . . [in] May of 2019 when Ms. Charley died." March 7 Tr. at 31:4-9 (Chanez). Go maintains, moreover, that, as to Powers' testimony, Powers testifies "only in response to a hypothetical that" the Plaintiffs assert in their questioning -- namely, that "if he were to assume that the nurses received hantavirus training . . . he would have to just review that training to assess whether the training materials were followed." March 7 Tr. at 32:5-11 (Chanez). Go also asserts that Go was "not on shift" during the second emergency room visit. March 7 Tr. at 33:6-7 (Chanez). Finally, Go asserts that the Court could base its summary judgment ruling on lack of evidence as to both the standard of care and as to causation. See March 7 Tr. at 36:4-13 (Chanez).

The Plaintiffs resume their argument, and contend that the NAIH Gallup Service United Intranet Site, filed January 3, 2024 (Doc. 247-6)("NAIH Printout"), shows that, in 2019, "they were training on hantavirus." March 7 Tr. at 19-21 (Curtis). According to the Plaintiffs, Go initialed the NAIH Printout next to a link labeled "hantavirus/plague update," which demonstrates that, "in 2019, they did training on hantavirus as part of the onboarding process." March 7 Tr. at 46:24-47:8 (Curtis). The Plaintiffs maintain, therefore, that, "with that training, if they fail to tell the doctor" about exposure to mouse droppings, "that was a breach of the standard of care." March 7 Tr. at 47:10-14 (Curtis).

Next, the United States asserts that, "[o]ver time, the nature of Dr. Harkins' relationship to this case has also changed." March 7 Tr. at 51:18-19 (Eaton). Additionally, the United States

asserts that Dr. Mertz states that "there was no action or inaction on the part of anyone at GIMC that led to a lost chance of survival." March 7 Tr. at 62:1-6 (Eaton). The United States maintains that "every record that was requested from us has been provided." March 7 Tr. at 67:8-10 (Eaton). Sales addresses the Court and contends that Go "actually initialed the 2019 patient safety goals" on the NAIH Printout and did not initial the hantavirus/plague update link. March 7 Tr. at 68:6-7 (Checkett). Then, in response to the Court's question, the Plaintiffs agree that the NAIH Printout "is the only record received that shows hantavirus training." March 7 Tr. at 71:16-19 (Curtis).

## LAW REGARDING RULE 37 SANCTIONS

Rule 37(c) of the Federal Rules of Civil Procedure provides for certain sanctions if a party fails to "disclose, to supplement an earlier response, or to admit" information in accordance with rules 26(a) or (e):

> **(1)    *Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > **(A)**    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> >
> > **(B)**    may inform the jury of the party's failure; and
> >
> > **(C)**    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c). Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure authorizes a court to impose various sanctions upon a party for failure to comply with "an order to provide or permit discovery," including: (i) ordering that designated facts be taken as established; (ii) precluding the disobedient party from supporting or opposing matters at issue, or "introducing designated matters

in evidence;" (iii) "striking pleadings in whole or in part;" (iv) "staying further proceedings until

the order is obeyed;" (v) dismissing the action; and (vi) "rendering a default judgment against the

disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi). "Determination of the correct sanction for

a discovery violation is a fact-specific inquiry that the district court is best qualified to make."

Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992). Sanctions must be "just" and related

to the claim "at issue in the order to provide discovery." Klein-Becker USA v. Englert, No. CIV

12-4076, 2013 WL 1223819, at *3 (10th Cir. 2013)(unpublished)(quoting Ehrenhaus v. Reynolds,

965 F.2d at 920).[16]

> Whether a failure to disclose is harmless and/or justified under Rule 37
> depends upon several factors that a district court should consider in exercising its
> discretion. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d
> 985, 993 (10th Cir. 1999). These factors include: "(1) the prejudice or surprise to
> the party against whom the testimony is offered; (2) the ability of the party to cure
> the prejudice; (3) the extent to which introducing such testimony would disrupt the
> trial; and (4) the moving party's bad faith or willfulness." Id.

---

[16]Klein-Becker USA v. Englert, No. CIV 12-4076, 2013 WL 1223819 (10th Cir. 2013), is
an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the
extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)
("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The
Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we
> have generally determined that citation to unpublished opinions is not favored . . . .
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Klein-
Becker USA v. Englert; Martinez v. Target Corp., 384 F. App'x 840 (10th Cir. 2010); and Gillum
v. United States, 309 F. App'x 267, 270 (10th Cir. 2009), have persuasive value with respect to a
material issue, and will assist the Court in its disposition of this Memorandum Opinion.

Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1129-30 (10th Cir. 2011).  "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness" of a rule 26(a) violation.  Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d at 993.  In the context of considering whether a district court properly excluded evidence because a party's failed to comply with rule 26(a) or (e), the Tenth Circuit explains: "The parties to a litigation are not merely players in a game, trying to catch each other out.  Rather, litigation should promote the finding of the truth, and, wherever possible, the resolution of cases on their merits."  Gillum v. United States, 309 F. App'x 267, 270 (10th Cir. 2009).

For example, in Gillum v. United States, the Tenth Circuit determines that a party's failure to produce a written expert report in compliance with rule 26(a)(2)(B) does not warrant the extreme sanction of excluding the expert's testimony.  See 309 F. App'x at 269-70.  The district court concludes that the inadequate expert report prejudiced the United States, because it could not adequately prepare for deposing the expert, and the district court determines that the prejudice could not be cured on the premise that the United States had "only . . . one chance to confront that expert, . . . flat-footed, with the benefit of the homework that you can do before you take that expert deposition, and that opportunity is now gone permanently in this case."  309 F. App'x at 269-70. The Tenth Circuit holds that the district court "abused its discretion in analyzing the 'cure factor,'" because the district court "focused on the fact that the inadequate report permanently deprived the United States of the opportunity to confront [the expert] . . . 'flat-footed.'"  309 F. App'x at 270. The Tenth Circuit holds that this analysis is faulty, because the plaintiff arranges for the United States to depose the expert a second time before the end of the discovery period, and the plaintiff

could cover the United States' costs for a second deposition. See 309 F. App'x at 270. While stating that "[b]y no means do we condone the provision of inadequate expert report and begrudging snippets of information, and we caution that parties who behave in this manner act to their peril," the Tenth Circuit holds that the total exclusion of the expert's testimony is unnecessary. 309 F. App'x at 370.

On the other hand, in Martinez v. Target Corp., 384 F. App'x 840 (10th Cir. 2010), the Tenth Circuit concludes that a district court properly struck a plaintiff's untimely expert report, which the plaintiff filed nine months after the deadline for expert disclosure had passed, seven weeks after discovery closed, and after the defendant had filed for summary judgment. See 384 F. App'x at 847-48. The plaintiff argues that the defendant should have been on notice of the expert reports, because they were filed in a separate action in Oklahoma before the plaintiff's trial, but the district court found "no precedent for the proposition that the timely disclosure of expert reports in a different case could satisfy the deadline requirements established in the present case." 384 F. App'x at 847-48. The plaintiff also provides no explanation for her failure to seek an "extension of the expert-disclosure deadline if, as she argued, she had an extremely difficult time locating experts she considered critical to her case." 384 F. App'x at 848.

The Court has applied Woodworker's Supply, Incorporated v. Principal Mutual Life Insurance Company to overrule a defendant's objection to a plaintiff's supplement to an expert report. See Coffey v. United States, No. CIV 08-0588 JB/LFG, 2012 WL 2175747, at *1, *12-14 (D.N.M. May 26, 2012)(Browning, J.). In Coffey v. United States, the Court determines that any prejudice or surprise that the defendant suffers is minimal, because the defendant's main argument against admitting the supplemented report is that it lacks relevance, which the Court explains the

defendant can raise as an objection at trial and, thus, does not warrant precluding the report pretrial. See 2012 WL 2175747, at *13. Additionally, the Court determines that, because the defendant has the supplemented report well before it deposes the plaintiff's expert, any prejudice to the defendant is the defendant's own fault. See 2012 WL 2175747, at *13. There is no evidence that the supplemented report would disrupt trial, because the defendant does not assert that it "would need additional witnesses to combat improper testimony." 2012 WL 2175747, at *12-13. Lastly, although the plaintiff does not have a consistent explanation for the need to supplement the report rather than including the new information in the expert's first report, the Court does not find any evidence of bad faith or willfulness in the plaintiff's delay, and, therefore, the Court does not exclude the supplemented expert report. See 2012 WL 21275747, at *14-15.

On the other hand, in Guidance Endodontics, LLC v. Dentsply International, Incorporated, the Court does not permit a party to supplement its expert report given the timing of the supplementation and the harm to the opposing side. See 2009 WL 3672502, at *4. The Court concludes that it is particularly relevant that the party seeking to supplement -- the plaintiff -- "had all of the information necessary to develop this supplemental report since June 17, 2009 -- two weeks before the deadline for designating rebuttal experts, a month and a half before the deadline for supplementing expert reports, and three months before trial," but does not give the supplement "to the Defendants until the day the trial began." 2009 WL 3672502, at *4. The Court enters a preliminary injunction against the defendants and is wary of delaying the trial, because even one day could prejudice substantially the defendants. See 2009 WL 3672502, at *5.

Relying on the Tenth Circuit's case in Jacobsen v. Deseret Book Co., the Court notes, in a discussion of that case: "The Tenth Circuit appeared to find that the fact that the opposing party

was unaware of the substance of the witnesses direct examination testimony was sufficient prejudice to weigh against permitting amendment." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 2009 WL 3672502, at *4.  The Court, addressing the contents of the supplemental expert report and the timing issues, states:

> While the Defendants are not entirely in the dark regarding Desrosiers' testimony, the timing of the supplemental report is such that it will impede the Defendants' ability to rebut any testimony based on it.  The trial of a case is a substantial undertaking that consumes most or all of an attorney's time.  Delivering an expert report to opposing counsel on the first day of trial, therefore, is not helpful.  There is no time to prepare a rebuttal expert or investigate the principles underlying the expert's opinions.
>
> In this case, the Defendants have little if any time to prepare a new or existing expert witness by sending the witness to the Johnson City facility nor doing additional research to rebut Desrosiers' new expected testimony. Furthermore, the supplemental report ambiguously references "some recent research" that underlies these new opinions.  With no indication what that research was and no properly informed expert witness to prepare the Defendants' counsel, the Defendants would be left going fishing in the expert's superior knowledge on cross-examination, which is never an enviable position for one to be in.

2009 WL 3672502, at *5 (citation omitted).  The Court also concludes that, given that the case is currently in trial, "neither party can substantially decrease the level of prejudice."  2009 WL 3672502, at *5.  The Court also finds it significant that its prior preliminary injunction still encumbers the defendants.  See 2009 WL 3672502, at *5.  The Court also notes that the particularly late timing of the disclosure is disruptive, because,

> if the Court were to put the trial on hold to allow the Defendants to prepare for this testimony, even if it only took one day, someone would have to rework the travel arrangements of many of the out-of-town witnesses and the trial would not be completed within the three weeks that the Court has allotted for it.

2009 WL 3672502, at *5.  Cf. Solis-Marrufo v. Bd. of Comm'rs for Cnty. of Bernalillo, No. CIV 11-0107 JB/KBM, 2013 WL 1658304, at *40 (D.N.M. Apr. 4, 2013)(Browning, J.)(declining to

exclude witnesses' testimony at trial, "because the Court's sanctions render the late disclosure harmless"). Moreover, in Leon v. FedEx Ground Package Systems, Inc., the Court concludes that, even though the Court deems that there is no indication of bad faith or willfulness, the factors point against admitting expert testimony on additional statutory violations, because: (i) the testimony would surprise and prejudice the other party, because the expert could choose from many statutes on which to testify; (ii) the prejudice would be incurable, because the expert could explore any statutory violation so the opposing party could not prepare; (iii) the expert testimony would disrupt trial, because the last-minute testimony would force the opposing party to go on a fishing expedition on cross examination, and the Court likely would have to delay trial to allow the opposing party time to respond to the testimony; and (iv) there were no indications of bad faith or willfulness. See 2016 WL 1158079, at *12-14.

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause[17] of the plaintiff's damages. See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 143 N.M. 43, 47, 73 P.3d 181, 185-86). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 100 N.M. 538, 541

---

[17]The 2004 amendments to Civ. UJI 13-305 eliminate the word "proximate" within the instruction. Use Note, Civ. UJI 13-305. The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause." Editor's Notes, Civ. UJI 13-305 (alteration added).

673 P.2d 822, 825, <u>overruled on other grounds by</u> <u>Folz v. State</u>, 1990-NMSC-075, ¶ 3, 797 P.2d

246, 249.  Generally, negligence is a question of fact for the jury.  <u>See</u> <u>Schear v. Bd. of Cnty.</u>

<u>Comm'rs</u>, 1984-NMSC-079, ¶ 4, 101 N.M. 671, 672 687 P.2d 728, 729.  "A finding of negligence,

however, is dependent upon the existence of a duty on the part of the defendant."  <u>Schear v. Bd.</u>

<u>of Cty. Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of

law for the courts to decide."  <u>Schear v. Bd. of Cty. Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at

729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal

obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual

or class of persons."  <u>Baxter v. Noce</u>, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the

inquiry into whether the defendant owes a duty to the plaintiff.  <u>See</u> <u>Herrera v. Quality Pontiac</u>,

2003-NMSC-018, ¶ 7, 134 N.M. at 48, 73 P.3d at 186.  New Mexico courts have recognized that,

"[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will

give recognition and effect."  <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 9, 134 N.M. at 49,

73 P.3d at 187.  To determine whether the defendant's obligation is one to which the law will give

recognition and effect, courts consider legal precedent, statutes, and other principles of law.  <u>See</u>

<u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 9, 134 N.M. at 48, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  <u>Edward C. v.</u>

<u>City of Albuquerque</u>, 2010-NMSC-043, ¶ 16, 241 P.3d 1086, 1090 (quoting <u>Grover v. Stechel</u>,

2002-NMCA-049, ¶ 11, 45 P.3d 80, 84 (citing <u>Restatement (Second) of Torts</u>, § 315 (1965))).[18]

---

[18]The Court predicts that the Supreme Court of New Mexico would agree with <u>Grover v.</u>
<u>Stechel</u>'s negligence analysis based on the Court's read of the Supreme Court of New Mexico's
opinion in <u>Solon v. WEK Drilling Co.</u>, 1992-NMSC-023, 829 P.2d 645, stating "[i]n New Mexico,

"[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84 (citing Restatement (Second) of Torts, § 314(A) (1965)). "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 117 N.M. 623, 626, 875 P.2d 379, 382 (quoting Restatement (Second) of Torts, § 449 (1964)). "[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 134 N.M. at 56, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 134 N.M. at 55, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence

---

negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person," which implies that one does not have a general duty to protect another from harm. Solon v. WEK Drilling Co., 1992-NMSC-023, ¶ 9, 829 P.2d 645, 648. Moreover, Grover v. Stechel draws from the Restatement (Second) of Torts for the above proposition, and the Supreme Court of New Mexico cites to the Restatement (Second) of Torts to support its negligence analysis in Solon v. WEK Drilling Co., 1992-NMSC-023, ¶ 11, 829 P.2d 645, 649.

[unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 134 N.M. at 55, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 134 N.M. at 55, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 134 N.M. at 55, 73 P.3d at 195.

### NEW MEXICO LAW REGARDING EXPERT TESTIMONY AND CAUSATION[19]

Like most other jurisdictions in the United States, New Mexico requires expert testimony to show causation in professional malpractice cases where it cannot be determined by common knowledge that an average person ordinarily possesses. New Mexico has also expanded this rule to cases involving crashworthiness, negligent installation, and stray voltage cases. In general, New Mexico, along with other jurisdictions, has required expert testimony when the issue of causation is presented in a context which is not a matter of common knowledge. Moreover, New Mexico law would require expert testimony on causation in breach-of-contract claims, and proximate

---

[19]In Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), the Supreme Court "held that federal courts adjudicating diversity jurisdiction claims should apply substantive state law and federal procedural law." Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1539 (10th Cir. 1996). Although "the line between substance and procedure has proven difficult to demarcate," Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d at 1539, the Tenth Circuit has observed that "[t]he propriety of summary judgment in federal diversity cases must be evaluated in light of the Federal Rules of Civil Procedure rather than state procedural law but with reference to the state's substantive law." C.F. Braun & Co. v. Oklahoma Gas & Elec. Co., 603 F.2d 132, 133 n.1 (10th Cir. 1979)(citing Hanna v. Plumer, 380 U.S. 460 (1965)). Moreover, the Tenth Circuit has treated the question whether a plaintiff must produce expert testimony on causation as a question of substantive state law. See Zuls v. United States, 50 F.3d 838 (Table), 1995 WL 397067, at *2 (10th Cir. 1995). Accordingly, the Court looks to substantive New Mexico law to determine whether expert testimony on causation is required in medical negligence cases.

causation in breach-of-the-implied-warranty-of-merchantability claims where it is beyond the common knowledge that an average person ordinarily possesses. For breach-of-the-implied-warranty-of-fitness-for-a-particular-purpose claims, however, New Mexico law would not require expert testimony on causation, because causation is not a prima facie element of the claim.

### 1.    Expert Testimony on Causation in Professional Malpractice Cases.

Under New Mexico law, expert testimony is generally required to show causation in professional malpractice cases. See Cervantes v. Forbis, 1964-NMSC-022,  73 N.M. 445, 389 P.2d 210. The Supreme Court of New Mexico explains in Cervantes v. Forbis, 1964-NMSC-022, 73 N.M. 445, 389 P.2d 210:

> Before a physician or surgeon can be held liable for malpractice in the treatment of his patient, he must have departed from the recognized standards of medical practice in the community, or must have neglected to do something required by those standards.  Derr v. Bonney, 38 Wash.2d 678, 231 P.2d 637, 54 A.L.R.2d 193; Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604; 12 Vanderbilt L.R. 549, 558.  The fact that a poor result is achieved or that an unintended incident transpired, unless exceptional circumstances are present, does not establish liability without a showing that the result or incident occurred because of the physician's failure to meet the standard either by his acts, neglect, or inattention.  Such facts must generally be established by expert testimony. See note, 141 A.L.R. 5, 6; 81 A.L.R.2d 597; 54 A.L.R.2d 200.  Likewise, expert testimony is generally required to establish causal connection. See note 13 A.L.R.2d 11, 31.

1964-NMSC-022, ¶ 12, 73 N.M. 448, 389 P.2d at 213.  "However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential." Pharmaseal Lab'ys, Inc. v. Goffe, 1977-NMSC-071, ¶ 17, 90 N.M. 753, 758, 568 P.2d 589, 594.  The Supreme Court of New Mexico summarizes the exception to the expert testimony requirement in Toppino v. Herhahn, 1983-NMSC-079, 100 N.M. 564, 673 P.2d 1297:

> It is not mandatory in every case that negligence of the doctor be proved by expert testimony which shows a departure from reasonable standards of care. Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential.

1983-NMSC-079, ¶ 14, 100 N.M. at 568, 673 P.2d at 1301.

In Zamora v. St. Vincent Hospital, 2014-NMSC-035, ¶ 1, 335 P.3d 1243, 1244, the Supreme Court of New Mexico applies the Pharmaseal Laboratories, Inc. v. Goffe "common knowledge" exception to a case involving the belated delivery of lab reports. See 2014-NMSC-035, ¶ 3, 335 P.3d at 1245. The plaintiff in this case alleges that the defendant hospital failed to forward a radiologist's report to his emergency room physician and his surgeon. See 2014-NMSC-035, ¶ ¶ 2-3, 335 P.3d at 1244-45. The report mentions the possibility that the radiology scan shows a cancerous mass, and the plaintiff argues that the hospital's error in not forwarding the report to the two doctors results in a fourteen-month delay in diagnosing his cancer. See 2014-NMSC-035, ¶ ¶ 2-3, 335 P.3d at 1244-45. The hospital contends that the plaintiff requires expert testimony to prove a breach of duty as to the delay in forwarding the lab report, but the Supreme Court of New Mexico holds otherwise, stating:

> the communication of the diagnosis by one doctor to another in this case was subject to review under an ordinary standard of care. This communication was not so far removed from common knowledge that a layperson factfinder could not logically consider whether the failure to communicate was negligent. Reaching a decision in this case does not require the factfinder to decide any medical issues; the communication in this instance is a clerical function.

Zamora v. St. Vincent Hosp., 2014-NMSC-035 at ¶ 26, 335 P.3d 1243 at 1250. According to the Supreme Court of New Mexico, "[c]ommunication between medical personnel is not a matter that requires expert knowledge to understand the standard of care involved." Zamora v. St. Vincent

Hosp., 2014-NMSC-035 at ¶ 29, 335 P.3d 1243 at 1251.  "A reasonable patient," states the court,

"understands that the radiologist who processes X-rays needs to communicate the results to the

treating physician."  Zamora v. St. Vincent Hosp., 2014-NMSC-035 at ¶ 30, 335 P.3d at 1252.  In

sum, the Supreme Court of New Mexico holds that the plaintiff does not require expert testimony

to prove matters pertaining to "[b]asic human communication."  Zamora v. St. Vincent Hosp.,

2014-NMSC-035 at ¶ 30, 335 P.3d at 1252.

### LAW REGARDING FEDERAL DISTRICT COURT INTERPRETATIONS OF STATE LAW

Federal district courts must apply State law under certain circumstances, such as when a

statute requires, or when exercising diversity jurisdiction.  Under Erie Railroad Co. v. Tompkins,

304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the

objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A.,

477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509

F.3d 1225, 1229 (10th Cir. 2007).  If a district court looks to New Mexico State law when

exercising diversity jurisdiction, for example, but cannot find a Supreme Court of New Mexico

"opinion that [governs] a particular area of substantive law," the district court "must . . . predict

how the Supreme Court of New Mexico would [rule]."  Guidance Endodontics, LLC v. Dentsply

Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  See Siloam Springs

Hotel, L.L.C. v. Century Sur. Co., 906 F.3d 926, 932 (10th Cir. 2018)(holding that, because the

majority of the Oklahoma Supreme Court declines to reach the merits of the issue, "we must

predict how that court would likely rule on this issue if the issue were properly before it"); Peña

v. Greffet, 10 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.)("Just as a court engaging in

statutory interpretation must always begin with the statute's text, a court formulating an Erie

prediction should look first to the words of the state supreme court.").[20]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

---

[20]In performing its Erie-mandated duty to predict what a State supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should be reticent to formulate an Erie prediction that conflicts with State court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds State trial and appellate courts.  The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court explicitly has called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a State supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")).[21]   The Court also may rely on

---

[21]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the State's highest court:

> The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54; Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . .
>
> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100, 101; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Tenth Circuit decisions interpreting New Mexico law.[22]  See Anderson Living Trust v. WPX

Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.  Ultimately, "the Court's task is to predict what

---

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940).  The Supreme Court has softened this position over the years; federal courts are no longer bound by State trial or intermediate court opinions, but "'lower state courts' should be 'attributed some weight . . .the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (quoting King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A Moore's Federal Practice - Civil § 124.20 (Matthew Bender 3d Ed.)("Moore's")("federal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently").

[22]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which holds that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a State's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects State law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end; and independently interpreting the State law, regarding the Tenth Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-

---

removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would.  Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law.  Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the State's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in State law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted.  Other than Oklahoma, every State encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one State.  It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State(s) than it is for the Tenth Circuit to monitor separate legal developments in eight States.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on State court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that <u>x</u> is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is <u>x</u>.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's

reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of State law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

Erie's purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the States' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 (stating that intermediate appellate courts are "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise")). This may not be the most precise formulation if the goal is to ensure identical outcomes in State and federal court -- the Honorable Milton I. Shadur, United States District Judge for the United States District Court of the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the State supreme court's holdings often will lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative State supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider State appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by State supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

The Erie doctrine results in federal cases that interpret State law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale. New State court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme

Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree.  In <u>Wankier v. Crown Equipment Corp.</u>, the Tenth Circuit says:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of <u>stare decisis</u>.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

 <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit permits a district court to deviate from the Tenth Circuit's view of State law only on the basis of a subsequent case "of the state's highest court."  <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest State court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition.  In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of <u>Allen [v. Minnstar, Inc.</u>, 8 F.3d 1470 (10th Cir. 1993)], a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.  Whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it.  In <u>Kokins v. Teleflex, Inc.</u>, the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite

- 86 -

the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  See also Estate

of Anderson v. Denny's, Inc., No. CIV 12–0605 JB/GBW, 2013 WL 6506319, *32 & n. 16

(D.N.M. Nov. 13, 2013)(Browning, J.)(noting that the Court's task is to predict what the Supreme

Court of New Mexico would do); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M.

2008)(Browning, J.)("The Court's task is to divine, as much as possible, what the Supreme Court

of New Mexico would do if the legal question was presented to it."); Dolan v. FEMA, 760 F. Supp.

3d 1200, 1243 (D.N.M. 2024)(Browning, J.)(concluding that "the Forest Service's instigation of

the Hermit's Peak/Calf Canyon Fire is a nuisance under New Mexico State law because it is a

negligent and reckless invasion, and is abnormally dangerous activity").

### LAW REGARDING RULE 56(D) MOTION FOR ADDITIONAL DISCOVERY

Rule 56(d) of the Federal Rules of Civil Procedure provides:

(d) When Facts Are Unavailable to the Nonmovant.

---

of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d
1290, 1297 (10th Cir. 2010)(Holmes, J.)(holding that the Colorado Court of Appeals case Biosera
Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998) is not an "intervening decision
of the state's highest court")(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)(emphasis
in Kokins v. Teleflex, but not in Wankier v. Crown Equip. Corp.).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
administer independently the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court [that] hold[s] that a prior
federal appellate decision [interpreting State law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the
Court is bound to abide by the Tenth Circuit's interpretation of Erie.  This scheme may be
inefficient, because the plaintiffs may appeal, after trial, the Court's ruling on an issue; the Tenth
Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may
then have to reverse the Court after a full trial on the merits.

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[23]  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redev. Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  """Unless dilatory or lacking in merit,""" a party's 56[(d)] application """should be liberally treated."""  Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (quoting Comm. for the First Amendment v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992)).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d)

---

[23]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.

does not require, however, that summary judgment not be entered until discovery is complete.  See

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Fort Collins, 903 F.2d

at 758.  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity

how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen

v. Redev. Agency of Sandy City, 998 F.2d at 1554.  Rule 56(d) may not be invoked based solely

upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary

judgment are unavailable.  See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554.

Moreover, while the summary judgment movant's exclusive control of information weighs heavily

in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely

asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redev. Agency

of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has

been dilatory, or the information sought is either irrelevant to the summary judgment motion or

merely cumulative, no extension will be granted."  Jensen v. Redev. Agency of Sandy City, 998

F.2d at 1554 (denying a 56(d) request and stating that "the record reflects that plaintiffs were

dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v.

Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request

where plaintiff did not explain why, during the discovery period that the court allowed, he did not

obtain the discovery sought in his motion).  The Tenth Circuit has summarized rule 56(d)'s

requirements as follows:

> "A prerequisite to granting relief [pursuant to Rule 56[(d)]] . . is an affidavit
> furnished by the nonmovant.  Although the affidavit need not contain evidentiary
> facts, it must explain why facts precluding summary judgment cannot be presented.
> This includes identifying the probable facts not available and what steps have been

taken to obtain these facts. In this circuit, the nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact."

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (quoting Comm. for the First Amendment v. Campbell, 962 F.2d at 1522)(outer brackets in Price ex rel. Price v. W. Res., Inc., but not in Comm. for the First Amendment v. Campbell)(inner brackets added). A rule 56(d) affidavit or declaration must state, with specificity, exactly what additional discovery is believed necessary. See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 2013 WL 6284428, at *5.

The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question. See Martinez v. Lucero, No. 11-10032012, WL 2175772, at *30 (D.N.M. May 31, 2012)(Browning, J.)("Because the information sought would not alter the Court's decision on either absolute or qualified immunity, the Court will deny the request for discovery pursuant to rule 56(d)."). Similarly, it has denied 56(d) requests where the party seeks duplicative information. See Todd v. Montoya, 877 F. Supp. 2d 1048, 1099 (D.N.M. 2012)(Browning, J.)("There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense."). Finally, the Court has dismissed rule 56(d) motions where the proponent does not submit a rule 56(d) affidavit. See Chavez v. Cnty. of Bernalillo, 3 F. Supp. 3d 933, 991 (D.N.M. 2014)(Browning, J.)("He did not submit a rule 56(d) affidavit or declaration.").

## ANALYSIS

After carefully and thoroughly reviewing the record, the Court stands by its decision to

exclude Dr. Polsky. This decision stems from the Plaintiffs' error and from Dr. Polsky's willful noncompliance with the Court's orders. In light of these circumstances that frustrated the litigation's progression, excluding Dr. Polsky is warranted.

Because the Court excludes Dr. Polsky and does not change that decision, the Court grants summary judgment to the Defendants; without Dr. Polsky, the Plaintiffs cannot point to record evidence supporting the causation element of their wrongful-death tort. Although the absence of record evidence on an element of the Plaintiffs' negligence claim is fatal to the Plaintiffs' case, the Court nonetheless holds that the Defendants are not entitled to summary judgment on the breach-of-duty element as to the nurses and the United States: the Plaintiffs have record evidence that creates a factual dispute about the nurses' and the United States breach-of-duty. Finally, the Court concludes that the additional record material to which the Plaintiffs point in the two Relief Motions does not change the reality that the Plaintiffs cannot prove causation without Dr. Polsky. Although the Plaintiffs contend that the Court should consider the Harkins Aff. in its causation analysis, the Court declines to consider it. Initially, the Plaintiffs hired Dr. Polsky and did not hire Dr. Harkins, despite that she treats N. Charley and that she works with the United States' expert, Dr. Mertz. The Plaintiffs' attempt to bring Dr. Harkins on board months after the Court excludes Dr. Polsky and months after the expert disclosure deadline has passed is not appropriate. The Plaintiffs do not offer a persuasive reason why the Court should treat their experts differently from how the Court usually treats experts or why the Court should treat their compliance with deadlines differently from how it treats other parties' compliance with deadlines. Accordingly, the Court grants summary judgment to the Defendants and does not consider the Harkins Aff.

## I.    EXCLUDING DR. POLSKY IS WARRANTED.

This first section of the Analysis addresses this case's central issue: whether the Court should rethink its decision to exclude Dr. Polsky.  First, the Court reviews the rules governing imposing sanctions.  Second, the Court explains its perspective on the two violations of its order.  Third, the Court discusses why, given the facts at hand, Tenth Circuit law counsels toward excluding Dr. Polsky.

### A.    THE COURT REVIEWS THE RELEVANT LEGAL STANDARD.

Rule 37(b) of the Federal Rules of Civil Procedure, entitled "Failure to Comply with a Court Order," Fed. R. Civ. P. 37(b), "provides comprehensively for sanctions for failure to obey discovery orders."  8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2289 Failure to Comply With Order Compelling Discovery (3d ed. 2008)("Wright & Miller"). This rule comes into play only when there is a court order in place.  See Evans v. Griffin, 932 F.3d 1043, 1046 (7th Cir. 2019)("Use of Rule 37(b) is therefore impossible if there is no court order in place.").  Once a party has filed a motion "seeking 'an order compelling disclosure or discovery,'" Evans v. Griffin, 932 F.3d at 1046 (quoting Fed. R. Civ. P. 37(a)), and the court grants that motion and enters the requested order, if "the person subject to the order fails to comply with it," the discovery-seeking party may move, under rule 37(b), for sanctions, Evans v. Griffin, 932 F.3d at 1046.  While the rule provides that the court may issue "further just orders," it lists seven examples of possible orders, including 37(b)(2)(A)(ii), "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A).    There is one rule 37(b) sanction, however, "that must always be considered no matter what action is taken," namely, the district court "must require the party failing

to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."  Wright & Miller, supra at § 2289.  Appellate courts review a district court's imposition of rule 37(b) sanctions for an abuse of discretion, meaning that the sanctions "would result in 'fundamental unfairness in the trial of the case.'"  Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002)(quoting Orijias v. Stevenson, 31 F.3d 995, 1005 (10th Cir. 1994)).  See Ehrenhaus v. Reynolds, 965 F.2d at 920 (applying the abuse-of-discretion standard to a "district court's decision to dismiss for discovery violations" under rule 37(b)(2)(C)).

The United States' Exclusion Motion suggests that the Court analyze excluding Dr. Polsky using the five factors from Ehrenhaus v. Reynolds, 965 F.2d at 921.  See Exclusion Motion at 10. The Tenth Circuit suggests that district courts use these factors, however, in "deciding whether to exercise its discretion to issue a dismissal sanction."  Lee v. Max Intern., LLC, 638 F.3d 1318, 1323 (10th Cir. 2011)(Gorsuch, J.)("Lee").  Excluding a party's witness -- which is what the United States asks the Court to do here -- is a less severe sanction than dismissing a case, although the effect of excluding Dr. Polsky is admittedly close to dismissal.  The Ehrenhaus factors contemplate their use in analyzing a dismissal sanction: Factor (iv) asks "whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance," and factor (v) asks the Court to consider less sanctions' efficacy.  Ehrenhaus v. Reynolds, 965 F.2d at 921.  Given that the Ehrenhaus factors guide dismissal-sanctions analyses and are not a one-size-fit-all framework for all discovery sanctions, the Court explains its decision to exclude Dr. Polsky without relying exclusively on the Ehrenhaus factors.

### B.     THE PLAINTIFFS AND DR. POLSKY VIOLATE TWO COURT ORDERS, AND THESE VIOLATIONS JUSTIFY EXCLUDING DR. POLSKY.

The Plaintiffs and Dr. Polsky violate two Court orders; together, these violations justify excluding Dr. Polsky.  The first violation occurs when Dr. Polsky does not attend his deposition, despite the Court's verbal ruling setting the deposition's date.  The second violation occurs when the Plaintiffs do not offer dates for Dr. Polsky to be deposed in Albuquerque, despite the Court's minute order directing the Plaintiffs to procure those dates.  See November 13 Minute Order. Explaining the Court's rationale for excluding Dr. Polsky requires discussing each violation in some detail.

The parties did not move through discovery expeditiously in this case.  The Court's Scheduling Order sets the expert-disclosure deadline for November 20, 2022, see supra, at 17, but after the Plaintiffs moved for, and received, four extensions, the Plaintiffs disclose their experts nine months after the original deadline in July of 2023, see supra, at 20.  Soon after, the parties begin to negotiate deposition dates.  See supra, at 20.

October 19, 2023, is the date that the Court orders Dr. Polsky's deposition to take place, but this date originates with the Plaintiffs: On September 22, 2023, Lopez, the Plaintiffs' legal assistant, emails Mr. Eaton and states that Dr. Polsky offers the morning of October 19, 2023, but that the Plaintiffs are waiting for Dr. Polsky to confirm his availability.  See supra, at 21.  Some back and forth ensues, but Ms. Ben, the Plaintiffs' counsel, continues, on September 28, 2023, to offer October 19, 2023, for Dr. Polsky's deposition, although Ms. Ben states that the deposition must finish by 12:00 p.m. Eastern Time.  See supra, at 23.  This limitation leads Mr. Eaton, the United States' counsel, to ask Ms. Ben on September 29, 2023, for additional dates for Dr. Polsky's deposition.  See supra, at 24.  In response, Ms. Ben again offers October 19, 2023, for Dr. Polsky's

deposition; neither party offers another date before the October 6, 2023, status conference.  See supra, at 24.

At the October 6, 2023, status conference, the Plaintiffs inform the Court that the parties are struggling to finalize deposition dates; in response, the Court tells the parties that, if they cannot agree on dates within a week, they should bring their calendars to the next hearing, set for October 13, 2023, and the Court will set deposition dates.  See supra, at 25.  After the status conference, Ms. Curtis, the Plaintiffs' counsel, emails Mr. Eaton, and again asks him to set Dr. Polsky's deposition for October 19, 2023, starting in the morning and ending at 2 p.m.  See supra, at 26.  Several days later, however, on October 12, 2023, Dr. Polsky emails Ms. Curtis, Ms. Ben, and Lopez, informing them that he "could not continue to hold the October 19th date" and that "the 19th is now off the table."  Supra, at 27.

The next day, during the promised motion hearing on October 13, 2023, Ms. Curtis' and Mr. Eaton's comments to the Court demonstrate that their dispute is over the deposition's time and not over the deposition's date.  See supra, at 28.  Ms. Curtis states: "Dr. Polsky's date was October 19.  That date he will start at any point in time in the morning . . . ."  Supra, at 28.  In response, the Court tells the parties that Dr. Polsky's deposition will run from 8:00 a.m. to 3:30 p.m. Mountain Daylight Time on October 19, 2023.  See supra, at 28.  Ms. Curtis does not object or otherwise respond to the Court's order setting the deposition's date and time.  See supra, at 28.

Between the hearing's date, October 13, 2023, and October 17, 2023, however, the Plaintiffs' attorneys realize that they missed Dr. Polsky's email on October 12, 2023, declaring that he is no longer available on October 19, 2023.  See supra, at 28-29  On October 17, 2023, at 10:50 p.m., Ms. Curtis emails Mr. Eaton asking to talk; the next day, however, Mr. Eaton flies to

New York, and calls Ms. Curtis at 2:05 p.m. Mountain Daylight Time, once he has landed in New York.  See supra, at 29.  Ms. Curtis calls him back and explains that Dr. Polsky will not be attending the deposition.  See supra, at 30.  When Mr. Eaton informs Ms. Curtis that he intends to proceed with the deposition, because Mr. Eaton is in New York, the Plaintiffs file their Notice of Non-Appearance, which explains that, despite that "[m]ore than reasonable efforts were made by Dr. Polsky and Plaintiffs' counsel to try and change Dr. Polsky's schedule," given Dr. Polsky's "position as Chair of his Department at the School of Medicine he must appear for a Board meeting on October 19, 2023, and cannot attend his deposition as noticed."  Supra, at 30.  On October 19, 2023, the Plaintiffs file the Notice of Non-Appearance and the Protective Motion; on October 26, 2023, the Court schedules a hearing for these two motions for November 14, 2023, and, when the Defendants file the Exclusion Motion on November 7, 2023, the Court adds the Exclusion Motion to the November 14, 2023, hearing's agenda.  See supra, at 31.

At this point, the Court desperately does not want to exclude Dr. Polsky, even though the Plaintiffs do not comply with the Court's order setting Dr. Polsky's deposition in New York.  To try to help the Plaintiffs and to give them another chance, the Court's CRD calls the Plaintiffs on November 13, 2023, and instructs them to bring dates for Dr. Polsky's deposition in Albuquerque to the hearing the next day.  See supra, at 31.  Also, on November 13, 2023, the Court enters a minute order instructing the Plaintiffs' counsel "to identify dates on which Bruce W. Polsky, M.D. would be available to be deposed in person in Albuquerque, New Mexico, and to bring said dates to the Motion Hearing."  See supra, at 31-32.

By missing his New York deposition, Dr. Polsky violates a Court order.  Nonetheless, the Court was not planning on excluding Dr. Polsky for missing his deposition.  Instead, the Court

intended to order Dr. Polsky to come to Albuquerque to be deposed.  This solution would have

been a fair one.  The United States had travelled to New York for a deposition, which did not

materialize.  It should not have to travel there again, with no guarantee that the second trip would

be any different. This cycle could go on forever.  The Court was willing to give the Plaintiffs

another chance, but Dr. Polsky should come to Albuquerque to rectify the situation.  Letting the

Plaintiffs have another chance and ordering Dr. Polsky to travel to New Mexico from the East

Coast struck the appropriate balance between moving the litigation forward and being fair to the

United States as the defendant, who had just traveled to New York.[24]  Accordingly, the Court

ordered the Plaintiffs to come to the November 14, 2023, hearing with dates when Dr. Polsky's

deposition could occur in Albuquerque; if the Plaintiffs had offered dates, the Court would have

denied the Exclusion Motion.

At the November 14, 2023, hearing, however, when the Court asks the Plaintiffs if they

have dates for an Albuquerque deposition, the Plaintiffs respond as follows:

| | |
|---|---|
| Ms. Curtis: | Your Honor, we filed a response to the motion to exclude. And I understand that the Court has made this direction. As you know, Dr. Polsky works at -- |
| The Court: | When did you file your response? |
| Ms. Curtis: | We just filed -- it's not due for a bit, but we filed it today |

---

[24]Notably, Mr. Eaton's decision to travel to New York to depose Dr. Polsky is generous. "The party noticing the deposition usually has the right to choose the location"; moreover, "if the party deposed is a plaintiff or its agent, deposition is generally appropriate at the litigation forum." Radian Asset Assur., Inc. v. Coll. of Christian Bros. of N.M,, No. CIV 09-0885 JB/DJS, 2010 WL 5150718, at *6 (D.N.M. Nov. 3, 2010)(Browning, J.)("Radian")(quoting 7 J. Moore, et al., Moore's Federal Practice ¶ 30.20[1][b][ii] (3d ed. 1997)).  If Mr. Eaton had insisted that Dr. Polsky travel to Albuquerque for his deposition, and if Mr. Eaton had not volunteered to go to New York, the Court would have set the deposition for Albuquerque.  See Radian, 2010 WL 5150718, at * 6 (observing that "other courts" also "require that litigants travel to the litigation forum to be deposed").

> as soon as we understood that we were going to have this hearing. We wanted you to have a response from us about the process that we'd gone through to get to where we were at. I didn't want the Court to have solely defendant's motion.

> The Court:  I don't want to hear argument from you right now. I want to know --

> Ms. Curtis:  About the dates, yes, sir. Certainly, Dr. Polsky cannot -- showing up here from New York would cause him three days.

> The Court:  Then we'll probably just exclude him then. We've had enough with Dr. Polsky.

November 14 Tr. 3:23-417 (Curtis, Court). The Plaintiffs' response here -- that "showing up here from New York would cause him three days" -- rejects the Court's proposed compromise entirely. Ms. Curtis states: "Certainly, Dr. Polsky cannot . . . ." At this point, the Plaintiffs' counsel represents at the November 14 hearing that Dr. Polsky is refusing to come out.[25] So, from a

---

[25]The Court acknowledges that travel from New York to Albuquerque and back is difficult. JetBlue offers the only direct flight between Albuquerque and New York. JetBlue runs a redeye from Albuquerque to New York that departs a little before midnight and arrives close to 6:00 a.m. Eastern Time. The return flight from New York is good, leaving at 8:00 p.m. Eastern Time and arriving at 11:00 p.m. Mountain Time. This flight, however, exists only between April and October. Without this JetBlue flight, Albuquerque is the largest city in the United States without a direct flight to New York. See JetBlue Airways Today Launches the Only Nonstop Service Between New York and Albuquerque, New Mexico, PR Newswire, https://www.prnewswire.com/news-releases/jetblue-airways-today-launches-the-only-nonstop-service-between-new-york-and-albuquerque-new-mexico-204158371.html (last visited May 28, 2025). If the JetBlue flight is not available, travel between New York and Albuquerque typically takes three days: one day to travel on each end, with business on the middle day in between.

When a New Mexico lawyer retains a New York expert, both the lawyer and the expert must take this reality into account, and see if it is doable. At some point, the witness may have to come out for a deposition and a trial to fulfill the expert's obligations. The parties can schedule a deposition for a particular day and allow the expert to plan a tight travel schedule. A trial, however, is a different story. Even if the lawyer who hires the expert tells the expert that they intend to call the expert on a particular day, the expert who flies out to Albuquerque for trial may have to wait to testify. Trials are unpredictable. Flying from New York to Albuquerque for trial testimony

litigation-management perspective, the Court's only play from here is to exclude the Plaintiffs' expert. At the November 14, 2023, hearing, the Plaintiffs do not work with the Court and the United States to set their expert's deposition in Albuquerque. The Court could have told the United States to fly back to New York or to depose Dr. Polsky over Zoom, but allowing Dr. Polsky to miss the Court-ordered deposition with no guarantee he is going to show up again is unfair to the United States. The bottom line is that, after the Plaintiffs' representations to the Court at the November 14, 2023, hearing that Dr. Polsky will not come to Albuquerque to be deposed, the Plaintiffs lose the Court's trust that Dr. Polsky will ultimately show up.

Fairness to the United States underpins the Court's decision to exclude Dr. Polsky. If the United States were to not comply with a Court order, the Court would have to come down hard on the United States, because the Court holds the federal government's attorneys to a high standard of professional responsibility and legal acumen. It is only fair that, when an opposing party does not comply with Court orders, and the United States is on the other end of the noncompliance, the Court backs up the United States as the defendant. It has to be fair to both sides. The Plaintiffs' response at the November 14, 2023, hearing is important. It conveys the Plaintiffs' unwillingness to fix their mistake in missing Dr. Polsky's email that conveys his inability to attend a deposition on October 19, 2023. Subsequently, missing this email leads the Plaintiffs to represent to the Court at the November 6, 2023, hearing, that the October 19 date is available. To make matters worse for the Plaintiffs, later in the hearing, they double down on their position, stating that Dr. Polsky cannot come to Albuquerque:

---

would require blocking out more than the usual three days of travel. Dr. Polsky's unwillingness to commit to the three-day trip from New York to Albuquerque concerns the Court that he would have even more problems coming here for trial.

> Ms. Curtis:   Your Honor, respectfully, I disagree with you . . . . And we don't hire guns, Judge . . . . This is a hard, hard expert to have.  The expert is not trying to treat the Court with disrespect.
>
> The Court:    Then why do I not have a date today for him to be in Albuquerque to be deposed?
>
> Ms. Curtis:   Because his ability to knock out three days from his schedule that he has is impossible for him, where --
>
> The Court:    It just seems with this doctor everything is impossible . . . . If he's not willing to help you correct the mess, then I don't think he needs to be in this case.

November 14 Tr. at 20:12-21:4 (Curtis, Court).

As this exchange makes plain, Dr. Polsky's unwillingness to schedule a trip to Albuquerque is not tenable for an expert in the United States District Court for the District of New Mexico.  The Court's goal in ordering a date for Dr. Polsky's deposition was to resolve the parties' dispute and to move the litigation forward, and not to come up with a solution that was most convenient for Dr. Polsky's schedule.  Dr. Polsky is under no obligation to make money by involving himself in litigation in federal court -- especially in faraway New Mexico, which has few direct, if any at that time, flights to and from New York -- but when he makes the decision to serve as an expert witness, that decision has legal ramifications.  Expert witnesses' schedules are subject to court orders.  Rule 26(b)(4)(A) of the Federal Rules of Civil Procedure provides that parties "may depose any person who has been identified as an expert whose opinions may be presented at trial,"  Fed. R. Civ. P. 26(b)(4)(A), and a district court has "great discretion in establishing the time and place of a deposition,"  Begay v. United States, No. CIV 15-0358 JB/SCY, 2018 U.S. Dist. LEXIS 6242, at *6 (D.N.M. Jan. 15, 2018)(Browning, J.)(quoting Sheftelman v. Standard Metals Corp., 817 F.2d 625, 628 (10th Cir. 1987)).  See Navajo Health

Found. -- Sage Mem'l Hosp., Inc. v. Burwell, No. CIV 14-958 JB/GBW, 2016 U.S. Dist. LEXIS 139646, at *37 (D.N.M. Sep. 16, 2016)(Browning, J.)(noting that a district court has "wide discretion in its regulation of pretrial matters").

Even though the Court has the power to set a deposition's time and date, it is important to note here that the Court's instruction to the Plaintiffs -- come to the hearing with dates for Dr. Polsky to show up in Albuquerque -- is not draconian. The Court did not order Dr. Polsky's physical presence at the hearing, and the Court unilaterally did not set a new deposition without consulting Dr. Polsky and the parties. Despite the Court's patience, the Plaintiffs represent at the hearing that Dr. Polsky's professional obligations preclude him from flying to Albuquerque before trial. This is not a workable position for a would-be federal expert to take. No one is forcing Dr. Polsky to accept expert-witness work for cases in the American Southwest. Dr. Polsky's insistence that he can have it both ways -- i.e., take the Plaintiffs' money but refuse to comply with Court orders and refuse to leave New York City -- undermines the Court's obligation to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

The Plaintiffs ask the Court to decide this case on the merits and not on "technicalities." Exclusion Reconsideration Motion at 8. This argument, however, elides the fact that the original sin here is the Plaintiffs'. Their inability to facilitate Dr. Polsky's deposition shifted this case's focus "from the merits to the collateral and needless," and ultimately has consumed "[h]ours, days, weeks of lawyers' time . . . at great expense." Lee, 638 F.3d at 1321 (Gorsuch, J.). Excluding Dr. Polsky, therefore, is warranted here.

The Court does not need a Tenth Circuit case that justifies excluding an expert witness when the expert witness misses his Court-ordered deposition and the Plaintiffs' counsel does not

comply with the Court's order charting a compromise -- but the Court has an illustrative case which buttresses its reasoning.  In Lee, then-Judge Gorsuch, along with Judge Hartz and Judge Murphy on the panel, affirms a district court's dismissal of a case in which "a party failed to comply with a document request and two court orders compelling production of materials within the party's control."  638 F.3d at 1324.  After the defendant files a motion to compel production of certain documents, the magistrate judge grants the motion, but the Lee plaintiffs do not turn over all of the documents at issue.  See 638 F.3d at 1319.  Subsequently, the Lee defendants file a motion for sanctions, asking the court to dismiss the case; the magistrate judge agrees that the plaintiffs violate the first production order, but gives the plaintiffs "one more chance to produce the requested documents."  638 F.3d at 1319.  A week or two later, the plaintiffs file a declaration "certifying that they had now produced all the requested documents," but the defendant disagrees, and sends the plaintiffs a letter asking for the remaining documents.  Lee, 638 F.3d at 1319 (emphasis in original).  When the plaintiffs do not respond to the letter, the defendant renews its motion for sanctions, which the magistrate judge grants, and recommends that the district court dismiss the case.  See 638 F.3d at 1320.  The district court adopts the recommendation and dismisses the case. See 638 F.3d at 1320.

The plaintiffs appeal, but the Tenth Circuit affirms.  See 638 F.3d at 1324.  Then-Judge Gorsuch, in upholding the district court's dismissal sanction, emphasizes the district court's "very broad discretion to use sanctions where necessary."  638 F.3d at 1320 (quoting In re Baker, 744 F.2d 1438, 1440 (10th Cir. 1984)(en banc)).  According to then-Judge Gorsuch, appellate courts should not "draw from fresh springs of patience and forgiveness" when evaluating district court discovery sanctions and should, instead, "remember that it is the district court judge who must

administer (and endure) the discovery process."  638 F.3d at 1320 (citing <u>Nat'l Hockey League v.</u> <u>Metropolitan Hockey Club</u>, 427 U.S. 639, 642 (1976)).  Flouting court orders, writes then-Judge Gorsuch, "is not speedy, inexpensive, or just.  Just the opposite.  And no doubt tolerating such behavior would encourage only more of it."  638 F.3d at 1320.  Accordingly, while then-Judge Gorsuch acknowledges that "the district court could've exercised its discretion to allow the case to proceed despite the false declaration and the plaintiffs' repeated noncompliance," he nonetheless concludes that the district court "certainly did not err in finding that" the plaintiffs violated its orders.  638 F.3d at 1322.

The Tenth Circuit's holding in <u>Lee</u> is instructive here; it shows that a pattern of noncompliance with discovery orders merits dismissal.  In <u>Lee</u>, the plaintiffs violate two court orders, and the district court dismisses the case.  Similarly, here, Dr. Polsky and the Plaintiffs violate two Court orders, and the Court excludes Dr. Polsky, a sanction that is less harsh than dismissal.  Admittedly, as this opinion explains, excluding Dr. Polsky results in summary judgment for the Defendants, and the Court came to this decision to exclude slowly and reluctantly.  Experts, however, have to know that, when they sign up for litigation in districts in the middle of the country, the parties and the Court run the litigation, and they have to accommodate their schedule to the schedule of others.  Expert witnesses have to bend some to the reality of litigation deadlines, no matter how important their testimony is to the case's outcome.  <u>Lee</u> confirms that violating two discovery orders warrants sanctions, and the Court, here, has selected a sanction -- exclusion -- that excises an uncooperative witness from this case.  Thus, the Court affirms its verbal ruling that Dr. Polsky is excluded.[26]

---

[26]Disregarding the Court's order to provide deposition dates at the November 14, 2023,

### C.   THE EXCLUSION RECONSIDERATION MOTION'S ARGUMENTS DO NOT PERSUADE THE COURT THAT IT SHOULD ALLOW DR. POLSKY TO TESTIFY.

The Exclusion Reconsideration Motion makes four primary arguments, but none of them persuade the Court that it should allow Dr. Polsky to testify. First, the Plaintiffs argue that the "Plaintiffs had limited time to work with their expert to provide dates for an in-person deposition which requires more than a day." Exclusion Reconsideration Motion at 4. Second, they argue

_____

hearing is the dispositive moment in the Court's decision to exclude Dr. Polsky; the Court acknowledges, however, that the first violation of the Court's orders -- Dr. Polsky's non-appearance at his deposition -- is the original mistake here, and it is a mistake that is attributable, in part, to the Plaintiffs' counsel. Dr. Polsky emailed Lopez, the paralegal, Ms. Ben, and Ms. Curtis on October 12, 2023, and tells them that he is no longer available on October 19, 2023. See supra, at 27. At the next day's hearing on October 13, 2023, Ms. Curtis tells the Court that "Dr. Polsky's date was October 19. That date he will start at any point in time in the morning . . . ." Supra, at 27. The Court orders Dr. Polsky's deposition to occur that day based on Ms. Curtis' representation. The record shows that Ms. Curtis only realizes her mistake on October 17, 2023, when she emails Mr. Eaton asking to talk, and, later, asks him not to go forward with the deposition. See supra, at 28-30.

This is a sticky situation for Ms. Curtis' and Ms. Ben's representation, but it is not an unsalvageable situation. Their mistake is clerical. It is not an unusual mistake. What is unusual, here, is the way in which the Plaintiffs attempt to rectify the mistake. Ms. Curtis tries to convince Mr. Eaton that he should call off the deposition, even though the Court has set the deposition and Mr. Eaton has already landed in New York. See supra, at 30. She tells him that he "knew my expert couldn't show up on the 19th at all when were in the hearing on Friday," a statement which lacks support in the record. Supra, at 30. A different tactic might have stopped the United States from filing the Exclusion Motion. Ms. Curtis or Ms. Ben could have filed a motion or sent a letter to the Court explaining their mistake, offering another date, and asking the Court to vacate the deposition. If they had realized their mistake and filed this motion early enough, Mr. Eaton may not have flown to New York, or, if he had, he could have gone at his own risk and the Court would be less sympathetic to his actions. Ultimately, the Plaintiffs chose a different route, and their choices exacerbated a common mistake.

In any case, the Court bent over backwards to help Dr. Polsky and the Plaintiffs' counsel by telling them to show up to Court at the November 14, 2023, hearing, with a date for Dr. Polsky to appear in Albuquerque to be deposed. The main problem was that they decided not to take up the Court's lifesaver and said that he could not appear. That decision is the one that left the Court no good options going forward.

that, because hantavirus is a rare and complex illness, the "Plaintiffs need a high level, educated, and practicing physician . . . which can be difficult to obtain as their availability is limited." Exclusion Reconsideration Motion at 7.  Third, they argue that the case should be decided on its merits and should not be decided on a technicality.  See Exclusion Reconsideration Motion at 7. Finally, they argue that the Court should allow the Plaintiffs to retain an "alternative infectious disease expert."  Exclusion Reconsideration Motion at 8.  The Court addresses each argument in turn.

The Plaintiffs' first and second arguments -- essentially, that the Court did not give them enough time to consult with Dr. Polsky to obtain dates for an Albuquerque deposition -- are not persuasive.  Throughout this litigation, the Plaintiffs and Dr. Polsky have treated scheduling as if it is far more difficult than it should be.  The Plaintiffs state, for example, that they "were still in communication with Dr. Polsky at the time of the hearing on November 14."  Exclusion Reconsideration Motion at 6.  They also state that, "[d]ue to Dr. Polsky's active practice and his position at NYU Long Island School of Medicine, Dr. Polsky has to set dates of availability well in advance."  Exclusion Reconsideration Motion at 7.  The Court appreciates that Dr. Polsky's calendar is busy, but there has to be some flexibility for a federal court engagement.  When Dr. Polsky signs up to be a federal expert, he can either prioritize the Court's dates a little higher on his calendar or exit the case.  The Plaintiffs are paying Dr. Polsky to help them, and he cannot help them by taking the position that he can never miss a medical meeting to participate in this case. The Court is struggling to believe that, when the Plaintiffs call Dr. Polsky the day before the November 14, 2023, hearing, every one of his calendar entries is fixed and unmovable.  The Court and many busy lawyers have commitments in the community beyond their work.  Sometimes, the

Court has to miss its personal commitments for work.  Every professional makes these tradeoffs, and Dr. Polsky's refusal to adjust his schedule in exchange for the Plaintiffs' money and the privilege of testifying in federal court does not persuade the Court that it should change its exclusion ruling.

The Plaintiffs' third argument cites to rule 1 of the Federal Rules of Civil Procedure to argue that the case should be decided on its merits and not on a technicality, especially considering Dr. Polsky's importance to the case.  See Exclusion Reconsideration Motion at 7-8.  The Plaintiffs assert, moreover, that the "Defendants suffer no harm," because on the day after the hearing, Dr. Polsky tells the Plaintiffs that he can travel to Albuquerque on January 23, 2024, sixty-nine days later.  Exclusion Reconsideration Motion at 8.  First, relying on rule 1's admonition that the Federal Rules of Civil Procedure "should be construed . . . to secure the just, speedy, and inexpensive determination of" proceedings does not relieve the Plaintiffs and their expert of the obligation to comply with Court orders that set deadlines.  As the Court has noted already, missing a deposition and refusing to provide dates for a New Mexico deposition is not conducive to speedy and inexpensive resolution of this litigation: the parties have now spent over a year fighting about Dr. Polsky.  Second, the assertion that the Defendants "suffer no harm," because Dr. Polsky offers a January 23, 2024, deposition date, is not sound.  Dr. Polsky's proffered date of January 23, 2024, is three months later than his Court-ordered October deposition date.  In October, 2023, the United States' position was that "they would only consider settlement until after Plaintiffs' experts were deposed."  Exclusion Response at 2.  This position makes sense: the United States wants to hear what Dr. Polsky has to say and how he presents before discussing settlement.  Pushing Dr. Polsky's deposition back three months deprives the parties, and the Defendants in particular, of a valuable

litigation data point that might have played an important role in whether the case proceeded to trial

or settled.    A three-month litigation timeout on Dr. Polsky's account is undesirable from the

Defendants' and the Court's perspective, especially considering that, at this point, the case was set

for trial on a trailing docket beginning on December 11, 2023.    Amended Scheduling Order at 2.

Accordingly, the Court does not agree with the Plaintiffs' assertion that a January 23, 2024,

deposition would not "harm" the Defendants' litigation interests and the Court's docket

management.[27]

---

[27]There are two additional reasons why the Court did not accept the Plaintiffs' proffered
January 23, 2024, deposition date. First, given the case's procedural posture, pushing Dr. Polsky's
deposition to late January would leave the parties with nothing to do. The parties needed to depose
Dr. Polsky before filing dispositive motions and, if the case proceeded to trial, motions in limine.
Pushing the deposition to late January, therefore, would push the trial back, too. The Plaintiffs'
January date is not, in other words, a three-month delay; it is closer to a six-month delay, when
accounting for the motions that the Defendants would likely file after deposing Dr. Polsky.

Second, after the Court ruled from the bench and excluded Dr. Polsky, the Plaintiffs needed
to make arguments that instilled confidence in their representations. They made a mistake by
missing Dr. Polsky's email giving up October 19 and telling the Court that Dr. Polsky was
available on that date. Then, they made another mistake when they did not show up with dates at
the November hearing on the Exclusion Motion and explained to the Court that Dr. Polsky's
"ability to knock out three days from his schedule that he has is impossible for him." November
14 Tr. at 18:19-19:12 (Curtis). The Plaintiffs assert that Dr. Polsky offered the January deposition
date the day after the November 14, 2023, hearing. See Exclusion Reconsideration Motion at 2.
The best way for the Plaintiffs to have bolstered their representation that Dr. Polsky would attend
an Albuquerque deposition in January would have been to call the Court and ask for the Court to
set immediately a status conference. Instead, the Plaintiffs waited until November 30, 2023, to
file the Exclusion Reconsideration Motion and let the Court know that Dr. Polsky offered the
January date. Even then, the Plaintiffs, in the Exclusion Reconsideration Motion, do not
acknowledge how their mistakes and Dr. Polsky's unwillingness to make himself available to be
deposed resulted in this situation.

The Exclusion Reconsideration Motion's timing, as well as its arguments, give rise to the
inference that the Plaintiffs and Dr. Polsky believe that Dr. Polsky's reluctance to make himself
available to be deposed is appropriate for a federal expert. It is not. Dr. Polsky's January proposal,
moreover, suggests some post hoc regret but not urgency. Dr. Polsky decided to work with the
Court after the Court excluded him. Even then, his compromise lacked urgency and a desire to
address the problem that he had created and would have delayed the litigation by months, and his
solution appears to avoid the hassle of scheduling during notoriously busy periods in the calendar

The Exclusion Reconsideration Motion's final argument -- that the Court should allow the Plaintiffs to retain an "alternative infectious disease expert," Exclusion Reconsideration Motion at 8 -- is equally unpersuasive. There is not much more to say about why this argument fares poorly. The Plaintiffs asked for, and the Court granted, four extensions of the expert-disclosure deadline. Their inability to wrangle their experts quickly does not make the Court confident that they will be any faster this time around. Hiring an expert and preparing the expert for depositions takes time. Writing an expert report takes time. Allowing the Plaintiffs a re-do on their causation expert runs into the same problems that Dr. Polsky's proffered January, 2024, date faces. When the parties want to push back a litigation deadline, the Court almost always agrees, but this situation is different, because the United States does not agree to extend the deadlines. The United States has the right to demand that the Court enforce its deadlines. See Amended Scheduling Order at 1 ("Accordingly, the termination date for discovery is July 24, 2023, and discovery shall not be reopened, nor shall case management deadlines be modified, except by an order of the Court upon a showing of good cause."). The party at fault for the original delay -- the Plaintiffs -- wants to cause additional delay. That is not a strong position to take, and it does not convince the Court to reverse course on Dr. Polsky.

---

year. To the end, Dr. Polsky tried to pick the most convenient option to him. And, once again, there is no assuming that if the Court had put the case on ice for an extended period, Dr. Polsky would have shown up in January.

The Plaintiffs waited until the end of the month to inform the Court of this development in a filing that does not frontally discuss their mistakes. These strategic choices do not persuade the Court that it should allow Dr. Polsky back into the case. Accordingly, the Court denies the Exclusion Reconsideration Motion.

II.    **THE COURT ENTERS SUMMARY JUDGMENT FOR THE DEFENDANTS, BECAUSE THE PLAINTIFFS DO NOT HAVE EXPERT TESTIMONY ON CAUSATION, WHICH NEW MEXICO LAW REQUIRES.**

Having provided its reasoning for excluding Dr. Polsky, the Court turns to the summary judgment motions and enters summary judgment for the Defendants.  First, the Court addresses the standard-of-care element and concludes that there are factual disputes about breach as to the traveling nurses and the United States.  Second, the Court turns to the causation element and explains that New Mexico law requires a medical-malpractice plaintiff to prove causation with expert testimony, which the Plaintiffs in this case cannot do without Dr. Polsky.  Third, the Court addresses the Plaintiffs' argument, pursuant to rule 56(d) of the Federal Rules of Civil Procedure, for additional discovery, and explains that the Ben Aff. does not describe how the depositions it specifies will allow the Plaintiffs to establish the causation element of their medical negligence claims.  Fourth, the Court addresses the Lybbert Motion and explains that the Court will not re-open Lybbert's deposition because the Plaintiffs could have, but did not, ask Lybbert to bring certain documents to his first deposition.

A.    **THERE ARE FACTUAL DISPUTES ABOUT THE NURSES' AND THE UNITED STATES' ALLEGED BREACH OF DUTY.**

Before addressing the Plaintiffs' lack of causation testimony, the Court discusses the antecedent negligence element -- breach of duty -- and concludes that there are factual disputes about the Go's, Sales', and the United States' alleged breach of duty.  Accordingly, the Defendants are not entitled to summary judgment on the breach issues.  First, the Court discusses the traveling nurses, Go and Sales.  Second, the Court discusses the United States.  There are factual disputes about these three Defendants' alleged breach of duty.  Third, the Court discusses the staffing agencies.  There are no fact disputes, however, about the staffing agencies' alleged breach of duty.

In an effort to avoid summary judgment on their claims against the nurses, the Plaintiffs'
responses to the Go and Sales MSJs point to Elvina Clark-Joe's deposition testimony, namely, that
Gallup Medical requires staff to ask hantavirus-screening questions; this testimony creates a fact
issue about breach of duty.  See Go MSJ Response at 7; supra at 12.  Clark-Joe, a sanitarian[28] at
Gallup Medical, testifies that, when she was a patient at the Gallup Medical emergency room
sometime before May of 2019 -- the month N. Charley died -- emergency room personnel asked
her questions about possible hantavirus exposure.  See Go MSJ Response at 7.  According to the
Plaintiffs, "based on Ms. Clark's testimony, nurses must be trained on screening for hantavirus."
Go MSJ Response at 7.  Crediting this inference, as the summary judgment standard obligates the
Court to do, means that Shradar's deposition testimony is no longer about a hypothetical: Shradar
states that, if the nurses were provided information about "hantavirus questions, screening, and
escalation, it would be a breach in the standard of care" if the nurses did not do the screening.
Shradar Depo. at 122:21-123:8.   Consequently, as to the nurses, Clark-Joe's and Shradar's
statements, taken together, create a genuine issue of material fact whether the nurses were trained
on hantavirus screening and whether, in light of this training, the nurses breach the standard of
care when they do not screen N. Charley for hantavirus.

There is also a factual dispute about breach as to the United States, because the Plaintiffs'
expert, Dr. Glaser, opines that Dr. Leach, the emergency room doctor who sees N. Charley during
her first visit to Gallup Medical, breaches the standard of care.  See Glaser Depo. at 107:5-108:1;

---

[28]A "sanitarian" is a health-and-safety specialist who "inspect[s] environments to ensure
that business remain complaint with safety, health, and environmental regulations."  The Complete
Job Description for Sanitarians, MPHOnline, https://www.mphonline.org/sanitarian-job-
description/ (last visited May 27, 2025).

101:12-18.  Dr. Glaser testifies that, because N. Charley presents with "signs and symptoms entirely consistent with the early hantavirus exposure," Dr. Leach "should have [] suspected" hantavirus.  Glaser Depo. at 101:1-18.  Dr. Glaser also asserts that the standard of care would have required that Dr. Leach order a CBC, which would have "demonstrated abnormalities."  Glaser Depo. at 102:25-103:13.  In contrast, the Deposition of Gregory James Mertz, M.D.[29] at 41:13-42:2 (taken January 11, 2024), filed November 1, 2024 (Doc. 299-1)("Mertz Depo."), states that it is "largely" not feasible to detect hantavirus during the prodromal phase.  In sum, the Plaintiffs can point to record evidence from which a reasonable jury could find that Dr. Leach could have -- and should have -- diagnosed N. Charley with hantavirus when she first visits the Gallup Medical ER.  This evidence conflicts with other record evidence from the Mertz Depo., from which a reasonable jury could find that it is impossible to diagnose hantavirus in the prodromal phase. When the evidence in the record conflicts, the Court draws all inferences in the nonmovant's favor, see Clayton v. Vanguard Car Rental U.S.A., Inc., 761 F. Supp. 2d 1210, 1234 n.35 (D.N.M. 2010)(Browning, J.)(accepting as true the plaintiff's version of the defendant's asserted fact, "[b]ecause the Court must construe the evidence in the light most favorable to the non-moving party"); accordingly, the Court holds that, because there is a fact issue about the standard of care, the United States is not entitled to summary judgment on the element of breach of duty.

AB Staffing and Next Medical are the remaining Defendants, and, unlike the nurses and the United States, they are entitled to summary judgment as to breach of duty.  The Plaintiffs' nursing expert, Shradar, states at his deposition that there are no opinions in his report concerning AB Staffing, see Shradar Depo. at 64:17-24, or concerning Next Medical, see Shradar Depo. at

_____

[29]Dr. Mertz is the United States' expert.

67:10-21.  Similarly, Dr. Glaser testifies that he does not have any opinions about AB Staffing, see Glaser Depo. at 133:7-11, and his expert report does not contain any opinions about AB Staffing or Next Medical.  Because there is no record evidence -- factual evidence or expert opinion[30] -- about the staffing agencies' breach of duty, the staffing agencies are also entitled to

_____

[30]The Sales MSJ contends that "[l]ay jurors cannot be expected to know the standards applicable to a staffing agency's hiring, credentialing, placement, training, or supervision of its staff; thus, these issues can be addressed only through expert testimony."  Sales MSJ at 11.  The Plaintiffs, in response, contend:

> Here, Defendants have not attempted to negate any of the elements required for Plaintiffs' claims of negligent training, hiring and supervising Nurse Go against AB Staffing Solutions, LLC.  Rather, Defendants improperly placed the initial burden to Plaintiffs by claiming that Plaintiffs have not provided expert testimony even though discovery has yet to be completed.

Sales MSJ Response at 15.
Deciding this issue requires, first, considering what claim the Plaintiffs are bringing against the staffing agencies.  The staffing agencies are business associations, and their alleged negligence in this case is, accordingly, legally distinct from the individual nurses' alleged negligence.  The Plaintiffs describe their claim as a negligent-supervision claim as opposed to a vicarious liability claim: "AB Staffing Solutions, LLC negligently trained, hired and supervised Nurse Go when it placed her at GIMC without providing necessary training of diseases endemic to the area."  Go MSJ Response at 15.  Later in the Go MSJ Response, moreover, the Plaintiffs clarify that,

> to establish the claim for negligence in supervising an employee, the Plaintiff has the burden of proving the following:
>
> 1.    AB Staffing Solutions, LLC was the employer of Nurse Go;
>
> 2.    AB Staffing Solutions, LLC knew or should have known that its employees failing to follow hospital policies and bylaws create an unreasonable risk of injury to patients;
>
> 3.    AB Staffing Solutions, LLC failed to use ordinary care when failing to ensure its employees follow hospital policies and bylaws;
>
> 4.    AB Staffing Solutions, LLC's negligence was a cause of Plaintiffs' injury.

Go MSJ Response at 16 (citing UJI 13-1647 NMRA).

Teasing out what the parties' dispute is requires some work. New Mexico negligence claims require "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86. While "the finder of fact must determine whether [a] [d]efendant breached the duty of ordinary care," Herrera v. Quality Pontiac, 2003-NMSC-018 at ¶ 33, 134 N.M. at 57, 73 P.3d at 195, a duty's existence is "a question of law for the courts to decide," Schear v. Board of County Commissioners of Bernalillo County, 1984-NMSC-079, ¶ 4, 101 N.M. 671, 672, 687 P.2d 728, 729. "[E]very person has a duty to exercise ordinary care for the safety of others. Whether or not defendant breached th[at] dut[y] is a question of the reasonableness of its conduct, and thus a fact question." Bober v. New Mexico State Fair, 1991-NMSC-031, ¶ 17, 111 N.M. 644, 650, 808 P.2d 614, 620 (quoting Knapp v. Fraternal Order of Eagles, 1987-NMCA-064, ¶ 10, 106 N.M. 11, 13, 738 P.2d 129, 131)(brackets in Bober v. New Mexico State Fair, but not in Knapp v. Fraternal Order of Eagles).

When the Plaintiffs contend in the Go MSJ Response that they have to prove that "AB Staffing Solutions, LLC failed to use ordinary care when failing to ensure its employees follow hospital policies and bylaws," Go MSJ Response at 16, their wording muddles the negligence concepts at issue. A nursing staffing agency has to "exercise ordinary care for the safety of others." Bober v. New Mexico State Fair, 1991-NMSC-031 at ¶ 17, 111 N.M. at 650, 808 P.2d at 620 (quoting Knapp v. Fraternal Order of Eagles, 1987-NMCA-064 at ¶ 10, 106 N.M. at 13, 738 P.2d at 131). Thus, the Plaintiffs' argument that a nursing staffing agency must supervise its nurses in their hospital placements to make sure that the nurses are following the hospitals' rules is an argument about breach: what is "the conduct necessary to fulfill" the duty to exercise ordinary care? Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 14, 111 N.M. 644, 649, 808 P.2d 614, 619 (quoting Coburn v. City of Tucson, 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (Ariz. 1894)). "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case." Herrera v. Quality Pontiac, 2003-NMSC-018 at ¶ 33, 134 N.M. at 57, 73 P.3d at 195.

In light of these negligence principles, it makes sense that, in New Mexico, a medical malpractice plaintiff needs to present expert testimony about what ordinary care requires, because a layperson does not understand what a "reasonably prudent" doctor "would foresee." Herrera v. Quality Pontiac, 2003-NMSC-018 at ¶ 33, 134 N.M. at 57, 73 P.3d at 195. Without a doctor's testimony, a jury would struggle to grasp how a reasonable doctor would react to a particular set of medical circumstances. An expert also may need to explain the circumstances themselves: while a jury may understand that a surgeon needs to fix a broken bone, some medical operations address more complex and unusual problems outside of a layperson's familiarity.

The Defendants ask the Court to transplant the principles that govern medical malpractice negligence claims in New Mexico to the negligent-supervision claims against the nurse staffing agencies. They argue that "jurors cannot be expected to know the standards applicable to a staffing

- 113 -

agency's hiring, credentialing, placement, training, or supervision of its staff; thus, these issues can be addressed only through expert testimony." Sales MSJ at 11. This argument's conclusion, however, does not follow from its premise. The Court agrees that many jurors may not know about medical staffing agencies' business models. Accordingly, educating the jury about how staffing agencies run their businesses and make their money requires the parties to bring in witnesses who know about staffing agencies -- for example, one of the Defendant staffing agencies' executives. Testimony from one of the Defendants' executives, however, would be lay testimony and not expert testimony. It would not be testimony that "results from a process of reasoning which can be mastered only be specialists in the field." Fed. R. Evid. 701, Advisory Committee Note on 2000 Amendment (quoting State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992)). A businessperson testifying about his or her business model does not need to qualify as an expert under rule 702. Medical staffing agencies are businesses that exist to provide a service in exchange for money. The breach-of-duty question as to the staffing agencies in this case is a question that requires context to answer -- more context than a jury would need in, say, a slip-and-fall case -- but the Court is not convinced that New Mexico law necessarily requires an expert to provide that context, particularly when the Defendants rely exclusively on medical negligence cases to support their position. See Go MSJ Reply at 10.

New Mexico law does not require the Plaintiffs to prove a medical staffing agency's breach of duty with expert testimony. The Court predicts that the Supreme Court of New Mexico would not impose this requirement, a prediction which finds support in the Supreme Court of New Mexico's holding in Zamora v. St. Vincent Hospital, 2014-NMSC-035, 335 P.3d 1243 ("Zamora"). The Zamora plaintiff sues a hospital, alleging that the hospital negligently failed to forward a radiologist's report to the plaintiff's emergency room physician and surgeon. 2014-NMSC-035, ¶¶ 2-3, 335 P.3d at 1244-45. The report mentions the possibility that the radiology scan shows a cancerous mass, and the plaintiff argues that the hospital's error in not forwarding the report to the two doctors results in a fourteen-month delay in diagnosing his cancer. See 2014-NMSC-035, ¶¶ 2-3, 335 P.3d at 1244-45. The hospital files a motion for summary judgment in which it contends that the plaintiff "had not identified an expert witness to establish the standard of care for communicating a radiologist's diagnosis to physicians and surgeons"; the district court grants summary judgment to the hospital, and the Court of Appeals of New Mexico affirms, but the Supreme Court of New Mexico reverses. 2014-NMSC-035 at ¶ 4, 335 P.3d at 1245.

At the outset, the hospital's argument -- that the plaintiff's claim is actually a medical negligence claim, and, accordingly, requires expert testimony to educate a jury about how a radiologist communicates a diagnosis to various doctors at a hospital -- is defensible. It is plausible that a layperson does not understand how the chain of command and communication works at a busy hospital. A hospital might have procedures detailing how certain medical information should be documented and transmitted from one hospital department to another. The Supreme Court of New Mexico, however, rejects this argument. See 2014-NMSC-035 at ¶ 26, 335 P.3d at 1250. "Communication between medical personnel," according to the Supreme Court of New Mexico, "is not a matter that requires expert knowledge to understand the standard of care involved." 2014-NMSC-035 at ¶ 29, 335 P.3d at 1251. "A reasonable patient," states the Supreme Court of New Mexico, "understands that the radiologist who processes X-rays needs to communicate the results to the treating physician." 2014-NMSC-035 at ¶ 30, 335 P.3d at 1252. In sum, the Supreme Court

summary judgment on this element.   See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, *8 n.22 (D.N.M. Aug. 22, 2015)(Browning, J.)("Accordingly, the Defendants do not present evidence to support their asserted fact, and the Court will not consider it.").

     **B.**     **NEW MEXICO LAW REQUIRES MEDICAL-MALPRACTICE PLAINTIFFS TO PROVE CAUSATION WITH EXPERT TESTIMONY, AND THE PLAINTIFFS DO NOT HAVE EXPERT TESTIMONY ON CAUSATION.**

Having discussed the standard-of-care element, the Court turns to the next, and dispositive, element in this case: causation.   The parties agree that the FTCA, § 28 U.S.C. § 1346, and the "common law of the State of New Mexico" govern this "medical malpractice action," JSR at 2-3; accordingly, the Supreme Court of New Mexico's holdings provide the cause of action's requirements.   New Mexico law allows medical-malpractice plaintiffs to recover for a loss of chance for survival.   See Waconda v. United States, No. CIV 06-0101 JB/ACT, 2007 WL 2461622,

---

of New Mexico holds that the plaintiff does not require expert testimony to prove matters pertaining to "[b]asic human communication."  2014-NMSC-035 at ¶ 30, 335 P.3d at 1252.

    Zamora's rationale buttresses the Court's conclusion and prediction here.  Jurors do not need expert testimony to understand that medical professionals need to communicate important information to each other.  Similarly, jurors do not need expert testimony to understand the profit-making principles that drive business decisions and business structures.  Good business practices, just like good communication practices, are not "so far removed from common knowledge that a layperson factfinder could not logically consider" whether the staffing agencies breach their duty to run their business with reasonable care.  2014-NMSC-035 at ¶ 26, 335 P.3d 1243 at 1250.  Accordingly, the Court does not agree with the Defendants' arguments that the plaintiff needs to establish breach of duty as to the staffing agencies with expert testimony.

    Compared to the expert testimony requirements to sue the doctors or nurses individually, the Court's holding does not make plaintiffs' lives much easier, because they still need expert testimony to prove causation.  In this case, the Plaintiffs are trying to recover against the businesses, and the individual doctors and nurses, using different theories of negligence that are based on the same injury -- N. Charley's alleged lost chance of survival.  Explaining how the negligence causes her hantavirus to progress in a way that makes her worse off requires a hantavirus expert, notwithstanding how the Plaintiffs go about establishing breach of duty.  The claims against the staffing agencies for negligent supervision still require expert testimony for the causation element.

*4 (D.N.M. May 30, 2007)(Browning, J.)("Waconda")(citing Bear v. Regents of the Univ. of Cal,
1999-NMCA-005, ¶ 14, 126 N.M. 508, 513, 972 P.2d 9, 13 ("Bear")). "To succeed on a lost
chance theory, 'the patient must present evidence that the harm for which he or she originally
sought treatment -- the presenting medical problem -- was in fact made worse by the lost chance.'"
Waconda, 2007 WL 2461622 at *4 (quoting Alberts v. Schultz, 1999-NMSC-015 ¶ 23, 126 N.M.
at 813, 975 P.2d at 1285). "The basic test," however, "for establishing loss of chance is no different
from the elements required in other medical malpractice actions, or in negligence suits in general:
duty, breach, loss or damage, and causation." Alberts v. Schultz, 1999-NMSC-015 ¶ 29, 126 N.M.
at 814, 975 P.2d at 1286. The Plaintiffs must prove these elements to a "reasonable degree of
medical probability," Alberts v. Schultz, 1999-NMSC-015 ¶ 29, 126 N.M. at 814, 975 P.2d at
1286; moreover, "[b]ecause the issues raised in lost-chance actions are, in virtually every case,
'beyond the province of lay persons,' the plaintiff will almost always establish these elements
through expert testimony," See Alberts v. Schultz, 1999-NMSC-015 ¶ 18, 126 N.M. at 812, 975
P.2d at 1284 (quoting Pfiffner v. Correa, 94-0924 (La. 10/17/94), 643 So.2d 1228, 1234).

　　　The Plaintiffs seek a way around these legal principles; they contend that "expert testimony
is not required to establish negligence against the Defendant nurses and their staffing agencies" --
although the Plaintiffs that "admit expert testimony is necessary in the case against Dr. Leach."
Go MSJ Response at 14. In support of their contention, the Plaintiffs cite a New Mexico Court of
Appeals case, which states that, "[i]f the act involves the use of specialized knowledge or skill to
make a judgment call as to the appropriate thing to do or not do, expert testimony will likely be
needed to assess the resultant act or failure to act." Richter v. Presbyterian Healthcare Servs.,
2014-NMCA-056, ¶ 22, 326 P.3d 50, 56 ("Richter"). See Go MSJ Response at 14. This legal

principle only buttresses the Court's conclusion that the Plaintiffs require expert testimony to prove causation. "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Alberts v. Schultz, 1999-NMSC-015, ¶ 27, 126 N.M. 807 at 975, P.2d at 1286 (quoting N.M.R.A. UJI 13-305 1998). By citing Richter -- a case that addresses expert testimony required to prove the standard of care[31] -- the Plaintiffs lose sight of the injury in this case, namely, death from hantavirus infection. At the very least, the Plaintiffs need a hantavirus expert to tell the factfinder why the standard-of-care breach -- for example, the staffing companies alleged failures to train their traveling nurses on local endemic diseases, or Go and Sales' alleged failures to screen for hantavirus -- causes in N. Charley's death. Anyone who tells this story needs to know about hantavirus: how it progresses in the usual course, without treatment; what treatments make it better; and what treatments make it worse. Laypeople do not know these things about hantavirus. Because New Mexico law requires expert testimony on causation in this case, and because the Court excludes Dr. Polsky, summary judgment for the Defendants is warranted.

---

[31]Richter, a case about belated delivery of laboratory reports, states:

> We draw from these cases two principles. First, challenges to the timing of the delivery of laboratory reports will normally require expert testimony, except when the required timing is set by a known standard such as internal policy, contract, or governmental regulation. Second, expert testimony will not be required if the asserted negligence is based on a standard of reasonable care which does not require professional interpretation.

Richter, 2014-NMCA-056, ¶ 28, 326 P.3d 50 at 57. This excerpt demonstrates Richter's focus on the relationship between expert testimony and standard of care, rather than on expert testimony and causation.

### C. THE PLAINTIFFS' RULE 56 AFFIDAVIT DOES NOT EXPLAIN WITH SPECIFICITY HOW ADDITIONAL TIME WILL ENABLE THEM TO REBUT THE DEFENDANTS' SUMMARY JUDGMENT MOTIONS.

The Plaintiffs attach the Ben Aff. to the Sales MSJ Response and to the Go MSJ Response to support their assertion that "there is insufficient information to respond to" the nurses' and staffing agencies' summary judgment motions, Sales MSJ at 14; the Ben Aff., however, does not "state, with specificity, what additional discovery" the Plaintiffs contend is "necessary" to meet their summary judgment burden, Dorato v. Smith, 108 F.Supp.3d 1064, 1105 (D.N.M. 2015)(Browning, J.)(citing Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006)). The Ben Aff. states

> 3. The Court Ordered [sic] additional written discovery and the depositions of Bruce Tempest, M.D., Michelle Harkins, M.D., and nurse educator, Tori Davidson, at the motion hearing held on October 13, 2023, which are essential to prove Plaintiffs' claims against the defendants in this case regarding negligence on behalf of Defendant Nurses Sales and Go and vicarious liability on behalf of their respective staffing agencies, AB Staffing and Next Medical Staffing.

> 4. These depositions have yet to take place and are essential to proving Plaintiffs' claims against the above-mentioned Defendants.

> 5. Plaintiffs require the above referenced Court ordered depositions to be able to fully respond to Defendants' Motions for Summary Judgment.

Ben Aff. ¶¶ 3-5, at 1-2. These statements boil down to the following argument: (i) discovery is incomplete; (ii) the identified depositions are "essential" to the Plaintiffs' claims and to respond to the MSJs; therefore, (iii) the Court should refrain from deciding the MSJs until discovery is complete. Ben Aff. ¶ 4, at 2.

Rule 56(d) "may not be invoked," however, "solely upon the assertion that discovery is incomplete." Dorato v. Smith, 108 F. Supp. 3d at 1105 (citing Jensen v. Redevelopment Agency

of Sandy City, 998 F.2d 1550, 1554 (10th Cir.1993)("Jensen")).  Furthermore, if "the information

sought is irrelevant to the summary judgment motion . . . no extension will be granted."  Jensen,

998 F.2d at 1554.  The MSJs are predicated largely on the absence of causation evidence.  The

Ben Aff. does not contend that any of the individuals it identifies will provide causation evidence.[32]

Rule 56(d)'s typical application is when, at summary judgment, the moving party has "exclusive

control of information."  Dorato v. Smith, 108 F.Supp.3d at 1105.  It lacks applicability when the

absence of evidence driving summary judgment stems from an expert's exclusion from the case.

As the Court explains earlier, New Mexico law requires the missing causation testimony to be

expert testimony.  Because none of the Ben Aff.'s identified deponents are expert witnesses, let

alone expert witnesses who will provide causation testimony, whatever information these

deponents may provide cannot change the summary judgment outcome.

### D.      THE COURT DENIES THE LYBBERT MOTION.

There is one additional discovery matter to address: the Lybbert Motion's request to re-

open the deposition of Lybbert, a nurse educator at Gallup Medical.  The Lybbert Motion requests,

pursuant to rule 37(a)(1), that the Court "enter an Order to compel Defendant United States to

produce" Lybbert "to have his deposition continued."  Lybbert Motion at 1.  As grounds for this

request, the Plaintiffs explain that, during Lybbert's "initial deposition[,] he failed to fully answer

Plaintiffs' questions and testified he had access to such information but did not have it with him."

Lybbert Motion at 2.  Accordingly, the Plaintiffs request that "they be permitted more time to

depose Mr. Lybbert and to take his deposition while he has access to his computer so he can fully

answer Plaintiffs questions."  Lybbert Motion at 2.  The Plaintiffs contend that the information

---

[32]The Court addresses the Harkins Aff., which opines about causation, later in the Analysis.

about which they ask Lybbert -- "the hantavirus training Defendant nurses received prior to Nena's visit to the ER" -- is information that the United States does not produce, despite its inclusion in the Plaintiffs' Request for Production No. 27.  Lybbert Motion at 3.

Before turning to the Lybbert Motion's merits, the Court observes that the Plaintiffs want Lybbert, the nurse educator, to testify about the nurses' training, which is relevant to the breach-of-duty element.  The Court agrees with the Plaintiffs that there is a factual issue about whether the nurses received training on hantavirus and how to screen for hantavirus.  The Court's decision to deny the Lybbert Motion, therefore, does not also drive its summary judgment decision, which rests on the absence of expert testimony about causation.

Federal discovery rules do not provide a sound basis for the Lybbert Motion's request, and, accordingly, the Court denies the request.  Rule 37(a)(3) lists "Specific Motions" that a party seeking discovery may bring, including a motion to compel disclosure -- if a party fails to make a disclosure under rule 26 -- and a motion to compel a discovery response -- if a deponent fails to answer a question asked under rule 30 or rule 31, fails to respond to an interrogatory submitted under rule 33, or fails to produce documents requested under rule 34.  See Fed. R. Civ. P. 37(a)(3).  None of these categories support the Plaintiffs' request to re-open Lybbert's deposition.  The Plaintiffs do not allege that Lybbert refused to answer a question at his deposition or to respond to an interrogatory.  As to rule 34 requests for production, moreover, this rule applies only to parties, see Fed. R. Civ. P. 34(a); accordingly, it does not apply to Lybbert.  The bottom line is this: if the Plaintiffs wanted Lybbert to bring specific documents to his deposition, they could have served him with a rule 45 subpoena, which commands the person to whom it is directed to produce "designated documents."  Fed. R. Civ. P. 45(a)(1)(A)(iii).  If the Plaintiffs subpoenaed Lybbert

under this rule and he did not produce the requested documents, the Plaintiffs could have moved for contempt under rule 45(g). Because the Plaintiffs declined to issue a rule 45 subpoena, however, there is no sound reason in law or in fact for the Court to grant the Plaintiffs a second crack at Lybbert.

In the course of requesting a second deposition, the Lybbert Motion alleges that the United States does not comply with the Plaintiffs' Request for Production No. 27; even though this allegation lacks a sound basis in the applicable facts and relevant law, it is a serious allegation that requires explication. See Lybbert Motion at 3. The Plaintiffs' goal in deposing Lybbert is to learn whether Gallup Medical trained the traveling nurses on hantavirus. See Lybbert Motion at 3. To achieve that goal, the Plaintiffs ask Lybbert "if he had been asked to find" certain required training modules "for nurses in 2019"; Lybbert responds that he has not been asked to find the modules, but that he could, with time, obtain them. Lybbert Motion at 3. After describing this exchange, the Lybbert Motion states: "Defendant USA was asked to produce this information in Request for Production No. 27. It was not produced." Lybbert Motion at 3.

The United States' Lybbert Response defangs this allegation and demonstrates that the United States has produced "the training materials regarding hantavirus and training provided to ER nurses." Lybbert Response at 7. As an exhibit to the Lybbert Response, the United States attaches the Defendant United States' Answers and Responses to Plaintiffs' Second Set of Interrogatories and Requests for Production and First Set of Requests for Admission to Defendant United States of America, filed July 8, 2024 (Doc. 268-2)("USA RFP Response"). The USA RFP Response shows that the United States produces the following categories of training-related documents to the Plaintiffs: (i) in response to RFP No. 21, all training documents "pertaining to

the standards, requirements, and training for hantavirus" at Gallup Medical "that nurses and healthcare providers use for training on hantavirus"; (ii) in response to RFP No. 25, "standard orientation programs for any nurses that work in the ER at" Gallup Medical; and (iii) in response to RFP No. 27, all "HealthStream testing scores for" Sales and Go. USA RFP Response at 2-5. Tellingly, at the October 13, 2023, hearing, the Plaintiffs state, "I think that's true," when discussing whether the United States has "answered all questions about what the training is on hantavirus over at GIMC." Oct. 13 Tr. at 70:2-6 (Curtis). The United States notes, moreover, that, at the same hearing, the Court allows the Plaintiffs to submit another request for production about training materials to the United States, but the Plaintiffs "never made this request." Lybbert Response at 7. The Lybbert Reply does not dispute any of the United States' assertions; it instead states: "Once Plaintiffs have narrowed their questions, they will be in a better position to send their last and limited requests for production permitted by the Court." Lybbert Reply at 5.

In sum, the Lybbert Motion's primary request, as well as its secondary allegation, lacks a sound basis in the relevant facts and applicable law. The United States has produced documents about the nurses' training at Gallup Medical. No legal rule obligates the United States to prepare a witness in a certain way for a deposition or to direct a witness to bring a computer with him, when that witness is not subject to a subpoena duces tecum. The Plaintiffs' assertion, moreover, that they require the second deposition to craft the permitted request for production is puzzling. If the Plaintiffs know for what documents they want to ask, they can skip the Lybbert redux and serve the United States with the document request. Their tactical maneuvers do not make sense. The Lybbert Motion stems from a situation of the Plaintiffs' own making, and the Court declines to award them relief from the consequences of their own decisions.

### III.    THE TESTIMONY AND OTHER DOCUMENTS THAT THE RELIEF MOTIONS IDENTIFY DO NOT AFFECT THE SUMMARY JUDGMENT OUTCOME.

After the Court's January 05, 2024, hearing, at which it states that it is inclined to grant the three MSJs, the Plaintiffs file two motions for relief, which correspond to the nurses and staffing agencies' MSJ, and the United States' MSJ, respectively.  See First Relief Motion at 1; Second Relief Motion at 1.  As grounds for relief, the Relief Motions purport to rely on rules 59 or 60(b)(2), see First Relief Motion at 2; Second Relief Motion at 2; these rules, however, are inapposite, because they both address relief from Final Judgments, see Fed. R. Civ. P. 59(e); Fed. R. Civ. P. 60(b).  The Court has not entered a Final Judgment in this case.  Accordingly, the Court construes the Relief Motions as motions for reconsideration of its interlocutory order granting summary judgment to the Defendants.  See Order at 3, filed September 9, 2024 (Doc. 293).[33]

Both Relief Motions purport to bring new evidence to the Court's attention, which, according to the Plaintiffs, creates a factual issue that precludes summary judgment.  The Plaintiffs' purported new evidence is the following: (i) Lybbert's Depo. (the nursing educator); (ii) Dr. Mertz' Depo. (the United States' hantavirus expert); (iii) Morikawa's Depo. (Sales' nursing expert); (iv) Powers' Depo (Go's nursing expert); and (v) the Harkins Aff.  See First Relief Motion at 1.  In this opinion, the Court grants summary judgment to the Defendants because there is no record evidence that the Defendants' alleged breaches of the duty of care cause N. Charley's lost chance of survival.  See supra, at 13.  None of the Relief Motions' new evidence -- apart from the Harkins Aff. -- creates a fact issue about causation, so summary judgment remains warranted.

---

[33]Rule 54(b) provides that "a district court can freely reconsider its prior rulings" and "puts no limit or governing standard" on its "ability to do so."  Kruskal v. Martinez, 429 F. Supp. 3d 1012, 1024 (D.N.M. 2019)(Browning, J.).

First, the Court addresses the First Relief Motion's evidence.  Second, the Court addresses the Second Relief Motion's evidence.  Finally, the Court addresses the Harkins Aff. and explains why the Court will not consider it.

### A.    THE FIRST RELIEF MOTION POINTS TO TESTIMONY THAT DOES NOT AFFECT THE SUMMARY JUDGMENT OUTCOME.

The Court's summary judgment ruling rests on the Plaintiffs' lack of expert causation testimony.  The Court agrees with the Plaintiffs, however, that Go, Sales, and the United States are not entitled to summary judgment on the breach-of-duty element of negligence.  Consequently, only evidence that creates a factual issue about causation has the potential to change the Court's overall summary judgment ruling.  While the First Relief Motion makes many different arguments, its arguments, besides those based on the Harkins Aff., do not pertain to causation.  See First Relief Motion at 7 (pointing to Morikawa's and Powers' testimony and arguing that Morikawa and Powers have insufficient knowledge about hantavirus, which has no bearing on causation); id. at 8 (pointing to Lybbert's and Powers' testimony, and arguing that, if the nurses were trained about hantavirus, they would have breached the standard of care, an argument which has no bearing on causation); id. at 9 (pointing to Morikawa's and Powers' testimony, and arguing that Gallup Medical should have trained the nurses about hantavirus, which has no bearing on causation); id. at 10-11 (pointing to Morikawa's testimony and arguing that she was not prepared to opine on the nurses' standard of care, which has no bearing on causation); id. at 12 (pointing to Powers' testimony and arguing that he is unaware of the training the nurses receive about hantavirus, which has no bearing on causation); id. at 13 (pointing to Morikawa's and Powers' testimony and arguing that the nurses were probably trained on hantavirus, which has no bearing on causation); id. at 13-14 (discussing Morikawa's testimony without making a cogent argument); id. at 14 (pointing to

Morikawa's testimony and arguing that Sales did not document N. Charley's "chief complaint of exposure to mouse droppings," which has no bearing on causation). Because none of these arguments relate to causation, and the Court agrees that there is a factual issue precluding summary judgment on breach of duty, the First Relief Motion does not put forward evidence that affects the award of summary judgment to the Defendants because of the Plaintiffs' lack of causation testimony.

### B.    THE SECOND RELIEF MOTION POINTS TO TESTIMONY THAT DOES NOT AFFECT THE SUMMARY JUDGMENT OUTCOME.

Similar to the First Relief Motion, the Second Relief Motion makes many arguments, none of which create a factual dispute about causation. See Second Relief Motion at 10 (arguing that, because hantavirus is endemic to the county in which Gallup Medical is located, the Defendants should have considered hantavirus as a potential diagnosis, which addresses the standard of care and has no bearing on causation); id. at 15 (discussing Mertz' testimony that he is not familiar with what training the Gallup Medical healthcare providers receive and arguing that the Defendants breached their "duty by not conducting a CBC to diagnose hantavirus," which addresses the standard of care, and does not address causation); id. at 16 (discussing Lybbert's testimony about disseminating a video on hantavirus to Gallup Medical doctors and nurses, which is relevant to the standard of care but not relevant to causation); id. at 16 (discussing Lybbert's testimony -- that a document about hantavirus is available to Gallup Medical employees on the Gallup Medical internal website -- without making any argument based on this testimony). Furthermore, according to the Second Relief Motion, Dr. Mertz provides a causation opinion that creates a fact issue, but this argument also lacks support in the record. See Second Relief Motion at 17. The Plaintiffs discuss several parts of Dr. Mertz' deposition. See Second Relief Motion at 8-15. First, they

contrast Dr. Mertz' assertion that hantavirus cannot be diagnosed until the cardiopulmonary phase with his statement that, during the asymptomatic incubation period after the initial infection, hantavirus can be detected in white blood cells.    See Second Relief Motion at 8.   Second, they discuss Dr. Mertz' assertion that a patient with symptoms similar to N. Charley's symptoms with an abnormal chest X-ray who reported exposure to mouse droppings would be referred to UNM for hantavirus treatment.   See Second Relief Motion at 9.   Third, they note Dr. Mertz' statement that patients with early-stage cardiopulmonary hantavirus have sixty-five to seventy-five percent chance of survival if they are treated at a care center with an Extracorporeal Membrane Oxygenation ("ECMO") machine.[34]   Fourth, they discuss one of Dr. Mertz' articles, which contends that a "decreased platelet count[35] during the prodromal phase" is a "measurable sign of hantavirus."   Second Relief Motion at 9.   Finally, they contend that Dr. Mertz testifies that Gallup Medical had the capability to conduct a CBC "that could diagnose hantavirus in the prodromal phase."   Second Relief Motion at 9.

Nowhere do the Plaintiffs identify, however, an instance in which Dr. Mertz opines that the Defendants' actions cause N. Charley to lose a chance of survival.  In his deposition, Dr. Mertz says the opposite:  The United States asks Dr. Mertz if any of the Gallup Medical healthcare

---

[34]An ECMO machine pumps blood "outside of the body to a heart-lung machine. The machine removes carbon dioxide and sends oxygen-rich blood back to the body.  Blood flows from the right side of the heart to the heart-lung machine.  It's then rewarmed and sent back to the body."    Extracorporeal    Membrane    Oxygenation    (ECMO),    The    Mayo    Clinic, https://www.mayoclinic.org/tests-procedures/ecmo/about/pac-20484615 (last visited June 4, 2025).

[35]"Platelets are the cells that circulate within our blood and bind together when they recognize damaged blood vessels . . . ."  What Are Platelets and Why Are They Important?, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/what-are-platelets-and-why-are-they-important (last visited June 4, 2025).

providers' actions "during Ms. Charley's first visit . . . led to a lost chance of survival," and Dr.

Mertz answers, "No." Mertz Depo. at 275:2-7. Similarly, the United States asks Dr. Mertz if any

of the Gallup Medical healthcare providers' omissions -- inaction -- "during Ms. Charley's first

visit . . . led to a lost chance of survival," and Dr. Mertz responds, "No." Mertz Depo. at 275:8-

12.

As this review of Dr. Mertz' testimony shows, Dr. Mertz does not provide a causation

opinion. To the contrary, he denies that anyone's acts or omissions at Gallup Medical cause

N. Charley's death. Dr. Mertz' testimony is the only record evidence about causation, or the lack

thereof. There is no other expert testimony with which his testimony conflicts. As a result, the

Second Relief Motion does not change the Court's conclusion that the United States is entitled to

summary judgment on the causation element.

### C. THE COURT DOES NOT CONSIDER THE HARKINS AFF., BECAUSE THE DEADLINE TO DISCLOSE EXPERTS HAS PASSED.

The Second Relief Motion contends that the Court should not enter summary judgment for

the Defendants because the Harkins Aff. creates a factual issue about causation. See Second Relief

Motion at 17. The Harkins Aff., however, is untimely, and the Court does not consider its contents

in the Court's summary judgment analysis. The deadline to disclose experts, July 21, 2023, has

passed. The Plaintiffs have known about Dr. Harkins and her hantavirus expertise since this case's

beginning. During the October 13, 2023, hearing, the Plaintiffs ask the Court to grant them

permission to depose Dr. Harkins, whom they describe as "the critical care doctor that was

involved in the care. She's a UNMH doc. And so Dr. Harkins is just a direct treater and somebody

that is particularly familiar with hantavirus." October 13 Tr. at 93:21-25 (Curtis). At the

November 14, 2023, hearing, the Plaintiffs explain:

> Your Honor, the one thing that I would add is that if, in fact, we're incapable of having Dr. Polsky appear, we do have a local expert at UNM, that's written extensively on Hantavirus. And they're involved in treating our client. But the concern has been not to call that person as an expert so it doesn't hurt the referral relationship between GIMC and UNMH. So we have an expert in the area. But I have not wanted to compromise that arrangement, because it's more important that GIMC does not hesitate to call UNMH when they have a Hantavirus patient.

November 14 Tr. at 28:14-25 (Curtis).

The takeaway from the Plaintiffs' statements is that the Plaintiffs initially decide to hire Dr. Polsky instead of Dr. Harkins, even though Dr. Harkins lives in New Mexico, treated N. Charley, and researches hantavirus. See November 14 Tr. at 28:14-25 (Curtis). Then, once the Court excludes Dr. Polsky, and the Court holds summary judgment hearings, the Plaintiffs wait seven months to obtain an affidavit from Dr. Harkins, on May 15, 2024. The Court will not accommodate the Plaintiffs' delay by modifying the expert-disclosure deadline when the Plaintiffs and their expert delay the case. The Court already has explained why Dr. Polsky's offer of a January, 2024, deposition date prejudiced the Defendants and burdened the Court's docket. See supra, at 106. If a three-month delay is too long of a delay, then a seven-month delay is also too long of a delay. Had the Plaintiffs obtained an affidavit from Dr. Harkins in November, 2023, the Court might have evaluated the situation differently, especially if the United States agreed to depose Dr. Harkins in Albuquerque that month. Instead, the Plaintiffs waited to obtain the Harkins Aff. until after the summary judgment motions were briefed and argued. Either the Plaintiffs took many months to decide how to proceed, or Dr. Harkins was not immediately amenable to working with them. Neither possibility persuades the Court that it should overlook the Plaintiffs' delay. Accordingly, the Court does not consider the Harkins Aff. and concludes that entering summary

judgment for the Defendants remains warranted.

**IS ORDERED** that: (i) Defendant United States' Motion to Exclude the Testimony of Bruce W. Polsky For Failure to Appear at his Court-Ordered Deposition, filed November 7, 2023 (Doc. 221), is granted; (ii) Plaintiffs' Motion for Reconsideration of the Court's Order Granting Defendant United States' Motion to Exclude Dr. Polsky as an Expert (Doc. 221), filed November 30, 2023 (Doc. 228), is denied; (iii) Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion for Summary Judgment, filed December 8, 2023 (Doc. 233), is granted; (iv) Defendants Robin Ranell Sales, R.N. and Next Medical Staffing's Motion for Summary Judgment, filed December 8, 2023 (Doc. 234), is granted; (v) the United States' Motion for Summary Judgment for Lack of Causation on Plaintiffs' Loss of Chance Claim, filed December 8, 2023 (Doc. 235), is granted; (vi) Plaintiffs' Amended Motion for Leave to Re-Depose Larry Lybbert Nurse Educator, filed June 24, 2024 (Doc. 267), is denied; (vii) Plaintiffs' Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant Nurse Sales' and Nurse Go's Motion for Summary Judgment [Doc. 233] and [Doc. 234], filed July 18, 2024 (Doc. 272), is denied; (viii) Defendants Joelle Catherin Cero Go, RN and AB Staffing Solutions, LLC's Motion to Strike Michelle Harkins, M.D.'s Affidavit, filed August 12, 2024 (Doc. 282), is denied, but the Court will not consider the Harkins Aff. in determining whether there is a genuine issue of material fact; (ix) Plaintiffs' Amended Motion for Relief Based on Newly Discovered Evidence Regarding the Court's Ruling on Defendant United States' Motion for Summary Judgment [Doc. 235], filed October 10, 2024, (Doc. 296), is denied; and (x) the Court will enter a separate Final Judgment disposing of this civil case.

_____
UNITED STATES DISTRICT JUDGE

- 129 -

*Counsel:*

Lisa K. Curtis
Melanie L. Ben
Curtis & Co. Law Firm
Albuquerque, New Mexico

> *Attorneys for the Plaintiffs*

Ryan Ellison
   United States Attorney
Roberto D. Ortega
Brett C. Eaton
Samantha E. Kelly
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

> *Attorneys for Defendant United States of America*

John Checkett
James Glen Bennett
The Checkett Law Firm
Phoenix, Arizona

> *Attorneys for Defendants Robin Ranell Sales and Next Medical Staffing*

Brenda M. Saiz
Denise Michelle Chanez
Saiz, Chanez, Sherrell & Kaemper, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants Joelle Catherin Cero Go and AB Staffing Solutions, LLC*